**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

THE DONALD J. TRUMP REVOCABLE      Case No. 1:25-cv-21596-RKA
TRUST, *et. al.*,

     Plaintiffs,

vs.

CAPITAL ONE, N.A., a Virginia
Corporation,

     Defendant.

_____/

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs THE DONALD J. TRUMP REVOCABLE TRUST, ERIC TRUMP, DJT HOLDINGS MANAGING MEMBER, LLC, DJT HOLDINGS, LLC, ERIC TRUMP WINE MANUFACTURING, LLC, LAMINGTON FAMILY HOLDINGS, LLC, MOBILE PAYROLL CONSTRUCTION, LLC, PINE HILL DEVELOPMENT, LLC, T INTERNATIONAL REALTY, LLC, TNGC CHARLOTTE, LLC, TRUMP ICE, LLC, and DTTM OPERATIONS, LLC (collectively, "Plaintiffs") by and through undersigned counsel, sue Defendant CAPITAL ONE, N.A. In support, Plaintiffs allege as follows:

### NATURE OF THE ACTION

"To be known as one of the most successful and trusted financial services companies in the world, we must continue to conduct ourselves – both as an organization and as individuals – according to the highest standards of ***honesty and fairness***. Our core Values and Excellence and Do the Right Thing embody our commitment to ethical business practices and inspire our culture and the decisions we make each day. Our commitment to living our Values and living up to exacting standards for integrity and professionalism is essential to building an enduring great

company. All of our stakeholders – our customers, communities, regulators and shareholders – expect nothing less." These principles were proclaimed by Capital One's founder, Chairman, and Chief Executive Officer Richard D. Fairbank in 2020. And yet, Capital One's unlawful, deceptive, and reckless conduct that gives rise to this action is the antithesis of what it claims to be the foundation of its business practices.

For decades, Plaintiffs have been customers of Capital One. During that timeframe, Plaintiffs and their affiliated entities have transacted tens of millions of dollars through Capital One. Over those years, President Donald J. Trump has maintained a highly public persona while Capital One and Plaintiffs—all of which contain President Trump's name or are otherwise affiliated with him—have maintained a mutually beneficial relationship. However, on March 8, 2021, Capital One forever altered the dynamic of the parties' relationship.

That day, without warning or provocation, Capital One notified Plaintiffs that hundreds of bank accounts that they controlled, were beneficiaries of, and actively used to transact ("Plaintiffs' Accounts") would be closed on June 7, 2021. Capital One did not provide Plaintiffs any recourse, remedy, or alternative—its decision was final. Collectively, Plaintiffs' Accounts held millions of dollars belonging to them and their affiliated entities. Because Capital One did not provide Plaintiffs and their affiliated entities with any advance notice and unilaterally terminated Plaintiffs' Accounts, Plaintiffs suffered considerable financial harm and losses caused not only by the interruption to their access to Capital One's banking services, but also by the devastating impact on Plaintiffs' ability to transact and access their monies.

Plaintiffs have reason to believe that Capital One's unilateral decision came about as a result of political and social motivations and Capital One's unsubstantiated, "woke" beliefs that it needed to distance itself from President Trump and his conservative political views. In essence,

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

Capital One "debanked" Plaintiffs' Accounts because Capital One believed that the political tide at the moment favored doing so. In addition to the considerable financial and reputational harm that Plaintiffs and their affiliated entities suffered, Capital One's reckless decision is part of a growing trend by financial institutions in the United States of America to cut off a consumer's access to banking services if their political views contradict with those of the financial institution. Capital One's conduct is but one example of a systemic, subversive industry practice that aims to coerce the public to shift and re-align their political views. Plaintiffs file this action to redress the harm they and their affiliated entities have suffered and shed light on a matter of great public interest and importance.

## PARTIES

1.      Plaintiff THE DONALD J. TRUMP REVOCABLE TRUST is a revocable trust created in Palm Beach County, Florida.

2.      Plaintiff ERIC TRUMP is *sui juris* and is a resident of Palm Beach County, Florida.

3.      Plaintiff DJT HOLDINGS MANAGING MEMBER, LLC is a Delaware limited liability company with its principal place of business in Palm Beach County, Florida. Its sole member is The Donald J. Trump Revocable Trust.

4.      Plaintiff DJT HOLDINGS, LLC is a Delaware limited liability company with its principal place of business in Palm Beach County, Florida. DJT Holdings, LLC's members are Trust and DJT Holdings Managing Member, LLC.

5.      Plaintiff ERIC TRUMP WINE MANUFACTURING, LLC is a Delaware limited liability company with its principal place of business in Charlottesville, Virginia. Eric Trump Wine Manufacturing, LLC's members are Eric Trump and Eric Trump Wine Manufacturing Member Corp., whose sole shareholder is Eric Trump.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

6.      Plaintiff LAMINGTON FAMILY HOLDINGS, LLC is a Delaware limited liability company with its principal place of business in Bedminster, New Jersey. Its sole member is DJT Holdings, LLC.

7.      Plaintiff MOBILE PAYROLL CONSTRUCTION, LLC is a Delaware limited liability company with its principal place of business in Bedminster, New Jersey. Mobile Payroll Construction, LLC's members are DJT Holdings, LLC and Mobile Payroll Construction Manager Corp., whose sole shareholder is DJT Holdings Managing Member, LLC.

8.      Plaintiff PINE HILL DEVELOPMENT, LLC is a Delaware limited liability company with its principal place of business in Pine Hill, New Jersey. Pine Hill Development, LLC's members include DJT Holdings, LLC and Pine Hill Development Managing Member Corp., whose sole shareholder is DJT Holdings Managing Member, LLC.

9.      Plaintiff T INTERNATIONAL REALTY, LLC is a Delaware limited liability company with its principal place of business in Jupiter, Florida. T International Realty, LLC's members are The Donald J. Trump Revocable Trust, The Ivanka Trump Revocable Trust, The Donald J. Trump, Jr. Revocable Trust, and The Eric F. Trump Revocable Trust—all of which were created in Palm Beach County, Florida.

10.     Plaintiff TNGC CHARLOTTE, LLC is a Delaware limited liability company with its principal place of business in Mooresville, North Carolina. TNGC Charlotte, LLC's members are DJT Holdings, LLC and TNGC Charlotte Manager Corp., whose sole shareholder is DJT Holdings Managing Member, LLC.

11.     Plaintiff TRUMP ICE, LLC is a New York limited liability company with its principal place of business in New York, New York. Trump Ice, LLC's sole member is DJT Holdings, LLC.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

12. Plaintiff DTTM OPERATIONS, LLC is a Delaware limited liability company with its principal place of business in Palm Beach County, Florida. DTTM Operations, LLC's members are DJT Holdings, LLC and DTTM Operations Managing Member Corp., whose sole shareholder is DJT Holdings Managing Member, LLC.

13. Defendant CAPITAL ONE, N.A. is Virginia corporation with its principal place of business in Virginia and authorized to do business in the State of Florida.

## JURISDICTION AND VENUE

14. This Court possesses subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest, costs, and attorneys' fees.

15. The Court possesses personal jurisdiction over Capital One pursuant to Florida Statute §§ 48.193(1)(a)(1), (1)(a)(2), and (1)(a)(6).

16. Florida Statute § 48.193(1)(a)(1) confers personal jurisdiction over Capital One because, during the operative period alleged in the Complaint, Capital One operated, conducted, engaged in, or carried on a business or business venture, and maintained offices in, Florida.

17. Florida Statute § 48.193(1)(a)(2) confers personal jurisdiction over Capital One because, during the operative period alleged in the Complaint, Capital One committed tortious conduct against Plaintiffs that caused them and their affiliated entities to suffer significant financial harm.

18. Florida Statute § 48.193(1)(a)(6) confers personal jurisdiction over Capital One because, during the operative period alleged in the Complaint, Capital One injured Plaintiffs and their affiliated entities while it was engaged in the sale of banking services in Florida.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

19.   Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(3) because Defendant maintains an office for transaction and its customary business in this District, Defendant has several agents and representatives acting on its behalf in this District, and Defendant is subject to this Court's personal jurisdiction.

20.   Plaintiffs have retained Brito, PLLC to prosecute this action and have agreed to pay it a reasonable attorney's fee.

21.   All conditions precedent to this action have been performed, excused, or waived.

## FACTUAL BACKGROUND

**A.  Plaintiffs' longstanding, mutually beneficial relationship with Capital One**.

22.   For the past several decades, Plaintiffs and their affiliated entities have held hundreds of bank accounts with Capital One.

23.   Plaintiffs' businesses, and the title on Plaintiffs' Accounts maintained with Capital One, either used President Donald J. Trump's name or were affiliated with him.

24.   Plaintiffs have operated many businesses across various industries including, but not limited to, real estate, hospitality, entertainment, tourism, media, and sports.

25.   Throughout their mutually beneficial banking relationship, Plaintiffs have deposited, transacted, and leveraged hundreds of millions of dollars with Capital One to grow and scale these businesses.

26.   In exchange, Capital One has profited from Plaintiffs' substantial deposits, impeccable creditworthiness, and the prestige associated with having a business relationship with President Trump.

**B.  The beginning of debanking in America**.

27.     In 2009, President Barack Obama launched the Financial Fraud Enforcement Task Force ("Task Force").[1]

28.     Initially, the Task Force's mission was to assist the Department of Justice with the "investigation and prosecution of cases of bank, mortgage, loan, and lending fraud; securities and commodities fraud; retirement plan fraud; mail and wire fraud; tax crimes; money laundering; False Claims Act violations; unfair competition; discrimination; and other financial crimes and violations[.]"[2]

29.     Four years later, the Task Force's scope was expanded to "protect the American public from the often-devastating effects of financial fraud, whether it be mortgage fraud or investment fraud, grant or procurement fraud, consumer fraud or fraud in lending."[3]

30.     A central principle guided the Task Force:

 If we can eliminate the mass-marketing fraudsters' access to the U.S. financial system -- that is, if we can stop the scammers from accessing consumers' bank accounts -- then we can protect the consumers and starve the scammers. This will significantly reduce the frequency of and harm caused by this type of fraud. We hope to close the access to the banking system that mass marketing fraudsters enjoy -- effectively putting a chokehold on it -- and put a stop to this billion dollar problem that has harmed so many American consumers, including many of our senior citizens.[4]

---

[1]     Executive Order 13519 - Establishment of the Financial Fraud Enforcement Task Force, OBAMA WHITE HOUSE ARCHIVES (November 17, 2009) (https://obamawhitehouse.archives.gov/the-press-office/executive-order-financial-fraud-enforcement-task-force).

[2]     *Id*.

[3]     Financial Fraud Enforcement Task Force Executive Director Michael J. Bresnick at the Exchequer Club of Washington, D.C., UNITED STATES DEPARTMENT OF JUSTICE ARCHIVES, (March 20, 2013) (https://www.justice.gov/archives/opa/speech/financial-fraud-enforcement-task-force-executive-director-michael-j-bresnick-exchequer).

[4]     *Id*.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

31.     Thus, the Task Force's efforts became unofficially known and publicly referred to as "Operation Choke Point."

32.     Although the Task Force's mission was to curb and eliminate sweeping examples of financial fraud, the Task Force had an ulterior motive.

33.     "Officials at both the Comptroller of the Currency (OCC) and the Federal Deposit Insurance Corporation (FDIC) threatened banks with regulatory pressure if they did not bend to their will. Gun and ammunition dealers, payday lenders and other businesses operating legally suddenly found banks terminating their accounts with little explanation aside from 'regulatory pressure.' "[5]

34.     "In this unprecedented initiative, unelected bureaucrats at the Department of Justice, the FDIC and other agencies set out to kill legal businesses by starving them of access to financial institutions."[6]

35.     Indeed, many lawful businesses, most of which did not present any significant legal, financial, or reputation risk, had their banking relationships terminated without warning or recourse.

36.     Operation Choke Point was not a siloed operation led by rogue employees. Instead, many high-ranking FDIC officials led the government's efforts.

---

[5]     Operation Choke Point reveals true injustices of Obama's Justice Department, THE HILL (November 7, 2018) (https://thehill.com/blogs/congress-blog/politics/415478-operation-choke-point-reveals-true-injustices-of-obamas-justice/).

[6]     Evidence is now clear: Operation Choke Point hurt lawful businesses, AMERICAN BANKER (November 25, 2018) (https://www.americanbanker.com/opinion/evidence-is-now-clear-operation-choke-point-hurt-lawful-businesses)

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

37.     For example, former FDIC Regional Director Anthony Lowe instructed his staff to use all "available means, including verbal recommendations, to strongly encourage [supervised banks] to refrain from any activities that provide assistance to the business activities of [payday] lenders[.]"

38.     Operation Choke Point persisted for years under the Obama administration, and it led to countless legal businesses losing access to banking services.

39.     "Former Federal Deposit Insurance Corp. Chairman William Isaac went as far as to call it 'one of the most dangerous programs I have experienced in my 45 years of service as a bank regulator, bank attorney and consultant, and bank board member.' "[7]

40.     As a result, in 2017, President Trump's first administration ended Operation Choke Point because "law abiding businesses should not be targeted simply for operating in an industry that a particular administration might disfavor."[8]

41.     Days before President Trump's first term ended, the Office of the Comptroller of the Currency promulgated a final rule to ensure that consumers and businesses, independent of their political viewpoints, would have "fair access to banking services provided by large national banks, federal savings associations, and federal branches and agencies of foreign bank organizations."[9]

---

[7]     *Id*.

[8]     Correspondence from Office of Assistant Attorney General to Hon. Bob Goodlatte, UNITED STATES DEPARTMENT OF JUSTICE, (August 16, 2017) (https://www.consumerfinancemonitor.com/wp-content/uploads/sites/14/2017/08/2017-8-16-Operation-Chokepoint-Goodlatte.pdf)

[9]     OCC Finalizes Rule Requiring Large Banks to Provide Fair Access to Bank Services, Capital, and Credit, OFFICE OF THE COMPTROLLER OF THE CURRENCY, (January 14, 2021) (https://www.occ.gov/news-issuances/news-releases/2021/nr-occ-2021-8.html).

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

42.     Then, in 2021, President Joe Biden took office.

43.     Not long after, the unlawful practices similar to Operation Choke Point began to resurface.

44.     This time, however, it was not the government that took the lead in foreclosing banking services to legal businesses.

45.     Instead, there were several national financial institutions themselves, including Capital One, that were debanking countless private businesses.

### C.  Capital One debanks Plaintiffs.

46.     On March 8, 2021, Plaintiffs received correspondence from Capital One communicating that hundreds of their bank accounts were being closed and their account relationships with Capital One would be terminated by June 7, 2021 ("Termination Letter").

47.     Although Capital One extended the closure of several of Plaintiffs Accounts, Plaintiffs were left to scramble to advise their business partners, customers, vendors, and creditors that Capital One had terminated their banking relationships and hindered Plaintiffs' ability to use its funds therein to transact.

48.     Capital One's unilateral, unprovoked, and sudden decision caused the businesses operated by Plaintiffs and their affiliated entities to suffer considerable financial harm.

49.     In addition to that financial harm, Plaintiffs and their affiliated entities and members suffered considerable reputational harm due to the severance of their relationship with Capital One.

50.     Notably, before receiving the Termination Letter, Plaintiffs' Accounts were in good standing.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

51.     During the entirety of Plaintiffs' banking relationship with Capital One, Plaintiffs never received any document, warning, or other notice indicating that Plaintiffs' Accounts were delinquent, flagged for suspicious activity, engaged in fraud, or other activity that would warrant sudden and abrupt termination.

52.     Indeed, when Plaintiffs' Accounts were terminated, Plaintiffs were actively engaged in business in several states, including North Carolina and New Jersey.

53.     However, upon conclusion of Plaintiffs' due diligence, they learned that Capital One terminated Plaintiffs' Accounts as a result of political discrimination against President Trump, the Trump Organization, and the Trump family.

**D. Plaintiffs' activity in North Carolina**.

  **i. TNGC Charlotte, LLC**.

54.     Plaintiff TNGC Charlotte, LLC owns and operates Trump National Golf Club, Charlotte ("Trump Charlotte"), which is in Charlotte, North Carolina.

55.     TNGC Charlotte, LLC's operations are exclusive to North Carolina.

56.     Trump Charlotte is an esteemed country club that offers its members access to an eighteen-hole golf course, world-class cuisine, fitness and tennis facilities, and other sought-after amenities.

57.     Among Plaintiffs' Accounts was the bank account used to operate Trump Charlotte's business and finances.

58.     When it received the Termination Letter,  TNGC Charlotte, LLC was forced to scramble to advise its business partners, clients, vendors, and creditors that Capital One had terminated its banking relationship and hindered its ability to use its funds therein to transact.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

59.     When Plaintiffs' Accounts were terminated, TNGC Charlotte, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, TNGC Charlotte, LLC suffered considerable financial harm and reputational harm.

60.     Capital One's decision to debank TNGC Charlotte, LLC and terminate its bank account had a direct effect on North Carolina commerce because it had a direct impact on Trump Charlotte's business operations and therefore, caused TNGC Charlotte, LLC to suffer an injury in North Carolina.

### ii.     T International Realty, LLC.

61.     Plaintiff T International Realty, LLC owns and operates Trump International Realty.

62.     Trump International Realty is a luxury real estate firm that has listed and sold multiple seven and eight-figure parcels of real estate in North Carolina.

63.     Although Trump International Realty operates its business in New York and Las Vegas as well, it has a substantial presence and track record in North Carolina.

64.     Indeed, when the Termination Letter was received, Trump International Realty had under contract multiple properties in Saluda, North Carolina, Mooresville, North Carolina, and Huntersville, North Carolina.

65.     Collectively, these properties were listed for at least $22,608,000.00.

66.     Any commission earned by Trump International Realty for the sale of these properties would have been deposited in its bank account, which was among Plaintiffs' Accounts.

67.     When it received the Termination Letter,  T International Realty, LLC was forced to scramble to advise its business partners, clients, vendors, and creditors that Capital One had terminated its banking relationship and hindered its ability to use its funds therein to transact.

68.     When Plaintiffs' Accounts were terminated, T International Realty, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, T International Realty, LLC suffered considerable financial harm and reputational harm.

69.     Capital One's decision to debank T International Realty, LLC and terminate its bank account had a direct effect on North Carolina commerce because it had a direct impact on Trump Charlotte's business operations and therefore, caused T International Realty, LLC to suffer an injury in North Carolina.

### iii.     DTTM Operations, LLC.

70.     Plaintiff DTTM Operations, LLC is the holder of certain trademarks used on countless products associated with President Trump and the Trump Organization.

71.     Those registered marks appear on several products that DTTM Operations, LLC sells at Trump Charlotte's golf club.

72.     In 2021, several products bearing the registered marks owned by DTTM Operations, LLC were actively being sold in North Carolina at Trump Charlotte.

73.     Since then and to date, several products bearing the registered marks owned by DTTM Operations, LLC continue to be sold in North Carolina at Trump Charlotte.

74.     When it received the Termination Letter, DTTM Operations, LLC's ability to use its funds in and transact with its Accounts with Capital One was hindered.

75.     When Plaintiffs' Accounts were terminated, DTTM Operations, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, DTTM Operations, LLC suffered considerable financial harm and reputational harm.

76.     Capital One's decision to debank DTTM Operations, LLC and terminate its bank account had a direct effect on North Carolina commerce because it had a direct impact on the sale

13
**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

of several products bearing the registered marks owned by DTTM Operations, LLC, caused DTTM Operations, LLC to suffer an injury in North Carolina.

**E. Plaintiffs' activity in New Jersey**.

      **i.    Mobile Payroll Construction, LLC**.

77.    Plaintiff Mobile Payroll Construction, LLC is a payroll and construction management company.

78.    For various real estate projects affiliated with the Trump Organization in New York and New Jersey, Mobile Payroll Construction, LLC processes and funds payroll for various construction management crew and covers operating expenses for those real estate development projects as well.

79.    Among Plaintiffs' Accounts was the bank account used to operate Mobile Payroll Construction, LLC's business and finances.

80.    When it received the Termination Letter, Mobile Payroll Construction, LLC was forced to scramble to advise its business partners, clients, vendors, and creditors that Capital One had terminated its banking relationship and hindered its ability to use its funds therein to transact.

81.    When Plaintiffs' Accounts were terminated, Mobile Payroll Construction, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, Mobile Payroll Construction, LLC suffered considerable financial harm and reputational harm.

82.    Capital One's decision to debank Mobile Payroll Construction, LLC and terminate its bank account had a direct effect on New Jersey commerce because it had a direct impact on its ability to fund payroll to multiple people servicing multiple real estate projects in New Jersey and therefore, caused Mobile Payroll Construction, LLC to suffer an injury in New Jersey.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

ii.     **Eric Trump Wine Manufacturing, LLC**.

83.     Plaintiff Eric Trump Wine Manufacturing, LLC owns and operates a winery in Charlottesville, Virginia ("Trump Winery").

84.     Trump Winery produces different vintages and blends of red wine, white wine, and rosé for sale and distribution throughout the United States, including New Jersey.

85.     In 2021, Trump Winery sold and distributed its wine throughout New Jersey.

86.     Since then, and to date, Trump Winery sells and distributes its wine throughout New Jersey.

87.     When it received the Termination Letter, Eric Trump Wine Manufacturing, LLC was forced to scramble to advise its business partners, clients, vendors, and creditors that Capital One had terminated its banking relationship and hindered its ability to use its funds therein to transact.

88.     When Plaintiffs' Accounts were terminated, Eric Trump Wine Manufacturing, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, Eric Trump Wine Manufacturing, LLC suffered considerable financial harm and reputational harm.

89.     Capital One's decision to debank Eric Trump Wine Manufacturing, LLC and terminate its bank account had a direct effect on New Jersey commerce because it had a direct impact on Trump Winery's business operations and therefore, caused Eric Trump Wine Manufacturing, LLC to suffer an injury in New Jersey.

iii.    **DTTM Operations, LLC**.

90.     Plaintiff DTTM Operations, LLC is the holder of certain trademarks used on countless products associated with President Trump and the Trump Organization.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

91.     Those registered marks appear on several products that DTTM Operations, LLC sells at Trump Bedminster's golf club.

92.     In 2021, several products bearing the registered marks owned by DTTM Operations, LLC were actively being sold in New Jersey at Trump Bedminster.

93.     Since then and to date, several products bearing the registered marks owned by DTTM Operations, LLC continue to be sold in New Jersey at Trump Bedminster.

94.     When it received the Termination Letter, DTTM Operations, LLC's ability to use its funds in and transact with its Accounts with Capital One was hindered.

95.     When Plaintiffs' Accounts were terminated, DTTM Operations, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, DTTM Operations, LLC suffered considerable financial harm and reputational harm.

96.     Capital One's decision to debank DTTM Operations, LLC and terminate its bank account had a direct effect on New Jersey commerce because it had a direct impact on the sale of several products bearing the registered marks owned by DTTM Operations, LLC, caused DTTM Operations, LLC to suffer an injury in New Jersey.

**F.  Other Plaintiffs were also debanked**.

97.     Plaintiffs Eric Trump, The Donald J. Trump Revocable Trust, Pine Hill Development, LLC, Lamington Family Holdings, LLC, DJT Holdings, LLC, DJT Holdings Managing Member, LLC, and Trump Ice, LLC were also debanked via the termination of their Accounts.

98.     Capital One's Rules Governing Deposit Accounts purport to allow Capital One to terminate or decline an account relationship with any consumer for any purpose. However, they

do not allow termination for an illegal purpose. A true and correct copy of the Rules Governing Deposit Accounts is **Exhibit A**.

99. Capital One terminated Plaintiffs' Accounts as a result of political discrimination against President Trump, the Trump Organization, and his family.

100. Neither the letter nor the spirit of Capital One's Rules Governing Deposit Accounts stipulate that Capital One may terminate an existing client relationship based on political discrimination.

101. Consequently, Capital One's debanking of Plaintiffs' Accounts was unlawful.

**D. The growing trend of debanking in America today**.

102. Capital One's decision is wrongful, and it is representative of a systemic and widespread practice that is employed by many financial institutions in the United States of America today.

103. The banking industry's practices are so rampant that at least sixteen Attorneys General have pleaded that Bank of America take note of its history of debanking consumers and legal businesses for their political views and reform its banking practices.[10]

---

[10] 15 AGs put BofA on notice for 'de-banking' conservatives, BANKING DIVE (April 18, 2024) (https://www.bankingdive.com/news/15-attorneys-general-put-bofa-notice-debanking-conservatives-christians/713618/); *see also* Correspondence from Attorney General Kris W. Kobach to Brian T. Moynihan, STATE OF KANSAS OFFICE OF THE ATTORNEY GENERAL (April 15, 2024) (https://adfmedialegalfiles.blob.core.windows.net/files/2024-04-16BankOfAmericaLetter.pdf); *see also* Attorney General Miyares Demands Bank of America Cease Practice of Debanking Conservatives, OFFICE OF THE ATTORNEY GENERAL COMMONWEALTH OF VIRGINIA (April 16, 2024) (https://www.oag.state.va.us/media-center/news-releases/2718-april-16-2024-attorney-general-miyares-demands-bank-of-america-cease-practice-of-debanking-conservatives).

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

104.    Congress has also been advised that debanking is a glaring issue that must be addressed.[11]

105.    Given the timeliness of this kitchen-table issue, other politicians, including United States Senator Elizabeth Warren (D-MA), have taken notice that debanking is a problem impacting consumers and businesses in the United States of America.[12]

106.    In addition, United States Senator Kevin Cramer (R-ND) has reintroduced the Fair Access to Banking Act, which seeks to protect "fair access to financial services and ensures banks operate in a safe and sound manner" and eliminate debanking.[13]

107.    In response, Bank of America and JP Morgan Chase CEOs have not only denied that their companies engage in debanking,[14] but they are lobbying to shape the narrative and favorably regulate debanking practices going forward.[15]

---

[11]    De-Banking/De-Risking: Issues for the 119th Congress, CONGRESSIONAL RESEARCH SERVICE (January 29, 2025) (https://crsreports.congress.gov/product/pdf/IF/IF12886).

[12]    Warren says Trump was 'on to a real problem' when he blasted BofA for debanking customers, YAHOO FINANCE (February 5, 2025) (https://finance.yahoo.com/news/warren-says-trump-was-on-to-a-real-problem-when-he-blasted-bofa-for-debanking-customers-162323188.html).

[13]    Cramer Reintroduces Fair Access to Banking Act to Protect Legal Industries from Debanking, KEVIN CRAMER U.S. SENATOR FOR NORTH DAKOTA (February 5, 2025) (https://www.cramer.senate.gov/news/press-releases/cramer-reintroduces-fair-access-to-banking-act-to-protect-legal-industries-from-debanking#:~:text=The%20Fair%20Access%20to%20Banking,against%20legal%20industries%20and%20individuals.%E2%80%9D).

[14] *Id*.

[15] BofA, JPMorgan to lobby White House, Congress after conservative criticism, REUTERS (January 24, 2025) (https://www.reuters.com/business/finance/bofa-plans-engage-with-white-house-congress-debanking-spokesperson-2025-01-24/).

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

108.    Plainly, debanking is a matter of public interest and significant importance to all consumers and businesses in the United States of America.

109.    It bears noting that Florida has prohibited financial institutions from terminating their banking relationship with an individual or a business based on their political opinions, speech, or affiliations. *Compare* Fla. Stat. § 655.0323(2)(a) ("It is an unsafe and unsound practice for a financial institution to deny or cancel its services to a person, or to otherwise discriminate against a person in making available such services or in the terms or conditions of such services, on the basis of: (a) The person's political opinions, speech, or affiliations[.]"); *with* Fla. Stat. § 655.0323(5) ("Notwithstanding ss. 501.211 and 501.212, a failure to comply with subsection (1) or engaging in a practice described in subsection (2) constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act under part II of chapter 501. Violations must be enforced only by the enforcing authority, as defined in s. 501.203(2)[.]").

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

## CAUSES OF ACTION

### COUNT I – DECLARATORY RELIEF
### (Plaintiffs v. Capital One)

110.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 109 as if set forth herein.

111.    This is an action under Florida Statute § 86.011, *et. seq.*

112.    There is an actual and present controversy between Plaintiffs and Capital One over the basis and propriety of Capital One's unilateral termination of Plaintiffs' Accounts as a result of political discrimination against President Trump, the Trump Organization, and his family.

113.    Due to the irreconcilable differences between Plaintiffs and Capital One, Plaintiffs are in doubt as to their legal rights, status, powers, privileges, and/or immunities with respect to Plaintiffs' Accounts and whether Capital One's Rules Governing Deposit Accounts allow termination of an existing banking relationship based on political discrimination.

114.    There is a bona fide, actual, present need for a declaration of the legal rights, powers, privileges, status, and immunities of the parties with respect to Plaintiffs' Accounts, Capital One's Rules Governing Deposit Accounts.

115.    Plaintiffs are not seeking an advisory opinion from this Court because there is a live controversy between the parties as to whether Plaintiffs' Accounts were improperly terminated and/or whether Plaintiffs' Accounts should be reinstated by Capital One.

116.    Plaintiffs are not seeking an advisory opinion from this Court because the relief sought is not based on a hypothetical set of facts.

117.    Plaintiffs and their affiliated entities, in good faith, and at all times material to this action, believe that they are entitled to possess all rights and obligations as holders of Plaintiffs' Accounts.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

118. Thus, Plaintiffs are entitled to have the doubt surrounding their rights and obligations as holders of Plaintiffs' Accounts resolved by way of declaratory relief from this Court.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter a judgment declaring that: (a) Capital One improperly terminated Plaintiffs' Accounts, (b) Plaintiffs are entitled to an award of costs, and (c) Plaintiffs are entitled to any other relief as this Court deems just and proper.

### COUNT II - VIOLATION OF
### NORTH CAROLINA'S CONSUMER PROTECTION ACT
### (TNGC Charlotte, LLC, T International Realty, LLC, & DTTM Operations, LLC v. Capital One)

119. Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC repeat and reallege the allegations contained in paragraphs 1 through 109 as if set forth herein.

120. This is an action arising from Capital One's violations of North Carolina's Unfair and Deceptive Trade Practices Act. *See* N.C. Gen. Stat. § 75-1.1.

121. N.C. Gen. Stat. § 75-1.1(a) defines unfair and deceptive trade practices as any "unfair or deceptive acts or practices in or affecting commerce, [which] are declared unlawful."

122. N.C. Gen. Stat. § 75-1.1(b) defines "commerce" as "all business activities, however denominated[.]"

123. Capital One maintains a continuous and systematic presence in North Carolina because it operates several branches therein and provides banking services, credit services, investment services, and other financial products and services to consumers throughout the State.

124. Over the course of decades, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC have opened and maintained several bank accounts with Capital One.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

125.   During this timeframe, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC have deposited, transacted, and leveraged millions of dollars with Capital One.

126.   In exchange, Capital One has profited from Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC's deposits, transactions, and the prestige of being associated with President Trump.

127.   By engaging in banking activity, Capital One has engaged in trade or commerce.

128.   Because Capital One and Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC maintained mutual banking relationships, the parties have been and remain market participants under N.C. Gen. Stat. § 75-1.1.

129.   On March 8, 2021, Capital One notified Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC that it was closing all of their Accounts and terminating their account relationships with Capital One by June 7, 2021.

130.   On June 7, 2021, Capital One terminated the Accounts of Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC.

131.   Capital One did not provide any lawful justification for why the Accounts of Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC were being closed.

132.   Instead, upon information and belief, Capital One leveraged unlawful and deceptive tactics and means to close the Accounts of Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC based on President Trump's political views to politically discriminate against him, the Trump Organization, and his family.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

133.    Simply stated, Capital One debanked Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC.

134.    Capital One's unlawful and deceptive debanking practices were employed in the trade or commerce of providing banking services to the Accounts of Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC, which falls under the definitions of N.C. Gen. Stat. § 75-1.1(a)-(b).

135.    Capital One's unlawful and deceptive debanking practices, which terminate banking relationships based on a consumer or business' political views that are contradictory to those held by Capital One, are a matter of significant public interest to the residents of North Carolina.

136.    Capital One's unlawful and deceptive practices to debank other consumers and businesses based on their political views directly affect North Carolina residents when their banking relationships are terminated.

137.    Capital One's unlawful and deceptive practices to debank other consumers and businesses based on their political views directly and indirectly affect North Carolina residents because it chills their exercise of political speech by the threat of having their banking relationships terminated.

138.    At the time that Plaintiffs' Accounts were terminated, as explained in paragraphs 55 through 77, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC were actively engaged in business in North Carolina.

139.    Capital One's unlawful and deceptive debanking practices injured Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC because it prevented them from using their bank accounts or accessing the funds therein.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

140.     As a direct and proximate result of Capital One's conduct, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC have suffered significant damages.

141.     Under N.C. Gen. Stat. §§ 75-16 and 75-16.1, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC seek recovery of treble damages and attorneys' fees and costs for prosecuting this action.

142.     Because Capital One's conduct against Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC was willful, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC intend to seek recovery of punitive damages against Capital One.

**WHEREFORE**, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC respectfully request that the Court enter Final Judgment in their favor and against Defendant Capital One, N.A. for all available damages under North Carolina law, an award of punitive damages, an award of attorneys' fees and costs, and any other relief this Court deems proper.

### COUNT III - VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT
**(Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC & DTTM Operations, LLC v. Capital One)**

143.     Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC repeat and reallege the allegations contained in paragraphs 1 through 109 as if set forth herein.

144.     This is an action arising from Capital One's violations of New Jersey's Consumer Fraud Act. N.J.S.A. § 56:8-2.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

145.    N.J.S.A. § 56:8-2 prohibits "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate."

146.    N.J.S.A. § 56:8-1(c) defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale[.]"

147.    Capital One maintains a continuous and systematic presence in New Jersey because it operates several branches therein and provides banking services, credit services, investment services, and other financial products and services to consumers throughout the State.

148.    Over the course of decades, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC have opened and maintained several bank accounts with Capital One.

149.    During this timeframe, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC have deposited, transacted, and leveraged millions of dollars with Capital One.

150.    In exchange, Capital One has profited from Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC's deposits, transactions, and the prestige of being associated with President Trump.

151.    By engaging in banking activity and providing banking services to Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC, Capital One has directly offered merchandise to Plaintiffs under N.J.S.A. § 56:8-1(c).

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

152.    On March 8, 2021, Capital One committed the affirmative act of notifying Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC that it was closing all of their Accounts and terminating their account relationships with Capital One by June 7, 2021.

153.    Capital One did not provide any justification for why the Accounts of Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC were being closed.

154.    Instead, upon information and belief, Capital One leveraged unlawful and deceptive tactics and means to close the Accounts of Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC based on President Trump and his political views.

155.    Essentially, Capital One debanked Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC.

156.    Capital One's unlawful and deceptive debanking practices were employed in the trade or commerce of providing banking services to Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC, which falls under the definition of N.J.S.A. § 56:8-2.

157.    Capital One's unlawful and deceptive debanking practices, which terminate banking relationships based on a consumer or business' political views that are contradictory to those held by Capital One, are a matter of significant public interest to the residents of New Jersey.

158.    Capital One's unlawful and deceptive practices to debank other consumers and businesses based on their political views directly affect New Jersey residents when their banking relationships are terminated.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

159. Capital One's unlawful and deceptive practices to debank other consumers and businesses based on their political views directly and indirectly affect New Jersey residents because it chills their exercise of political speech by the threat of having their banking relationships terminated.

160. Because Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC were actively engaged in business in New Jersey when the Termination Letter was received and took effect, as explained in further detail in paragraphs 78 through 106, the closing of their Accounts on June 7, 2021, was an ascertainable loss under N.J.S.A. § 56:8-2.

161. Capital One's unlawful and deceptive debanking practices injured Plaintiffs, Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC because it prevented them from using their bank accounts or accessing the funds therein.

162. As a direct and proximate result of Capital One's conduct, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC have suffered significant damages.

163. Under N.J.S.A. § 56:8-19, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC seek recovery of treble damages and attorneys' fees and costs for prosecuting this action.

164. Because Capital One's conduct against Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC was willful, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC intend to seek recovery of punitive damages against Capital One.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

**WHEREFORE**, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC respectfully request that the Court enter Final Judgment in their favor and against Defendant Capital One, N.A. for all available damages under New Jersey law, an award of punitive damages, an award of attorneys' fees and costs, and any other relief this Court deems proper.

## COUNT IV – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Plaintiffs v. Capital One; Pled Alternatively)

165.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 109 as if set forth herein.

166.    Plaintiffs and Capital One agreed that the Rules Governing Deposit Accounts would govern the parties' relationship.

167.    The Rules Governing Deposit Accounts state:

**Closing an account**. We may close any account in our sole discretion at any time, for any or no reason and without notice to you. For example, we may close your account with no notice of action if the account has a zero balance. If we close your account with a balance, we will notify you of our action and either transfer the funds to another internal account owned by you or an external account through an approved link or send you a check for the collected balance in your account, less any amounts due to us for pending transactions. Capital One Bank is not liable for any damages or liabilities resulting from the termination of an account relationship. Subject to any rights we may have with respect to advance notice of withdrawal from your account, you may close your account at any time and for any reason. If we receive a debit or credit to your closed account, the account may be reopened to accept the debit or credit for you, even if doing so overdraws your account, and funds deposited therein will be subject to any and all rights we may have with respect to offset. If your account is overdrawn when we close it, you agree to promptly pay all amounts owed to us.

Exhibit B.

168.    In the Rules Governing Deposit Accounts, Capital One reserved the right to terminate any existing banking relationship at any time and for any reason.

28
**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

169.    However, neither the letter nor the spirit of the Rules Governing Deposit Accounts authorized Capital One to terminate an existing banking relationship with a client for an unlawful purpose.

170.    Here, the Termination Letter closed Plaintiffs' Accounts and severed any banking relationship that Plaintiffs had with Capital One because of Capital One's political discrimination against President Trump, the Trump Organization, and his family.

171.    When Capital One issued the Termination Letter it committed a conscious and deliberate act against Plaintiffs that were inconsistent with Plaintiffs' reasonable expectations under the Rules Governing Deposit Accounts.

172.    When Capital One executed the mandate in the Termination Letter and closed Plaintiffs' Accounts, Capital One failed to discharge its obligations under the Rules Governing Deposit Accounts to Plaintiffs regarding how their Accounts should have been managed.

173.    Consequently, Plaintiffs have suffered considerable financial and reputational harm.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter Final Judgment in their favor and against Defendant Capital One, N.A. for all available damages under Florida law, an award of attorneys' fees and costs pursuant to the Rules Governing Deposit Accounts, and any other relief this Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial as to all issues so triable.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

Dated: June 11, 2025

Respectfully submitted,

**BRITO, PLLC**
*Counsel for Plaintiffs*
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office: 305-614-4071
Fax: 305-440-4385

By: /s/ *Alejandro Brito*
      **ALEJANDRO BRITO**
      Florida Bar No. 098442
      Primary: abrito@britopllc.com
      Secondary: apiriou@britopllc.com
      **IAN MICHAEL CORP**
      Florida Bar No. 1010943
      Primary: icorp@britopllc.com



# Account disclosures

## Rules governing deposit accounts

**May 14, 2025**

Welcome to Capital One, N.A. (hereafter referred to as "Capital One Bank," "Capital One," "we," "us," or "our"). These Rules Governing Deposit Accounts (herein after referred to as "Rules"), as well as other agreements that are provided to you separately, as may be amended from time to time, constitute the deposit contract which governs all deposit accounts with Capital One Bank. By opening or continuing to maintain a deposit account with us, each customer (referred to as "you" or "your") agrees to be bound by the applicable provisions of these Rules, and all applicable agreements, disclosures, and other documents, as well as by all applicable federal or state laws, statutes and regulations. Please keep a copy of the Rules.

We may decline to open an account for any reason, or for no reason. We are not liable for any damages or liabilities resulting from refusal of an account relationship.

**Important information about procedures for opening a new account**. To help the United States Government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information identifying each person who opens an account.

When you open an account, we will ask for your name, street address (a post office box may not be used), date of birth, and other information that will allow us to identify you. We will also ask to see your driver's license or other identifying documents.

**Taxpayer Identification Number**. Federal law requires that you provide us with your Social Security Number or your Employer Identification Number before opening any account. If you are in the process of applying for such a number, we may open your account temporarily pending receipt of the number. If you fail to provide us with the number, we may close the account at any time without prior notice to you.

<div style="border:1px solid #000; text-align:center;">
**EXHIBIT**

**A**
</div>

Case 1:25-cv-21596-RKA Document 30-1 Entered on FLSD Docket 06/11/2025 Page 32 of 77

**Your new account**. Additional terms and conditions, applicable service charges, minimum deposit requirement, and where applicable, information concerning the calculation, compounding and crediting of interest are contained in the disclosure statement and agreement for the type of account you have opened (your "Account Disclosure").

Your account is considered a new account if it has been open for thirty (30) calendar days or less. If you already have existing accounts with Capital One Bank that have been open for a period of at least thirty (30) calendar days, accounts subsequently opened will not be considered new accounts.

**Additional deposits**. Unless otherwise provided by the terms and conditions contained in your Account Disclosure, there is no limit on the number of deposits that may be made to an account, however, we reserve the right, at our sole discretion, to refuse further deposits to your account.

**Crediting of deposits**. Funds deposited in a branch before 2 p.m. local time, or such later time posted in the branch, (9 p.m. ET for funds deposited at an ATM) on any business day will be credited to the applicable account that business day. Funds deposited after the above stated times will be credited on that business day or the next business day. Please refer to the section of this disclosure entitled Deposit Availability Disclosure to determine when funds are available for withdrawal or for paying transactions on your account.

**Accepting items for deposit**. We will accept items for deposit, but act only as your agent for collection and assume no responsibility for these items, beyond the exercise of ordinary care.

Even though we credit your account for the amount of any item, this credit is temporary until we receive final payment in cash or other manner acceptable to us. Any temporary credit may be reversed by us. We reserve the right to require waiting periods, as described in the Deposit Availability Disclosure provided herein, before we will allow withdrawal against temporary credits. If an item you deposit (or a check cashed against your account) is returned to us unpaid, or if we receive a claim from another bank that the item was not properly payable (for example, a claim that the item was altered), we may debit the entire amount of the item (plus any applicable fees) from any account you hold with us, even if doing so creates an overdraft. If a temporary credit is reversed or an item is charged back to your account, a fee may be deducted from the account, together with any interest earned on the amount of the item. Your account may also be debited for any special fees incurred in processing items for collection.

If checks deposited into multiple accounts are returned unpaid, we'll debit your account with the largest amount deposited. For equal deposit amounts, we'll debit the account that first received a deposit. If one of the deposits was to a Total Control Checking, Confidence Savings, or a 360 account, we'll always debit that account for the full amount. Please ask a banker if you have questions.

Foreign checks are handled as collection items only and are converted at our current daily rate and credited in U.S. dollars. Foreign checks sent for collection are exchanged at the exchange rate on the day of payment. All returned foreign checks will be charged back to your account at the rate used when initially credited and may be subject to a return fee and foreign bank charge (if applicable). Please note that while the foreign check collection process typically takes anywhere from four to six weeks, we have no control over the process once a check is sent for foreign collection. Accordingly, the process may take longer, depending on the foreign bank. You hereby waive notice of dishonor, nonpayment, or protest with respect to any items credited to or charged against your account.

**Receipts for deposits**. We will give you a receipt for the total amount shown on your deposit ticket, but the amount must be verified before it is credited to your account. If an error is discovered in the amount of your deposit, we will adjust your account and notify you of the correction.

**Deposit errors**. If we mistakenly credit your account for funds to which you are not the rightful owner, we may deduct those funds from your account, even if this causes your account to be overdrawn. We may do so at any time and without prior notice to you.

**Envelope depository**. We may accept payments and/or deposits through the use of an "envelope depository" (a "drop" receptacle into which envelopes may be placed during business and nonbusiness hours). You authorize us to remove your payment and/or deposit from the envelope, count the funds and credit your account.

The envelope depository is provided as a convenience to our clients, and we are not responsible for any loss suffered by you resulting from your use of said envelope depository unless caused by our gross negligence or willful misconduct. If an error is discovered in the amount of your deposit, we will adjust your account and notify you of the correction.

**Withdrawals**. Withdrawals from your account may be made at the teller window only by authorized signer(s) on the account. We will not pay withdrawals to third parties. If you provide your ATM card or ATM/Debit card and personal access code to a third party, you have authorized the third party to withdraw funds from your account at a teller window, ATM machine or point of sale terminal.

**Account transaction limitations**. Commercial-purpose savings accounts (including savings accounts with check writing privileges and money market accounts) may be limited in the number of transfers or withdrawals allowed per monthly service charge cycle to a third party or to another account of the depositor at Capital One Bank by means of preauthorized, automatic, telephone or online transfers.

If you exceed the number of transactions permitted in a monthly service charge cycle as disclosed to you in the applicable product disclosure more than once during any twelve-month period, you

may be charged a fee for each transaction in excess of the number permitted (an "Excessive Transaction Fee"). Please see the current Schedule of Fees and Charges applicable to your account for the amount of the Excessive Transaction Fee. If you exceed six (6) transfers or withdrawals from your account three (3) times in any twelve-month period you agree that we may, at our discretion, convert your savings or money market account to an account that is not subject to transaction limits (a "transaction account").

Consumer savings accounts are not currently subject to a transfer limit. You will be notified if we choose to re-impose a limit.

Unless your Account Disclosures provide otherwise, you may make any number of withdrawals from your account in person or at any ATM; provided that you do not exceed daily ATM cash withdrawal limits. Please refer to our Electronic Fund Transfers Agreement and Disclosure ("EFT Disclosure") available on our Website or at any of our banking offices for the daily cash withdrawal and point of sale limits applicable to your ATM card or ATM/Debit card.

**Notice of withdrawal**. We may allow withdrawals at any time, but reserve the right to require twenty-one (21) days written notice of intention to withdraw funds from any savings, money market and negotiable order of withdrawal (NOW) account.

**Large cash transactions**. We reserve the right to place a limit on the amount of cash that may be deposited or withdrawn in a business day. We may require advance notice of a large cash withdrawal, and we may require that the cash be obtained by an armored carrier (at your expense). We may also refuse to accept a cash deposit for a very large amount.

**Same-day transactions**. We are not responsible for paying items against deposits made the same day the items are presented for payment.

**Statements**. We will provide you with monthly or periodic statements for certain accounts. The postal (or electronic) address you provide to us will be deemed to be correct for purposes of delivering account statements and other notices to you, until we receive a change of address notification from you. If your statement is returned to us as a result of your failure to notify us of your change in address, we may stop sending account statements to you until a valid address is provided to us, but for all purposes it shall be considered as if we delivered your account statement to you as of the date that was or would have been printed on your account statement. If you enroll in Online Banking, your periodic statements will be accessible online from the date of enrollment. You must inspect your statement and any cancelled checks promptly after they are made available to you. You have a responsibility to review your account statement in a timely manner and to notify us promptly of any errors. Within sixty (60) days after your statement is postmarked or made available to you, or account transaction history is made available to you through Online Banking, you must notify us in writing of any errors, discrepancies or irregularities, including but not limited to, unauthorized signature, alterations, improper charges, unauthorized

transfers or withdrawal of funds, nonreceipt of an expected statement, or that any deposit was not properly credited to your account. We will not be responsible for any loss suffered by you if you do not notify us in writing within these stated time periods. If we pay an item bearing an unauthorized signature, forged maker's signature or forged endorsement or alteration, our liability, if any, shall be limited to the face amount of the item.

**Claim of loss**. If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss. Your cooperation **may** include, but not be limited to, providing us with an affidavit containing whatever reasonable information we require concerning your account, the transaction and the circumstances surrounding the loss. You further agree to notify law enforcement authorities of any criminal act related to the claim. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you. You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

If you make a claim, or if we suspect that your account may be compromised, we may recommend that you close the account. For non-consumer accounts only, if you decline to close the account, you agree that we will not be liable to you for subsequent losses or damages on the account due to unauthorized activity.

**Transactions using our IVR System**. Telephone transactions using the IVR System may require a combination of: 1) the entry of your social security number 2) the entry of the last four digits of your account number 3) the entry of your debit card number 4) the entry of your debit card pin or 5) automated phone number verification/matching to transfer funds between checking, savings and money market accounts bearing your name and linked to your social security number. All accounts must be maintained with us. You are solely responsible for the security of your debit card pin, which should be held under the strictest confidence and not revealed to other persons. If you know or suspect that another person knows your debit card pin, you should notify us immediately so that your debit card pin may be changed. You will be liable for unauthorized transactions to your accounts using your debit card pin to the extent allowed by applicable state or federal law. You hereby agree that the security procedure described in this section is commercially reasonable and authorize us to process transfers between your accounts via our automated telephone service. Please consult our EFT Disclosure for the rules and regulations regarding telephone transfers and the limits of our liability.

**Processing order of credits and debits**. We process credits and debits to your account in a specific order. We refer to this as the processing order and it is how we decide what posts first and

last each day. The processing order also determines the order that you will see the items on your statement.

Our processing order might not be the same as the order you make transactions and could result in overdraft transactions. You can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions. Please read the Deposit Availability Disclosure section of these Rules for more information on when we make funds available to you.

Credits, like a check or cash deposit, increase your account balance. Debits, like ATM withdrawals and debit card transactions, decrease your balance. We will process credits and debits as follows:

- All credits to your account that are received by the close of our business day will be processed to your account first. Any credits that we initiate to your account, like interest payments, will be processed last. Credits received after our business day cutoff time will be processed the next business day. We will post credits from the highest to lowest dollar amount, regardless of the order in which we receive or process them.
- After we have processed any credits to your account, we will process debits. First, we group any similar types of debits (like all checks) together into separate categories. Then, we process those debits within each category in a specific order such as by dollar amount. For some debits, we will know the time you made the transaction. This allows us to post the debit closer to the time you actually made the debit transaction instead of by dollar amount.

To help you better understand our debit processing, we have created the following table that includes both the category of debits to be processed and our processing order for each:

| PROCESSING ORDER | DEBIT CATEGORY | EXAMPLES | ┝ |
|---|---|---|---|
| 1 | Debits deferred from a prior day for manual review due to insufficient or unavailable funds and related fees | • Manually approved checks and ACH transactions<br>• Overdraft and nonsufficient funds (bounced check) fees from the prior business day | ┕<br>┝ |

| PROCESSING ORDER | DEBIT CATEGORY | EXAMPLES | H |
|---|---|---|---|
| 2 | Cash or cash-like withdrawals | • Teller and ATM withdrawals<br>• Wire Transfers<br>• Capital One loan payments | D<br>E<br>o |
| 3 | Customer initiated service charges and fees (except overdraft transfer protection fees) | • Stop payment request<br>• Check re-order fees<br>• Wire transfer fees | D<br>E<br>o |
| 4 | Debit card transactions and fees | • One-time and recurring debit card transactions | D<br>E<br>o |
| 5 | Automated Clearinghouse (ACH) transactions | • Automatic payments you authorize, like mortgage payments or monthly utility bills | D<br>E<br>H<br>I |
| 6 | Checks and other payment items | • Check payments<br>• Capital One Bank Online Bill Pay transactions | H<br>I |
| 7 | Bank initiated transaction fees | • Returned items chargeback fee | H<br>I |
| 8 | Certain Capital One Bank account-to-account funding transfers and related fees | • Overdraft protection account transfers<br>• Sweep account transfers | H<br>I |

| PROCESSING ORDER | DEBIT CATEGORY | EXAMPLES | |
|---|---|---|---|
| 9 | Credits and debits that we initiate | <ul><li>Account interest payments (credits)</li><li>Monthly account fees (debits)</li></ul> | |

**Uncollected/held funds**. We reserve the right to return and/or refuse to pay any check, in-person withdrawal, ATM withdrawal or other electronic item or instruction which is presented for payment against uncollected/held funds. If you have a commercial account, a fee may be deducted from the account for any item drawing against uncollected funds, whether the item is paid or returned unpaid, in accordance with our current Schedule of Fees and Charges.

**Returning items for insufficient funds**. You do not have the right to write a check or draft, to make an ATM or other withdrawal, or to initiate or have an automatic debit processed against your account for an amount that exceeds your available balance (If you're enrolled in an overdraft protection, we'll transfer available amounts to cover the transaction in accordance with the agreement governing your overdraft protection plan). At any time before final payment (as defined in the Uniform Commercial Code) we may return any check, draft, image, negotiable order of withdrawal, electronic debit or other item presented for payment against your account when there are insufficient available funds in your account to pay the item or if for some other reason the item is not good or payable. In addition, we may charge a fee for each item returned in accordance with our current Schedule of Fees and Charges.

**Overdrafts**. This section applies to consumer accounts. Business-purpose accounts may have different policies.

### What is an overdraft?

An overdraft occurs when you do not have enough money in your account to cover a debit transaction, but we pay it anyway. Debit transactions include your checks, Automated Clearinghouse (ACH) transactions, bill payments, regularly scheduled repeating payments (like your mortgage or car payment) and other withdrawals you make.

### What overdraft services do we offer?

For all checking accounts, we will consider paying your checks, ACH (such as your mortgage payment), bill payments, withdrawals and recurring debit card transactions (like your monthly gym payment) into overdraft rather than returning the item unpaid.

We also offer an additional overdraft service that you can opt into. If you opt into this service we will also consider paying your everyday one-time debit card and ATM transactions.

You can also ask us to generally decline all transactions that would take your account into overdraft.

Regardless of the overdraft service you have, sometimes we are required to pay a transaction that may create an overdraft in your account. Here are two examples of when this could happen:

- For example, some merchants, like restaurants, hotels or gas stations—won't know the exact amount of your purchase when they request the authorization. That transaction could come in for more money and we would need to pay it even if you don't have enough money in your account.
- Or sometimes we authorize a debit card purchase when you have funds in your account, but if the merchant does not submit it for payment right away, another transaction could come in first (while the original debit card purchase transaction is still pending). Then when that debit card transaction comes in for payment there are no longer enough funds in your account to cover it and the payment makes your balance negative.

In either case, you still won't be charged a fee.

You can avoid overdrafts on your account by always making sure that you have sufficient funds in your account to cover all the transactions presented for payment.

**How do we handle overdraft items?**

You have no right to overdraw your account at any time, for any reason, and our decision to pay overdraft transactions is solely within our discretion. We may refuse to pay an overdraft transaction at any time, even though we may have previously paid overdrafts. If we choose to pay a transaction into overdraft, you must make a deposit into your account to cover the overdrawn amount. We will send you a notice to let you know that your account is overdrawn. You will receive the notice via mail if you have not agreed to receive electronic communications or if you have not provided us with a valid email address.

When deciding to pay transactions that cause an overdraft, we consider a variety of factors, including the amount of the transaction and/or your history with us, including whether you've previously had too many overdrafts on your account(s).

**What else do you need to know?**

Maintaining a negative balance in your account for 56 consecutive calendar days will result in account closure and this could affect your ability to open new accounts with us or other banks in the future. Also, we may report the account closure to a consumer reporting agency.

**Stop payment orders**. You or any one of the signers on your account may request us to stop payment on a check written on your account by providing us with the account number and the check number or check range. You understand that unless we have complete and accurate information from you, we may be unable to identify the check for which a stop payment has been requested which will result in the check being paid. We also require a reasonable amount of time to act on the request. If two or more signatures are required to transact business, we may accept any ONE authorized signature for a stop payment order.

Under certain circumstances, current transaction information may not be available, and the item upon which a stop payment has been requested may already have been paid. If the item upon which you have stopped payment has already been paid, we will refund the stop payment fee at your request. Written stop payment orders expire after six (6) months. All stop payment orders entered by you through Teleservice24℠ expire six months from the date entered unless otherwise renewed by you in writing before they expire.

Unless stop payment orders are renewed in writing, Capital One Bank assumes no responsibility if the item is paid after the expiration of the stop payment order. You will be charged a fee for initial and renewed stop payment orders.

You may not stop payment on a check that is used to purchase a Cashier's Check, on the purchased Cashier's Check (except as otherwise provided by applicable law), or on any item that has already cleared or has been paid.

**Automated processing**. In accordance with general banking standards, we have adopted automated collection and payment systems which rely on information encoded onto each check in magnetic ink. You agree that we may disregard all information on any check drawn on your account (front and back) other than your signature, the amount of the check and the information encoded in magnetic ink. You further agree that we shall not be deemed to have failed to exercise ordinary care in paying an item solely because our procedures do not require us to perform a sight examination of items with a face amount below a threshold level established by us from time to time.

**Post-dated checks**. If you write a post-dated check, we may pay it and charge it against your account, even if it is presented prior to the date of the check.

**Stale Checks**. We are not obligated to pay a check presented for payment more than six months after its date (a "Stale Check"). Notwithstanding the foregoing, you agree to hold us harmless if we pay a Stale Check. If you do not want us to pay a Stale Check, you must place a stop-payment order on the check.

**Restrictive legends**. We are not required to honor any restrictive legend placed on checks you write. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1000.00". We are not responsible for any losses, claims, damages, or expenses that result from your placement of these or other special instructions on your checks.

**Drafts which do not bear your signature**. If we receive a draft drawn against your account which does not contain your signature as reflected on the signature card for your account we may, at our discretion, return the draft unpaid. If you wish to ensure that a draft drawn against your account but not bearing your signature will be paid, you must communicate to us in advance that you want the draft to be paid.

**Facsimile signature/system-generated signatures**. If you authorize us to honor any facsimile or system-generated signature, you have the sole responsibility for maintaining the security of each signature affixing device or system. No facsimile or system-generated signature shall be deemed to be an unauthorized signature notwithstanding the lack of authority of the person(s) affixing such signature, and you shall be solely responsible for any and all losses incurred in connection with the use of the facsimile or system-generated signature.

**Checks presented over the counter for payment by a non-customer**. To the extent permitted by applicable law, you agree that if a check drawn against your account is presented over-the-counter for payment by a person who is not a deposit customer of Capital One Bank we may, in our sole discretion, refuse payment of the check or charge a fee for payment of the check.

**Power of attorney**. Power of attorney is a legal arrangement in which a person (the principal), authorizes another person (the agent/ attorney(s)-in-fact) to act on his or her behalf with respect to certain matters. Such matters may include banking, retirement benefits, real estate, insurance, and other transactions. If you want someone other than an authorized signer on your account to transact business on your account, you must provide us with a form reasonably acceptable to us which identifies the person to whom you grant your power of attorney and each account for which you wish the agent to exercise the power of attorney.

We have no duty or agreement whatsoever to monitor or insure that the acts of the agent are for your benefit. We may continue to honor the transactions of the agent until: (a) we have received written notice or have actual knowledge of the termination of the authority or the death of the principal, and (b) we have had a reasonable opportunity to act on that notice or knowledge. You agree not to hold us responsible for any loss or damage you may incur as a result of our following instructions given by an agent acting under a valid power of attorney.

**Death or incompetence**. If any person with a right to withdraw funds from your account(s) dies or becomes legally incompetent, we must be promptly notified. We may continue to honor your checks, items and instructions until (a) we know of your death or legal incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay checks

drawn on or before the date of death or legal incompetence unless ordered to stop payment by someone claiming interest in the account. We may restrict access to your account upon notice of your death or legal incompetence until the appropriate documentation is provided to us by your executor, administrator or other legal representative of your estate or person.

**Grant of security interest and right to set-off**. To secure payment of any monies that you may owe us or any of our affiliates, for any reason, you grant us a continuing security interest in all funds that you may now and in the future maintain on deposit with us, with the exception of funds held in a trust or fiduciary account, or in an Individual Retirement Account, or in other qualified tax-deferred accounts. You agree that we may apply (set-off) funds that you maintain on deposit with Capital One Bank, or any of its affiliates, against any amount that you may then owe us, or any of our affiliates, under a loan, or Overdraft, or guaranty, or for any other reason at any time and without prior notice to you. This right of set off does not apply if the debt is created under a consumer credit card plan. We may set-off your account at any time whether or not you are then in default in making payment to us, and we may exercise our right of set-off without liability to you even if it results in an interest penalty or dishonor of subsequent checks and other items with respect to your account. You further agree that the foregoing right extends to any federal or state benefit payments (including Social Security benefits) electronically deposited into your account. You understand and agree that if you do not want your benefits to be subject to our right of set-off, you may change your direct deposit instructions by providing notice to the benefits payor at any time. You also agree that any federal benefits or other payments deposited to your account after you are no longer eligible to receive benefits must be returned to the federal government or other payor, and we may set-off against any of your accounts if we are obligated to return funds to the payor. Our right to set-off your account is in addition to any other rights and remedies that we may have under law or under any other contractual agreement.

**Collection expenses**. You agree to pay and reimburse us for our reasonable costs and expenses in attempting to collect amounts that you owe us arising out of transactions on your account. This includes payment and reimbursement of fees we incur for collecting such amounts, including, without limitation, attorneys' fees (including our in-house attorneys) and court costs.

**Adverse claims**. If we receive conflicting instructions with respect to your account, or notice of an adverse claim of ownership, right to control, or access to funds in your account, or notice that the funds in your account may have been obtained through fraudulent or criminal acts, you agree that if any such dispute exists, we may place a hold on the funds in your account and refuse to honor all withdrawal and transfer requests, including checks written on the account, until all appropriate parties provide us with joint specific written instructions with respect to disposition of the funds. We are not required to determine whether a dispute has merit. Additionally, we shall have the right to close the account and deposit the funds held in the account into the registry of a court of proper jurisdiction, wherein the adverse claimants and/or appropriate parties shall be interpleaded and/or joined to the action for purposes of resolving the dispute regarding the funds. If we elect to

take any action(s) described herein, you agree that we shall not be liable to you for damages of any kind, and you agree to pay and reimburse us for our reasonable costs and expenses including, without limitation, attorneys' fees (including our in-house attorneys) and court costs from the funds in the account prior to any distribution. If an adverse claim is made among joint depositors, the rights of the parties shall be determined in accordance with the section herein entitled Special Rules for Multiple Party Deposit Accounts.

**Legal process against account**. If your account is attached, garnished, or otherwise subject to levy or seizure, in whole or in part, by legal action, we shall not be liable to you for any sums we may be required to pay because of such attachment, garnishment, levy or seizure, even if paying the money from your account leaves insufficient funds to pay a check you have written. We can restrain your account regardless of the location of the account and the location of service. For example, if a New York levy is properly served on us in New York, we may honor the New York levy even if your account was opened in Virginia. You hereby authorize us to comply with legal process, and we are not required to determine whether the court issuing the legal process had jurisdiction over you or over the account or otherwise had the authority to issue the legal process. If we incur any expenses, including without limitation, reasonable attorney fees, in responding to an attachment, garnishment, levy, or seizure that are not otherwise reimbursed, we may charge such expenses to your account without prior notice to you. Any such attachment, garnishment, levy or seizure is subject to our right of offset. If we are served with a notice of proceeding relating to a safe deposit box, and you are not a named defendant in the proceeding, we may deny you access to the box unless otherwise directed by an appropriate court or the judgment creditor.

**Unclaimed property**. The law establishes procedures under which unclaimed property must be surrendered to the applicable State. The applicable State is usually the State listed in the address on your account statement. Generally, the funds in your account are considered unclaimed if you have not had any activity or communication with us regarding your account over a period of years. If your funds are surrendered to the State, you may be able to reclaim them, but your claim must be presented to the State. Once your funds are surrendered, we no longer have any liability or responsibility with respect to the funds.

**Closing an account**. We may close any account in our sole discretion at any time, for any or no reason and without notice to you. For example, we may close your account with no notice of action if the account has a zero balance. If we close your account with a balance, we will notify you of our action and either transfer the funds to another internal account owned by you or an external account through an approved link or send you a check for the collected balance in your account, less any amounts due to us for pending transactions. Capital One Bank is not liable for any damages or liabilities resulting from the termination of an account relationship. Subject to any rights we may have with respect to advance notice of withdrawal from your account, you may close your account at any time and for any reason. If we receive a debit or credit to your closed account, the account may be reopened to accept the debit or credit for you, even if doing so

overdraws your account, and funds deposited therein will be subject to any and all rights we may have with respect to offset. If your account is overdrawn when we close it, you agree to promptly pay all amounts owed to us.

**Minor accounts**. We may pay funds on deposit in an account in the name of a minor to the minor. Once the minor attains the age of majority he or she will be considered to be the owner of the account, capable of making any and all transactions on the account.

**Business accounts**. If the account owner is not a natural person, such as a corporation, unincorporated association, limited liability company, partnership or any other entity holding an account in any capacity other than an individual capacity, and as may be required by Capital One Bank for the specific deposit account, each person who signs the signature card hereby certifies that they are fully authorized to execute all documents in their stated capacity. Additionally, and where applicable as set forth above, the individual who signs the signature card as Secretary hereby certifies that (1) she/he is the duly qualified Secretary or other authorized officer of the business entity identified on the signature card as the account holder; (2) such business entity is organized and existing under state or federal law; (3) all actions by shareholders, directors and all others necessary to execute this signature card and establish an account with Capital One Bank have been taken; and, (4) until further actual notice to Capital One Bank, each signer is authorized to transact on the account until Capital One Bank receives actual written notice in a form acceptable to us, executed by the number of Signers required to execute withdrawals on the account, and/or executed by others as required by us, that such Signer is no longer so authorized. To the extent a signature card is required for the specific deposit account, in the event any one or more of the signatures affixed to the front of this signature card, or otherwise provided to Capital One Bank as an authorized signature for the operation of this account, are facsimiles or made or reproduced by any mechanical means, Capital One Bank is authorized to rely upon and treat the same, in good faith, as a true and valid signature, and the account holder hereby holds Capital One Bank harmless and indemnifies it from and against any loss, damage or liability it may suffer or incur as a result of its said reliance.

**Multiple-signer business accounts**. We are not required to comply with any multiple-signature requirement, even if your signature card specifies that multiple signatures are required or you have otherwise instructed us to do so. A multiple-signature requirement is for your internal control purposes.

**Online account consolidation disclosure**. If you have more than one eligible Capital One account, we will link your eligible accounts so they appear when you are logged into your account through the website or mobile app. We will display only summary information about your connected accounts. To get any other information or conduct any activity on these account types, you must access the specific account servicing area for that account. All connected bank accounts will be visible when you log into your account through the website or mobile app. Keep in mind that certain features, information, types of transactions, or other services may not be available for all

Case 1:25-cv-21596-RKA   Document 30-1   Entered on FLSD Docket 06/11/2025   Page 45 of 77

of your connected accounts. As long as you maintain your unique log in credentials, you will have access to view all of your individual accounts and shared accounts. People with whom you share accounts will only be able to view accounts that are shared with you, not your individual accounts.

**Payment processing restrictions on internet gambling fund transfers**. The Federal Reserve recently enacted regulations that require U.S. financial firms that participate in designated payment systems to establish and implement policies and procedures reasonably designed to prevent payments connected to unlawful Internet gambling. In light of the regulations, please be informed that restricted transactions (as defined in Federal Reserve Regulation GG / 12 CFR Part 233) are prohibited from being processed directly or indirectly through any account or relationship maintained with us. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks or drafts are knowingly accepted by gambling businesses in connection with unlawful Internet gambling.

## Specific terms applicable to the following account ownerships

**Joint account** – If two or more individuals are designated as owners of the accounts (without a fiduciary, beneficiary or other designation), then the account is a joint account and, unless your signature card states otherwise, all owners are considered to be joint tenants with right of survivorship. If there is more than one joint owner, the rights of survivorship will continue between the surviving joint owners. One joint owner is not authorized to remove another joint owner from the title of the joint account, but may withdraw all of the funds in the account or close the account.

**Trust** — An account established pursuant to a written trust agreement. Any funds placed in or added to this type of account are conclusively presumed to be a delivery at that time to the trust estate. Only the trustee is authorized to perform transactions on the trust account. If the original trustee dies or is replaced as trustee, we reserve the right to require documentation reasonably acceptable to us to which identifies the successor trustee. We have no duty whatsoever for enforcing the terms of the trust agreement and can rely on the statements and representations made to us by the trustee. The owners and beneficiaries of the trust agree that we shall not be held liable if the trustee breaches their fiduciary duty or fails to comply with the terms of the trust agreement.

**Uniform Transfers to Minors** — This type of account is established pursuant to the Uniform Transfers/Gifts to Minors Act in effect in the state where the account is opened and maintained, as may be amended from time to time. Only the Custodian is authorized to act on the account. As the Custodian you agree to comply with all applicable laws. When the minor reaches the age of majority, in accordance with applicable state law, the Custodian shall transfer any funds in the account to the minor. In the event we receive actual notice of the death, resignation or legal

incapacity of the Custodian, we are directed to deliver this account to the Successor Custodian (as provided by law) who shall, in such event, have all of the rights and duties of the Custodian.

**"Payable on Death" (POD)** – You may designate an individual or joint account to be payable upon your death to a designated beneficiary or beneficiaries. POD accounts are also known as "In Trust For" (ITF)", "As Trustee For" (ATF), "Transfer on Death" (TOD) or "Totten Trust" account and are governed by applicable state laws and regulations. You are solely responsible for meeting the requirements for establishing your account as a POD, including any titling requirements.

During your life, the funds in the account belong to you and, until your death, or if there are co-owners, upon the death of the last co-owner, the beneficiary(ies) have no interest in the account and cannot perform transactions on the account. You may withdraw all or part of the account balance, close the account, remove or add POD beneficiaries or change the account type or ownership. Upon the death of all owners, we will distribute the then remaining funds to such of the beneficiaries as shall be then-living, in equal shares, subject to our right to charge the account for any amount a deceased owner, co-owner or POD beneficiary owes us; if any beneficiary is under the age of 18 years at the time he would be entitled to receive property under the terms of the previous provision, we will pay such person's share to any person who is the statutory or court-appointed custodian for the benefit of such person.

## Special rules for multiple party deposit accounts

If your account was opened or assigned to a branch in New Jersey, the provisions of the Multiple Party Account Act, N.J.S.A. 17:16i-1 et seq. apply.

1.  We may treat each co-owner of a joint account as having full and complete authority to make deposits into such account, to request information with respect to such account and to place a hold on such account. Each co-owner owns his/her net contribution to such account. In the absence of proof of net contribution, and unless all of the co-owners have specifically otherwise agreed, each co-owner will own an equal share of such account. We are not required to determine net contributions.
2.  **Deposits**: Each co-owner authorizes the other co-owners to endorse for deposit into the account any item payable to any or all of the co-owners, and you expressly authorize us to supply the endorsement of any co-owner necessary for such deposit.
3.  **Withdrawals**:
    A.  You authorize us to recognize the signature, oral or electronic instruction of any co-owner for withdrawals, payments or funds transfer. We are not required to enforce multiple signature requirements that you may have agreed upon among yourselves.
    B.  We may continue to honor checks and withdrawal requests by any co-owner without liability to any other co-owner unless we receive written notice signed by one of you not

to honor checks or withdrawals against the joint account. After we receive such a notice, we may require written authorization from all of you for any checks or withdrawals. If we receive a notice in writing as provided by this section 3(b), we shall be relieved of responsibility to each and every co-owner for failure or refusal to honor any check, draft or other demand for payment or withdrawal unless the action is authorized by all co-owners in writing.

4. Without notice to any party, we may withdraw or hold any or all of the money in the joint account and apply funds withdrawn to reduce any indebtedness of any party due and owing to Capital One Bank. A notice sent, mailed or delivered to any party constitutes notice to all.

5. We may make payment from the joint account, including payment of the entire account balance: (i) pursuant to any statutory or common law right of set-off, levy, attachment, or other valid legal process or court order, relating to the interest of any one or more of the co-owners or (ii) on request, to a trustee in bankruptcy, receiver in any state or federal insolvency proceeding or other duly authorized insolvency representative of any one or more of the co-owners.

6. **Overdrafts**: In the event that we pay a check drawn on a joint account and that payment causes an Overdraft, each party to that joint account will be jointly and severally liable to us for the amount of that Overdraft without regard to which party signed the check or for what purpose the proceeds of the check were used.

7. **Death of a party**: You agree to notify us of the death of any joint owner and to reimburse us for any tax we must pay by reason of our payment or release of funds in the account to you. **Unless your signature card states otherwise, upon the death of any account owner, the funds in a multiple-owner account shall belong to the surviving owner(s)**. We reserve the right to hold funds in the account until we receive documentation satisfactory to us, proving death and/or directing the disposition of such funds.

8. If you want to change the form of your account, you must notify us in writing, by certified or registered mail, return receipt requested, addressed to the branch where your account is maintained. If you wish to alter the form of an account, the altered form must be an account offered by Capital One Bank and written notice must be made by the proper completion of a document approved by Capital One Bank and delivery of that document to us. Written notice is not effective until received by us. You must also provide us with new completed signature cards within thirty (30) days from the date you forwarded written notice to us.

9. We will be protected from liability for all payments made from the multiple party deposit account, when made in accordance with applicable law.

**Limitations on assignment and transfer of ownership**. You may not assign or transfer ownership of your deposit accounts with us without obtaining our prior written approval. In addition, you may not grant a security interest in funds held in your deposit accounts in favor of any other creditor without obtaining our prior written approval, which we have the right to withhold for any or no reason. If any ownership interest in an account is proposed to be transferred or if there is any change in account title, we may require that the account be closed and a new account be opened.

Case 1:25-cv-21596-RKA   Document 30-1   Entered on FLSD Docket 06/11/2025   Page 48 of 77

# Deposit availability disclosure

**General deposit availability**:

Our general policy is to make funds from your deposits available to you on the first business day after the day we receive your deposits. Wire Transfers, and electronic deposits (such as ACH credit transfer direct deposits) will be available on the day we receive the deposit. Once funds are available, you may withdraw the funds in cash, and we will use the funds to pay checks that you have written. For the purpose of determining the availability of your deposits, every day is a business day except Saturdays, Sundays, and federal holidays. Banking office cutoff times may vary, but in no event shall a cutoff time be earlier than 2:00 p.m. local time. If you make a deposit in a branch before 2:00 p.m. local time, or such later time posted at the branch of deposit on a business day that we are open, we will consider that day to be the day of your deposit. If you make a deposit at one of our automated teller machines ("ATM") before 9:00 p.m. ET, we will consider the deposit to be made that day. However, if you make a deposit after these stated times, or on a day we are not open, we will consider the deposit to be made on the next business day that we are open. Deposits made through our night drop after 7:00 a.m. may be processed on the next business day.

Please remember that even after we have made deposited funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit. If you have any questions, contact a banking officer.

1. **Government checks and cashier's checks**:

   Funds from the following deposits are available on the first business day after the day of your deposit: U.S. Treasury Checks, USPS Money Orders, Federal Reserve Bank & Federal Home Loan Bank checks; and when deposited with a special deposit slip, State or Local government checks, Cashier's, Certified, Teller's and Travelers checks.

2. **Longer delays may apply**:

   In some cases, we will not make all of the funds you deposit by check available to you on the first business day after the day of your deposit. Funds may not be available until the second business day after the day of your deposit. The first $275 of your deposits, however, may be available on the first business day after the day of your deposit. If we are not going to make all of the funds from your deposit available on the first business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the day after we receive your deposit.

If you will need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

- We believe the check you are depositing will not be paid.
- You deposit checks totaling more than $6,725 on any day to any account(s) you maintain (alone or with others) at Capital One Bank.
- You redeposit a check that has been returned unpaid.
- You have overdrawn your account(s) repeatedly in the last six months.
- There is an emergency, such as failure of computer or communications equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. The funds will generally be available no later than the seventh business day after the day of your deposit.

3. **Special rules for new accounts**:

   If you are a new customer, the following special rules will apply during the first thirty (30) days your account is open:

   - Funds from wire transfers and electronic deposits (such as ACH credit transfer direct deposits) will be available on the day we receive the deposit.
   - Funds from the following deposits are available on the first business day after the day of your deposit: U.S. Treasury Checks, USPS Money Orders, Federal Reserve Bank & Federal Home Loan Bank checks; and when deposited with a special deposit slip, State or Local government checks, Cashier's, Certified, Teller's and Travelers checks.
   - Funds from all other check deposits will be available no later than the fifth business day after the day of your deposit.

4. **Expedited availability**:

   Based on your overall relationship with us, we may make a portion of your check deposits available to you on an expedited basis. We will periodically reevaluate the usage and handling of your account based on your customer history with Capital One Bank. This review could result in reducing the availability schedule currently applied to your check deposits. In the event of such a reduction, your funds will be made available to you as described in the preceding sections of this disclosure.

   As described above, deposits made after the branch and/or ATM cut-off time will be considered next day deposits. In some instances, however, you may be able to access these deposits on the calendar day the deposit was made. In these instances, the funds will be

accessible to you for withdrawal (at a branch or ATM), but will not be available to pay incoming ACH transactions or checks you have written.

5. **Holds on other funds (check cashing)**:

   If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. (These funds will be available at the time that funds from the check we cashed would have been available if you had deposited the check.)

6. **Holds on other funds (other accounts)**:

   If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure. Please ask a Relationship Banker if you are unsure about when funds from a deposit will be available.

# Substitute checks and your rights

Federal rules for Check 21 allow banks to replace original checks with "substitute checks". Below are the details and your rights:

**What is a substitute check?**

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

**What are my rights regarding substitute checks?**

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account

more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law. If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

**How do I make a claim for a refund?**

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact your local branch or call us at 1-800-262-5689. You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include:

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check and/or the following information to help us identify the substitute check: the account number, the check number, the name of the person to whom you wrote the check, the date paid, and the amount of the check.

Substitute checks should only be generated by banks during the check collection process. If you deposit a substitute check that was not generated or previously handled by Capital One Bank, you agree to provide the substitute check warranties as required by Check 21, and represent that the substitute check:

- is properly generated and accurately, clearly and completely represents all the information on the front and back of the original check as of the time the original check was truncated

- bears a MICR encoded line that is suitable for automated processing in the same manner as the original check
- has not previously been paid by the drawee bank, and
- is not fraudulent

A breach of any Check 21 warranty may result in the substitute check being charged back against your account.

**Telephone solicitation**. If you provide our routing number and your account number to a telephone solicitor pursuant to your acceptance of an offer of goods or services made by the solicitor, you agree that any and all subsequent transactions made to your account by the entity which the solicitor represents are considered authorized transactions. We shall not be liable for any transactions you later allege are unauthorized unless you have placed a stop payment order, and we have had a reasonable time to act upon your stop payment request.

**Communications**. You agree that we may communicate with you by mail, telephone, email, fax, prerecorded message, automated voice, text message or other means allowed by law regarding your Account. You agree that we may contact you at any telephone number (including a mobile telephone number that you provide us), and use an automated telephone dialing system or similar device to do so. You agree that we may monitor or record any conversation or other communication with you.

**Correspondents**. Capital One Bank may forward items to correspondent banks and will not be liable for the wrongful conduct of the correspondent bank. Each correspondent will be liable only for its own negligence. We will not be liable for the loss of items in transit.

**Address changes for deposit accounts governed by this document**[1]. You are responsible for notifying us of any change in your address. Your Privacy and Security is important to us so having the most current address on file is required. Unless we agree otherwise, changes of address must be made online, over the phone, or in a branch by at least one of the account holders. Informing us of your address on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. In the event mail we attempt to deliver to you is returned as a result of your failure to notify us of your change in address, we may charge a fee to your account in accordance with our Schedule of Fees and Charges.

We may change your postal address of record if we receive an address change notice from the U.S. Postal Service or if we receive information from a third party vendor in the business of providing correct addresses, that our records no longer correspond to your address.

[1] For example, if you have a line of credit with us or a 360 checking account, please follow the account agreement given to you.

**Cash transaction reporting**. The law requires all financial institutions to gather and report information on certain types of cash transactions. If the information required to complete the report is not provided, we are required to refuse to process the transaction.

**Obtaining credit reports**. We may request a consumer (credit) report in connection with your account(s). Upon your request, you will be informed whether or not a consumer (credit) report was requested, and if such report was requested, informed of the name and address of the consumer (credit) reporting agency that furnished the report. We may also request subsequent consumer (credit) reports for all legitimate purposes in connection with updating, renewing, reviewing, modifying, and/or taking collection action on your account(s).

**Reporting information to credit bureaus and check verification systems**. We may report information about your account to credit bureaus and/or check verification systems. Defaults on your account may be reflected in your credit report. This could affect your ability to open accounts in the future.

In the event we report your account to a check verification system, you acknowledge that even if you pay us all amounts owed, we are not required to remove an accurate report of account mishandling from any such check verification system.

**Business day.** Any day, excluding Saturdays, Sundays and federal holidays.

**Reproduction of bank records**. If you request us to research and/or reproduce any of your records (statements, checks, deposits, withdrawals, etc.) we may charge a fee, and you agree to pay this fee. If the expected fee is large, you may be asked to pay the fee in advance. We reserve the right to provide any account holder with an imaged item in lieu of the original item.

**Governing law/waiver of jury trial**. Applicable federal law will decide any questions under these Rules, or if no federal law exists, applicable state law (the state where your account was established). Any action you commence against us, arising out of or concerning these Rules, shall be heard by a judge sitting without a jury. In any such action, Capital One Bank shall be entitled to its reasonable attorney's fees (including in-house attorney's fees) and court costs if it is the prevailing party.

**Notices**. We shall deem any and all notices to us effective upon receipt by us. Any notice that we give to you will be effective when mailed or electronically transmitted to you at the mailing/email address reflected in our records. Even though we may have provided you account opening disclosures in a language other than English, we may continue to provide you with notices/communications in English. Notice to any one owner of an account constitutes notice to all owners of that account.

**Severability**. If any provision of these Rules is deemed to be invalid or unenforceable, such invalidity or unenforceability will not affect the validity and enforceability of the remaining

provisions of these Rules or of any agreements, disclosures or other documents incorporated by reference herein.

**Liability**. You agree that we shall be not be liable for acting upon your instructions or failing to act upon your instructions when we reasonably believe that doing so would expose us to civil or criminal liability or conflict with industry standard banking practices. You agree further, that except as otherwise provided by applicable law, in no event shall we be liable for indirect, special or consequential damages or for attorney's fees incurred by you, regardless of the form of the action, even if we have been advised of the possibility of such damages.

**Waiver of rights**. We reserve the right to waive any one or more of our rights hereunder in our sole discretion, however, any such waiver shall only apply to that specific instance. Any such waiver of rights can also be terminated at any time, in our sole discretion.

**Caption headings**. The caption headings in these Rules are for convenience purposes only and are not to be construed as a summary of each provision of these Rules.

**Privacy Policy**. We understand how important privacy and confidentiality are to you. Please consult our Online Privacy Policy and our U.S. Consumer Policy Notice for information about our commitment to you and your privacy rights. A copy of our Online Privacy Policy and our U.S. Consumer Policy Notice is available on our Website. Information regarding mobile banking security can also be found on our Website ([capitalone.com/privacy](capitalone.com/privacy)).

**Electronic Funds Transfers**. Special provisions relating to electronic funds transfers are set forth in our EFT Disclosure which is available at any of our banking offices.

**Wire and ACH transfers**. Special provisions relating to wire transfers are set forth in our Wire Transfer Agreement and Disclosure, provided to you at account opening and available at any of our banking offices. For Treasury Management clients, ACH and Wire transfer terms are set forth in the applicable Treasury Management agreements. This provision supplements those agreements. You agree that we are not required to provide you with a separate notice of incoming or outgoing wire/ACH transfers. We notify you by listing the wire/ACH transfer on your account statement. We can deduct our fees for handling wire/ACH transfers from the amount of the transfer. You can verify whether a wire/ACH transfer has been processed to your account by calling us at [1-800-655-2265](1-800-655-2265).

For international wire transfers involving non-U.S. currencies, exchange rates can vary and we do not guarantee any rate. The exchange rates we use for your transactions will typically be the customary retail exchange rates in effect at the time of the transaction. This rate is not necessarily the bank-to-bank negotiated exchange rate or other potentially more favorable rate. FDIC deposit insurance does not insure against any loss due to foreign currency fluctuations. Consult your attorney or investment advisor regarding the potential risks associated with foreign exchange transactions.

**Faster Payments (FP).** You agree that we are not required to provide you with a separate notice of incoming FP payments.  We notify you by listing the FP payment on your account statement.

**Amendments and fee changes**. We reserve the right to change our fees, these Rules and any or all of the agreements, disclosures, and other documents incorporated by reference at any time. If we change these Rules, the then-current version of these Rules supersedes all prior versions and contains the terms governing your account. We will provide prior notice of changes to you as required by applicable law. You agree that continued use of your account(s) will constitute your agreement to any and all new fees, Rules, agreements, disclosures and other documents incorporated by reference. If you choose to close your account and do so prior to the effective date of any amendment, you will not be bound by such amendment.

**Copy received**. You acknowledge receipt of a copy of these terms and conditions and agree to be bound by them.

# Electronic Fund Transfer Agreement and disclosure for personal and commercial accounts

**Effective February 9, 2022**

Welcome to Capital One, N.A. (hereinafter referred to as "Capital One Bank," "us," "our," or "we"). In this Agreement, "you," "your," and "yours" mean the authorized person or persons who conduct electronic fund transfers, including but not limited to persons to whom a Capital One Bank ATM or Debit Card is issued. Capital One Bank provides various electronic banking services to you. These services include, but are not limited to:

- Automated Teller Machine ("ATM") transactions.
- Telephone transfers.
- Point-of-Sale ("POS") transactions, whether or not initiated through an electronic terminal.
- Pre-authorized transfers to or from an account ("ACH").
- Smartphone or other mobile device transfers.
- Online banking (see the Online Banking Terms and Conditions at [www.capitalone.com/corporate/terms/](www.capitalone.com/corporate/terms/)).

This Electronic Fund Transfer Agreement and Disclosure ("Agreement") contains disclosures required by Regulation E that apply to consumer accounts in addition to disclosures that apply to commercial accounts as they relate to electronic banking services, and it contains our terms and

conditions with respect to these services. A consumer account is an account held by an individual and used primarily for personal, family, or household purposes.

1. **Your access device and your Personal Identification Number**: An access device is a card, personal identification number ("PIN"), or other code used to initiate an electronic fund transfer ("EFT") to or from your account. The Capital One Bank, ATM card, platinum Debit Card, or Business Debit Card (hereinafter referred to collectively as "ATM/Debit Card") that you have requested is an access device.

   You have selected or have been provided with a special PIN, a code you must enter into the ATM or that you may be required to enter into the POS terminal whenever you use your ATM/Debit Card. For your own protection, please memorize the PIN, and do not keep any notation of the PIN on the ATM/Debit Card or in the same wallet or purse as the ATM/Debit Card, and do not disclose the PIN to anyone who is not authorized to use your ATM/Debit Card.

   **Important information concerning international use of your ATM or Debit Card**: Capital One Bank employs fraud monitoring and protection capabilities to help protect you from ATM/Debit Card fraud. These protection systems are designed to block transactions that occur outside of our customers' ordinary transaction patterns and may block transactions originating in countries that are experiencing a high incidence of card fraud.

2. **Accounts that may be accessed**: The accounts you link to your ATM/Debit Card are referred to in this Agreement as "designated accounts." You may access only the designated accounts. If you requested access to multiple accounts, you chose one checking account and one savings account as your primary checking and savings accounts. We may limit the number of accounts that can be linked to an ATM/Debit Card. If you wish to access additional accounts or change your primary accounts, please contact your banking officer.

   You may use your ATM/Debit Card and PIN to access the following types of designated accounts:

   A. Checking account.
   B. NOW account.
   C. Savings account.
   D. Money Market account*

   * At certain ATMs, when accessing your Money Market accounts you may need to select the 'checking' option rather than the 'savings' option.

3. **Types of transactions that can be completed**: You may use your ATM/Debit Card at any Capital One Bank ATM. You may also use your ATM/Debit Card to complete transactions at non-Capital One Bank ATMs that are members of the EFT networks in which we participate.

Purchases may also be made using your ATM/Debit Card at merchant locations that are members of the POS networks in which we participate. You may also use your Debit Card or Business Debit Card to make purchases at locations that accept Debit MasterCard™ Cards. (Note: Your Debit Card or your Business Debit Card is not a MasterCard credit card, and this Agreement does not replace or affect any MasterCard account agreement that you may have with us or any other financial institution.)

Please note that some of the below services may not be available at all ATMs.

A. **Cash withdrawals**: You can use your ATM/Debit Card and PIN at ATMs to obtain cash withdrawals from your designated accounts. At certain ATMs, cash withdrawals may only be made from your primary savings and primary checking account. Withdrawals made at ATMs owned and operated by other entities will be automatically deducted from your designated primary checking or savings account. Each time you use your ATM/Debit Card, we may place a hold on a corresponding amount of funds in your account until the transaction is posted against your account.

B. **Deposits**: You can use your ATM/Debit Card and PIN at Capital One Bank-branded ATMs to make deposits into your designated accounts. Deposits made at an ATM may not be available for immediate withdrawal. Please refer to the Deposit Availability Disclosure contained in our Rules Governing Deposit Accounts Agreement to determine when the deposit will be credited to your account and when funds will be available for withdrawal or for paying transactions on your account.

C. **Transfers between your Capital One accounts**: You can use your ATM/Debit Card and PIN at a Capital One Bank-branded ATM to transfer available funds between your designated accounts. Transfers made at a non-Capital One Bank ATM can only be made between your designated primary checking and primary savings accounts.

    You may also transfer funds between your Capital One Bank accounts via the telephone, online banking, or by establishing an automatic transfer schedule.

D. **Purchases**: You can use your ATM/Debit Card and PIN to make purchases at merchant locations that are members of POS networks in which we participate.

    You may also use your ATM/Debit Card without your PIN to make purchases at merchant locations accepting Debit MasterCard Cards. The merchant may request a preauthorization for the transaction. If we authorize the transaction, the funds will be debited from your primary checking account immediately, or a hold may be placed on your account for up to several days after the purchase transaction has occurred, depending upon the promptness with which the merchant processes your transaction.

    Some purchases may result in a longer hold. Sometimes the preauthorization requests may be in amounts different from the total amount of the transaction. For example, a

gas station typically requests authorization in the amount of $1.00. Also, restaurants typically request authorization for 20% more than the price of the meal. If the preauthorization request varies from the amount of the actual transaction, payment of the transaction may not remove the preauthorization hold immediately. Generally, the preauthorization hold may remain on your account for up to three (3) business days after the date of the transaction and may affect the availability of funds from your designated account for other transactions. We will not be responsible for damages for wrongful dishonor of an item resulting from a preauthorization hold. You agree not to withdraw, write checks, or make point-of-sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against your account.

E. **Inquiries**: You can use your ATM/Debit Card and PIN at ATMs to check the balance in your designated accounts. At non-Capital One Bank ATMs, you may only make balance inquiries on your designated primary checking or savings account. You may also check the balance in your designated accounts via our telephone or online banking service.

F. **Transfers between your Capital One Bank accounts and accounts at other financial institutions (or third parties) and check conversion**: You can authorize a third party to initiate transfers between your accounts and the third party's accounts by providing the third party with our routing number and your account number.

You may also authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to: (i) pay for purchases, or (ii) pay bills.

When you provide a check as payment, you authorize us to use information from your check to make a one-time electronic fund transfer from your account. In certain circumstances, such as for technical or processing reasons, we may process your payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account on the same day you make your payment.

You should only provide your financial institution and account information (whether over the phone, the Internet, or via some other method) to trusted third parties whom you have authorized to initiate electronic fund transfers.

4. Limitations on Transactions: There are certain limitations on the use of electronic banking services. These include, but are not limited to, the following:

A. **Designated accounts**: You may only access your designated accounts with Capital One Bank.

B. **Daily limitation**: A daily spending limitation exists on all ATM/Debit Cards. This limitation combines three categories: cash withdrawals, cash advances and point-of-sale purchases. You may not aggregate transactions during any one (1) day (including

either cash withdrawals, purchases, cash advances or a combination of the three) that exceed the established card limit. See the chart below for the limits established for the card product that you have. The limits listed below are the current default limits for our standard ATM/Debit Card products. Some cards might have different prevailing limits for their product at time of issuance. We do offer specialty ATM/Debit Cards with different default limits. If you have received a Wealth Management debit card or a Deposit Only ATM card, please refer to the documentation you received when you opened your account for details about limits for these cards.

| | ESTABLISHED CARD LIMIT | CASH LIMIT | F |
|---|---|---|---|
| Platinum debit | $2,500 | $600 | $ |
| Business debit | $5,000 | $800 | $ |
| ATM card | $2,500 | $600 | $ |

Other ATM owners and operators may impose lower dollar limitations on the amount of cash withdrawals made at their ATMs.

C. **Online banking external funds transfer limitation**: You may enroll in online banking to perform electronic transfers. When you enroll, you will be provided with additional terms and conditions that apply to electronic transfers using our online banking services. The below charts provide the default limits established for online banking transfers into and out of your designated accounts. Different limits may be assigned on a case-by-case basis. These limits do not apply to internal transfers between accounts opened in a Capital One Bank branch and accounts opened with Capital One Direct Banking accounts (both National Direct Bank [NDB] and 360 accounts), bill pay transfers, or pre-authorized third party payments.

The below limits apply to High Yield Checking and High Interest Checking accounts:

|  | PER TRANSFER LIMIT | DAILY LIMIT | N |
|---|---|---|---|
| Inbound transfer | $10,000 | $10,000 | $ |
| Outbound transfer | $10,000 | $10,000 | $ |
| Total transfer limit (combined inbound and outbound) |  | $20,000 | $ |

The below limits apply to all other products (excluding High Yield Checking and High Interest Checking):

Case 1:25-cv-21596-RKA   Document 30-1   Entered on FLSD Docket 06/11/2025   Page 61 of 77

| | PER TRANSFER LIMIT | DAILY LIMIT | |
|---|---|---|---|
| Inbound transfer | $3,000 | $3,000 | |
| Outbound transfer | $3,000 | $3,000 | |
| Total transfer limit (combined inbound and outbound) | | $6,000 | |

Small Business accounts have different limits that change based on multiple factors.

D. **Third party transaction limitation**: Our savings and money market accounts permit no more than six (6) transfers per statement cycle to a third party or to any of your other deposit accounts at Capital One. There is no limit in the number of transfers that you may make into your account. Note: We are currently not enforcing the transfer limits on consumer accounts. You'll be notified if we choose to re-impose these limits.

E. **Other reasons**: We and other ATM owners and operators may limit or refuse to complete your ATM/Debit Card transactions for security or technical reasons.

We may also suspend your ATM/Debit Card if we consider your designated account to be inactive or dormant.

5. **Overdraft situations**: An overdraft occurs when you do not have enough money in your designated account to cover a transaction, but we pay it anyway. Generally, we will not authorize and pay overdrafts for ATM withdrawals and everyday debit card transactions against your designated account unless you have authorized us to do so.* You understand and agree that even if you have authorized us to do so, you have no right to overdraw your account at any time, for any reason, and our decision to pay overdraft items is solely within our discretion. You further agree that if we elect to pay overdraft items, you must deposit additional funds into your designated account immediately in an amount sufficient to cover the overdraft. Available credit on an overdraft protection line of credit associated with the designated account may be used to fund ATM/Debit Card transactions when you do not have sufficient collected funds in your designated account(s). If the amount of the overdraft causes you to exceed the balance in the overdraft protection deposit account linked to the

overdrawn deposit account, you agree to pay the amount by which the deposit account has been overdrawn *Applies only to consumer accounts.

6. **Transactions that are not completed**: If we do not complete a transfer to or from your account on time or in the correct amount according to our Agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

   A. If, through no fault of ours, you do not have enough money in your account to make the transfer;
   B. if we have terminated this Agreement for any reason;
   C. if the funds in your designated accounts are subject to legal process or other encumbrance restricting the transaction;
   D. if circumstances beyond our control (such as fire or flood) prevent the transaction from being completed despite reasonable precautions that we have taken;
   E. if an ATM does not have enough cash to complete the transaction;
   F. if there is a technical malfunction in the ATM that is known to you when you try to perform the transaction;
   G. if we have reason to believe that you or someone else is using our electronic banking services for fraudulent or illegal purposes;
   H. if you exceed the transfer limits listed in Section 4, "Limitations on Transactions," of this Agreement;
   I. if your ATM/Debit Card has deteriorated or has been damaged so that it does not function properly;
   J. if your ATM/Debit Card or PIN has been reported lost or stolen;

   You agree that we will not be liable for any damages resulting from a refusal for any reason to authorize a transaction that you have attempted. You further agree that we will not be responsible or liable for a merchant's refusal to accept your ATM/Debit Card.

7. **Charges for ATM/Debit Card transactions**: When you use your ATM/Debit Card at a non-Capital One Bank branded ATM, the ATM owner/operator may charge you a fee for your use of their ATM, and you may be charged a fee for a balance inquiry, even if you do not complete a cash withdrawal or funds transfer. You may also be charged a fee by us, as disclosed in our then current Schedule of Fees and Charges, for each cash withdrawal, funds transfer, or balance inquiry that you may make using a non-Capital One Bank branded ATM.

   For international transactions, MasterCard's currency conversion procedure includes use of either a government mandated exchange rate, or a wholesale exchange rate selected by MasterCard for the processing cycle in which the transaction is processed. The currency conversion rate used by MasterCard on the processing date may differ from the rate that would have been used on the purchase date or cardholder statement posting date.

Withdrawals from an ATM outside of the United States, Puerto Rico, and U.S. Virgin Islands may incur an international transaction fee, as disclosed in our then current Schedule of Fees and Charges.

8. **Receipts and account statement**: You will be given a receipt for transactions made with your ATM/Debit Card at ATMs owned by Capital One Bank unless you decline to receive the receipt. Your periodic account statement(s) for your designated accounts will also detail electronic transfer activity on the designated account. Generally, if you have a consumer account, you will receive a monthly statement if you have an EFT in that month. In any case, you will get the statement at least quarterly.

9. **In case of errors or questions about your electronic transfers**: (For information pertaining to the error resolution process for international wire transfers, please refer to the Wire Funds Transfer Disclosure Statement and related disclosures.)

   **Call us at**: 1-866-536-9023; Small Business: 1-833-368-5386

   **Write to us at**:
   Capital One, N.A.
   7933 Preston Rd.
   Plano, TX 75024
   Attn: Customer Service Center

   Log into your account at capitalone.com and click on the transaction.

   Contact us as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt.

   *The following section applies only to consumer accounts*: We must hear from you no later than sixty (60) days after we sent you the FIRST statement on which the problem or error appeared.

   1. Tell us your name and account number.
   2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
   3. Tell us the dollar amount of the suspected error.

   If you tell us verbally, we may require that you send us your complaint or question in writing within ten (10) business days.

   We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days (ninety (90) days for those transactions at merchant POS terminals, processed on a new account, or initiated outside the United States) to investigate your

complaint or question. If we decide to do this, we will credit your account within ten (10) business days for the amount you think is in error so that you will have full use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days, we may not credit your account.

For errors involving new accounts (an account where the first deposit to the account occurs less than 30 days before the error), we may take up to twenty (20) business days to credit your account for the amount you think is in error.

We will tell you the results within three (3) business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

***The following section applies only to commercial accounts***: If you are a business or other entity that is not a natural person, the above referenced procedures do not apply to any accounts held by you. If you believe that an unauthorized transaction has occurred, we must hear from you within twenty four (24) hours of the time the transaction posts to your account. We will require you to submit an affidavit of unauthorized activity in connection with any such transaction immediately thereafter.

10.   **Pre-authorized payments**:

A.   **Right to stop payment**: If you have authorized regular payments out of your account, you can stop any of these payments. If the account requires multiple signatures to transact the withdrawal of funds, it is understood that we will recognize and accept stop payment instructions from any one authorized signer. Here is how: Visit your nearest Capital One Bank location. You may also:

**Call us at**: 1-800-655-2265

**Write us at**:
Capital One, N.A.
7933 Preston Rd.
Plano, TX 75024
Attn: Customer Service Center

We must receive your request at least three (3) business days before the payment is scheduled to be made. If you call us, we may also require you to put your request in writing to the above address and to get it to us within fourteen (14) days after you call. If you do not, then your verbal request will expire after fourteen (14) days. We will charge you a fee as disclosed in our then current Schedule of Fees and Charges for each stop payment order you give.

Case 1:25-cv-21596-RKA   Document 30-1   Entered on FLSD Docket 06/11/2025   Page 65 of 77

Merchants may allow returns or refunds on purchases; however, except as provided above for recurring payments, you cannot stop a one-time payment on any ATM/Debit Card transactions. For this reason, you should inquire about the merchant's return or refund policy before entering into a purchase transaction. Merchandise purchased using your ATM/Debit Card that is subsequently returned will be reflected as a credit on your designated account statement, provided you elect to have the return credited to your designated account. Please refer to Section 9 for information on error resolution.

B. **Varying amounts**: If these regular payments vary in amount, the person you are paying must tell you ten (10) days before each payment when it will be made and how much it will be. If you do not know this information, you may be unable to have the payment stopped without closing your account. (If we are required to provide this notice, you may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

C. **Liability**: If you order us to stop one of these payments three (3) business days or more before the transfer is scheduled, and we do not do so, we will be liable for your actual losses or damages, unless you failed to give us proper instructions that would enable us to stop the transfer. *We will pay other damages only as required by applicable law. We will not be liable for any consequential or special losses or damages unless we act in bad faith. In addition, we will not be liable if the merchant or other third party initiating the transaction changes the dollar amount of the transaction or makes other changes so that we do not recognize it as the payment you stopped.*

11. **Verifying pre-authorized deposits**: You can verify whether a direct deposit has been processed to your account by calling us at 1-800-655-2265.

12. **Joint accounts**: If more than one person signed your request for electronic banking services, each person who signed will be bound by this Agreement and will be responsible for paying all amounts owed as a result of this Agreement. If two (2) signatures are required to transact business on a designated account, any ONE (1) signer may initiate an electronic banking transaction on the account.

13. **Liability for unauthorized transfers on consumer accounts only**:

A. Notify us immediately if you believe your ATM/Debit Card has been lost or stolen, or if you believe that an electronic fund transfer has been made without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your designated accounts (plus any available revolving line of credit, if applicable). If you tell us within two (2) business days after you learn of the loss or theft, you can lose no more than $50.00 if someone used your ATM/Debit Card without your permission.

B. If you DO NOT tell us within two (2) business days after you learn of the loss or the theft of your ATM/Debit Card, and we can prove we could have stopped someone from using your ATM/Debit Card without your permission if you had told us, you could lose as much as $500.00.

C. If you think that a transfer or withdrawal shown on your periodic statement is incorrect, or if you believe an unauthorized transfer or withdrawal has taken place, including those made by your ATM/Debit Card, code, or other means, contact us at once. We must be notified within sixty (60) days after the first statement we mailed to you on which the suspected problem appeared. If you do not contact us within this sixty (60) day time period, you could be held responsible for all unauthorized transfers and withdrawals that occurred between the end of the sixty (60) day period and the time you actually notified us if the transaction could have been prevented if we had been notified.

D. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we may extend the above time periods.

E. If you believe that your ATM/Debit Card has been lost or stolen or that someone has transferred or may transfer money from your account without your permission, you may:

**Call us at**: 1-800-655-2265

**Write us at**:
Capital One, N.A.
7933 Preston Rd.
Plano, TX 75024
Attn: Customer Service Center

14. **MasterCard Zero Liability**: You may have additional rights under the MasterCard rules. Provided that the PIN is not used as the cardholder verification method, you will not be responsible for unauthorized use of the Platinum Debit and Business Debit Cards under the following conditions:

A. Your account is in good standing;

B. You have exercised reasonable care in safeguarding your card from any unauthorized use. Unauthorized use means that you did not provide directly, by implication or otherwise, the right to use your card, and you received no benefit from the "unauthorized" purchase; and

C. You have not reported two or more unauthorized events in the past 12 months.

If you have questions regarding zero liability coverage or you suspect unauthorized use of your debit card, contact us IMMEDIATELY.

15. **Evidence**: If we go to court for any reason, we can use a copy, microfilm, or microfiche of any document or electronic documentation, e-mail, or database information to prove what you

owe or that a transaction has taken place. These facsimiles will have the same validity as the original documents.

16. **Our rules and regulations and other agreements**: The designated deposit accounts are also subject to other agreements that you may have with us including, but not limited to, our Rules Governing Deposit Accounts and Online Banking Terms and Conditions.

17. **Disclosure of information about your account**: In the ordinary course of business, we may disclose information to third parties about your designated accounts or the transfers you make:

- Where it is necessary for completing transfers or resolving errors involving transfers;
- In order to verify the existence and condition of your account for a third party, such as a consumer reporting agency or a merchant;
- In order to comply with orders or subpoenas of government agencies or courts;
- If you give us your written permission;
- As disclosed in our Privacy Notice; or
- As otherwise permitted by law.

18. **Our business days**: For purposes of this Agreement, our business days are Monday through Friday. Federal holidays or other days we are closed are not considered business days.

19. **Terminating this Agreement**: You can terminate this Agreement at any time by notifying us in writing. We reserve the right to deactivate any ATM/Debit Card that has not been used for an extended period of time. We can also terminate this Agreement at any time. The termination of this Agreement by either party will not affect your obligations under this Agreement, even if we allow any transaction to be completed after this Agreement has been terminated.

20. **Changing this Agreement**: We have the right to change the terms of this Agreement from time to time. We will notify you at least twenty-one (21) days before the change will take effect if the change will cause you greater costs or liability or if it will limit your access to your designated accounts. We will not have to notify you in advance, however, if the change is necessary for security reasons.

21. **Notices**: All notices from us will be effective when we have e-mailed them, mailed them or delivered them to the last address that we have for you in our records. Notices from you will generally be effective when received at the appropriate address specified in this Agreement, but notices under Section 14 ("Liability for Unauthorized Transfers on Consumer Accounts Only") will be effective once you have done whatever is reasonably necessary to give us the information we need. A mailed notice will be considered delivered to us when it is received by us at the notice address in Section 14 of this Agreement. If more than one person signs your request for electronic banking services, notice to or from one of the people who signed the request will be effective for everybody who signed.

22. **Collection expenses**: If we have to file a lawsuit to collect whatever you owe us, you will pay our reasonable expenses, including attorney's fees.

23. **Governing law**: Any questions under this Agreement will be decided by applicable federal law, or, if no federal law exists, applicable state law. If any term of this Agreement cannot legally be enforced, the Agreement is to be considered changed to the extent necessary to comply with the law.

24. **Acceptance of this Agreement**: You have agreed to be bound and obligated under the terms of this Agreement and any subsequent amendments to this Agreement by using our electronic banking services.

# Wire Funds Transfer Disclosure Statement

**Effective September 17, 2020**

In this Wire Funds Transfer Disclosure Statement and Agreement (this "Agreement"), the words "you" and "your" mean a Capital One Bank account owner, and the words "us," "we," and "our" mean Capital One Bank. Capital One Bank is used as a trade name for Capital One, N.A. This Agreement defines your responsibilities and our responsibilities with respect to transfers of funds from your account(s) with us by wire transfer for credit to an account at another financial institution or another account with us ("Funds Transfers"), whether such transfers are domestic or international, made pursuant to: (a) written instructions, signed by you or your authorized representative ("Authorized Representative"), which we receive (i) in person from you or from someone present on your behalf, (ii) via facsimile transmission, (iii) via email, or (b) instructions we receive via our telephone wire request channel [(a) and (b) are collectively referred to herein as the "Funds Transfer Service"; (b) referred to herein as "Remote Channel"]. You understand that, except as specifically modified by this Agreement, your account(s) will continue to be governed by the terms and conditions contained in other agreements and/or disclosures that you have been provided with in connection with your account(s), which are incorporated herein by reference. Unless otherwise defined herein, the terms used in this Agreement shall have the same meaning as set forth in Article 4A of the Uniform Commercial Code and, to the extent applicable, the Electronic Fund Transfer Act (EFTA) and its implementing regulations.

1. **How to make a funds transfer**: You may request or authorize a Funds Transfer ("Funds Transfer Request") either in person, through our Telephone Wire Request Service, or strictly for an outbound international wire from a business account, by email. All Funds Transfer Requests delivered in person, by email, or by facsimile must be in writing, signed by you or your Authorized Representative and must contain detailed and specific instructions in a form acceptable to us in our sole discretion. Your Authorized Representative may be: (1) any joint owner on your account; (2) an authorized attorney-in-fact of an individual or joint owner on

the account, acting pursuant to a power of attorney recognized by us; (3) an authorized fiduciary, such as a trustee, executor, administrator, custodian, guardian or conservator; (4) an authorized signatory on a business account, or (5) an individual indicated on a business resolution as someone authorized to initiate a Funds Transfer.

2. **Method used to make the funds transfer**: We may select any means for the transmission of funds that we consider suitable, including but not limited to Fedwire. We may make use of correspondents, agents, subagents and funds transfer and communication systems. Such third parties shall be deemed your agents and we shall not be liable for any errors, delay, misdelivery, or failure of delivery by any of them unless applicable law says otherwise.

3. **Cut-off times**: We have cut-off hours for processing Funds Transfers. Cut-off times vary depending on the location. Check with your local branch or contact the call center for cut-off hours. We may treat any Funds Transfer Request received at or after our cut-off time as if it were received that business day or we may treat it as if it were received at the opening of the next business day.

4. **Security procedures**: You agree and consent to the use of certain security procedures by us to confirm the validity of the Funds Transfer Request made pursuant to this Agreement. You understand the security procedures are not designed to detect errors in the content of the Funds Transfer Request or to prevent duplicate transfers.

   Some elements of the procedures will vary depending upon the method used to initiate a Funds Transfer. You hereby agree that your utilization of any security procedure established hereunder shall constitute your agreement to its use and affirmative acknowledgment of its commercial reasonableness. You further agree that any Funds Transfer Request that is acted upon in good faith by us in compliance with these security procedures, whether or not in fact authorized by you, shall constitute an authorized Funds Transfer.

   The following security procedures shall apply to this Agreement: Before accepting any such Funds Transfer Requests, we will: (1) perform verification on the individuals initiating the Funds Transfer Request that is designed to ensure they are the individuals previously authorized to initiate a Funds Transfer for the account in question; (2) apply fraud-related screens to the wire instructions; (3) contact you using information from your account records to verify the Funds Transfer for wires that are not initiated in person (this contact may be through a method different than the one you used to request the Funds Transfer (e.g., phone versus e-mail) or it may be through the same channel to obtain a password or other information that only you should have); and (4) request and receive any other proof of identification or any other documentation from you or your Authorized Representative which we may, in our sole discretion, require under the circumstances.

5. **International Funds Transfer**: For commercial transactions involving an international Funds Transfer (also known as a "remittance transfer"), you are responsible for providing us with the name and address of an intermediary bank at the time of the Funds Transfer. If you do

not supply us with an intermediary bank, we will select one of our choosing. We will not be held liable if we have not confirmed the intermediary bank with you. For a consumer international Funds Transfer, we will select the intermediary bank through which the Funds Transfer is transmitted.

**Selection of currency**: Unless you state otherwise on the Funds Transfer Request form, Funds Transfers sent to foreign countries may be converted to the currency of the destination country at our rate of currency exchange for remittance transfers. Even if you tell us that you want the Funds Transfer sent in U.S. dollars, we cannot guarantee that the beneficiary/designated recipient will receive the funds in U.S. currency. The actual amount that the beneficiary/designated recipient receives may be reduced by fees and taxes imposed by the beneficiary bank, or a correspondent bank, including currency conversion charges.

**Refund**: Refunds of U.S. dollar consumer international Funds Transfer Requests shall be in U.S. dollars in the total amount of funds provided by you at the time of the Funds Transfer; refunds of commercial U.S. dollar international Funds Transfer Requests shall be in U.S. dollars in the amount of U.S. dollar payment that we receive from the bank returning the funds to us at such bank's rate of currency exchange, less any fees therefore. Refunds of foreign currency consumer international Funds Transfer Requests shall be in the total amount of foreign currency funds provided by you at the time of the Funds Transfer; refunds of commercial foreign currency international Funds Transfer Requests shall be in the amount of U.S. dollars that can be bought by us for the applicable non-U.S. dollar currency amount at our then current rate of currency exchange. You shall bear all risk of loss due to fluctuation in the currency exchange rate.

**Conversion rate**: For international Funds Transfers involving non-U.S. currencies, the exchange rates we use for your transactions are not necessarily the bank-to-bank negotiated exchange rate or other potentially more favorable rate. FDIC deposit insurance does not insure against any loss due to foreign currency fluctuations. Consult your attorney or investment advisor regarding the potential risks associated with foreign exchange transactions.

6. **Force majeure**: We will not be liable for our inability to perform our obligations under this Agreement when such inability arises out of causes beyond our control, including but not limited to, any act of God, accident, labor disputes, power failures, system failure, equipment malfunction, suspension of payment by another bank, refusal or delay by another bank to accept the funds transfer, war, emergency conditions, fire, earthquake or the failure of any third party to provide any electronic or telecommunication service used in connection with the execution or cancellation of a Funds Transfer.

7. **Inconsistency of name and account number**: You acknowledge and agree that when you (or your Authorized Representative), provide us with a name and account number in order for us

to process a Funds Transfer, payment may be made by the beneficiary's/designated recipient's bank solely on the basis of the account number, even if the account number identifies a person different from the beneficiary so named. We or an intermediary bank may send a Funds Transfer to an intermediary bank or beneficiary's/designated recipient's bank based solely on the bank identifying number, even if the payment order indicates a different name. We may rely on all information contained in the Funds Transfer Request, regardless of who may have provided the information. You further agree that your obligation to pay the amount of a Funds Transfer to us is not excused in such circumstances. Except as provided by applicable law, any losses resulting from an incorrect account number or your misidentification of the beneficiary/designated recipient is your responsibility and not ours.

8. **Acceptance and execution of request by Capital One Bank**: A Funds Transfer Request is considered accepted by us when we execute it. There is a deadline for each type of Funds Transfer Request. Please contact your Capital One Bank branch or Capital One Call Center for this information. If a Funds Transfer Request is received prior to the deadline, it will be executed by us that business day, provided we are able to validate your request that same business day as described in Section 4. A Funds Transfer Request received after the cut-off time may be executed on the next business day, again provided we are able to validate your request that next business day as described in Section 4. You can verify whether your Funds Transfer Request has been executed by calling us at 1-800-655-BANK (2265).

9. **Payment to Capital One Bank**: You must pay us the amount of the Funds Transfer, plus any applicable fees, before we will execute the Funds Transfer Request. Please contact your Capital One Bank branch or Capital One Call Center for fees applicable to Funds Transfers and any other related pre-payment disclosures.

10. **Rejection of Funds Transfer**: We have no responsibility to accept any incoming Funds Transfer(s) for your benefit. Likewise, we have a right to reject any Funds Transfer Request(s) for an outgoing Funds Transfer for reasons including, but not limited to, insufficient or uncollected funds in the account specified in the Funds Transfer Request, a request that fails the security procedures outlined in Section 4, our inability to execute the Funds Transfer for the reasons set out in the Section of this Agreement entitled Method Used to Make the Funds Transfer above, or if we are unable to verify the authenticity of the Funds Transfer Request.

11. **Notice of Funds Transfer not executed**: If we determine, in our sole discretion, not to honor, execute or accept a Funds Transfer Request, we will endeavor to notify you, but we shall have no liability for delay or failure to do so. We will also endeavor to notify you promptly if a Funds Transfer is returned to us after its execution but shall have no liability by reason of our delay or failure to do so. We shall have no obligation to resend a Funds Transfer if we complied with the original Funds Transfer Request and such Funds Transfer was returned to us.

12. **Cancellation or amendment of Funds Transfer**:

A. **Domestic Funds Transfers**: Once we receive a domestic Funds Transfer Request, it may not be able to be canceled or amended. However, at our discretion, we may use reasonable efforts to act on any request for cancellation or amendment, provided that the method by which we are notified of a request for cancellation or amendment complies with our security procedures. However, we shall have no liability if such cancellation or amendment is not effected. You agree to indemnify and hold us harmless from any and all liabilities, claims, damages, costs and expenses we may incur in attempting to cancel or amend the Funds Transfer. Any cancellation or amendment of a Funds Transfer by us shall relieve us of any obligation to act on the original Funds Transfer Request.

B. **Consumer International Funds Transfers**: Cancellation requests for consumer international Funds Transfers, must be received no later than 30 minutes after payment is made for the Funds Transfer. Cancellation requests received outside of this time frame may not be able to be processed.

13. **Account statements**: Except as provided by applicable law, you agree that we are not required to provide you with a separate notice of incoming or outgoing Funds Transfer. All Funds Transfers will be reflected on your periodic bank statement. You should review your statement for any discrepancies, unauthorized transactions or errors in connection with any Funds Transfers. Except as otherwise provided herein, if you think a Funds Transfer is wrong or if you need more information about a Funds Transfer, you must contact us in writing upon discovery of the error or within fourteen (14) days from the date your statement is postmarked or otherwise made available to you, whichever is earlier. Failure to do so will relieve us of any obligation to pay interest on the amount of an unauthorized or erroneous Funds Transfer for which we are liable. Furthermore, you will also be liable to us for any damages or losses we may incur as a result of your failure to notify us within the time period stated in this Section.

14. **Change in authorized representative**: Any changes in the authority of persons authorized to make a Funds Transfer on your behalf shall not be binding upon us until we have received written notice from you. The notice must be in a form acceptable to us and be given within a reasonable period of time for us to act upon the change.

15. **Duty of reasonable care**: We shall exercise good faith and reasonable care in processing Funds Transfer Requests. You shall similarly exercise good faith and reasonable care in observing and maintaining security procedures, in communicating Funds Transfer Requests to us, and in reviewing periodic bank statements for any discrepancies.

16. **Liability of Capital One Bank**: We shall be responsible only for performing the Funds Transfer Service expressly provided for in this Agreement; provided however, we shall be liable only for our own gross negligence or willful misconduct in performing such service. We shall not be liable to any third party or for any act or omission of yours or any third party, including, but not limited to, third parties used by us in executing a Funds Transfer or performing a related act and no such third party shall be deemed to be our agent. IN NO EVENT SHALL WE BE

LIABLE FOR ANY DAMAGES OF ANY KIND INCLUDING WITHOUT LIMITATION DIRECT, INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOST PROFITS, LOSSES OR EXPENSES ARISING OUT OF OR IN CONNECTION WITH THE FUNDS TRANSFER SERVICE, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SAME. Except as otherwise provided by applicable law, the maximum period for which we shall be liable for interest on any amount to be refunded or paid to you with respect to an unauthorized, erroneous or other Funds Transfer Request is thirty days.

**Interest compensation**: In the event we are liable to you for interest compensation under this Agreement, or applicable law, interest shall be calculated at the average of the federal funds rate published by the Federal Reserve Bank for the period involved; or at such other rate that we may agree to, in writing, from time to time.

**Consumer International Wire Fund Transfer error resolution**: In case of errors contact us at 866-536-9023, or write us at:

Capital One Bank
Claims Processing Center
PO Box 85039
Richmond, VA 23285-5039

You must contact us within 180 days of the funds availability date on your Funds Transfer receipt, or within 60 days of the date we provided you with any requested documentation, additional information or clarification concerning a Funds Transfer.

When you do, please tell us:

(1) Your name and address [or telephone number];
(2) The error or problem with the transfer, why you believe it is an error or problem and, if possible, the date of the error;
(3) The name of the designated recipient of the funds and, if possible, the designated recipient's telephone number and address;
(4) The dollar amount of the transfer; and
(5) The confirmation code or number of the transaction.

We will determine whether an error occurred within 90 days after you contact us and report the results to you within three (3) business days of completing our investigation. If we determine an error occurred, we will notify you of the available remedies and will correct the error promptly and in accordance with the remedy you select.

If we determine no error occurred, we will send you a written explanation. You may ask for copies of the documents on which we relied for our determination.

17. **Liability of the customer**: Except as otherwise provided by law, you shall be liable for any loss or damage to which your negligence contributed or which resulted in unauthorized, fraudulent or dishonest acts by your current and/or former Authorized Representatives. Such liability includes instances when a current or former Authorized Representative effects one or more Funds Transfers or improper use of telephone security procedures to effect a Funds Transfer to your detriment.

18. **Compliance with Anti-Money Laundering and Exchange Control Regulations and OFAC Enforced Sanctions**:

    A. You covenant with us to observe all Anti-Money Laundering and Exchange Control laws and regulations including economic and trade sanctions promulgated by the Office of Foreign Assets Control of the U.S. Department of Treasury in relation to any Funds Transfer and you will use all reasonable endeavors to assist us to do likewise. In particular, you covenant that the information given to us by you is accurate. We may disclose any information given to us that we in our sole discretion think necessary or desirable to disclose; except we will only disclose confidential information if required by law, a court, or legal, regulatory, or governmental authority, or as permitted by law in order to combat, prevent, or investigate issues arising under anti-money laundering laws, economic sanctions, or criminal law.

    B. Sometimes legal, regulatory, or governmental authorities require additional information, either in respect of individuals, entities, or particular transactions. You agree to promptly supply all such information, which any such authority may require, and/or which we may be required to supply, in relation to the individual, entity, or particular transaction.

    C. If you, or your Authorized Representative, breach any such laws or regulations, you irrevocably agree that we may retain any monies or funds transmitted to us pursuant to this Agreement and/or not fulfill any Funds Transfer Request if we are required to take or refrain from such action by any legal, regulatory or governmental authority or if we reasonably believe that such action may violate any laws or regulations described herein, and such monies shall not bear interest against us. You further agree that we may pay such monies to the appropriate legal, regulatory or governmental authority, if and when required by law.

19. **Indemnification**: In consideration of Capital One Bank agreeing to accept Funds Transfer Requests in the manner set forth herein, you shall forever indemnify and hold Capital One Bank, its officers, directors, shareholders, employees, successors, predecessors, representatives, principals, agents, assigns, parents, subsidiaries and/or insurers, harmless from and against all liability, claims, damages, costs, claims or expenses (including reasonable attorneys' fees) that we may incur, without regard to the merit or lack thereof, arising out of, or related in any way to the matters set forth herein, or to the Funds Transfer Service, which shall be provided pursuant to the terms of this Agreement. Your agreement to

indemnify us and hold us harmless shall survive the expiration and/or termination of this Agreement and all provisions contained herein.

20. **Recording of communication**: You agree that all telephone conversations made in connection with the Agreement may be recorded and retained by us.

21. **Termination of Agreement**: We may terminate the right to make Funds Transfers at any time or amend or change the terms of this Agreement or cancel this Agreement without advance notice to you.

22. **Agreement controls**: Both you and Capital One Bank will be bound by this Agreement. If there is a conflict between this Agreement and something said by one of our employees, you agree that this Agreement controls. This Agreement and the terms of the Account Agreement(s) related to your deposit accounts, which are incorporated herein by reference, constitute the entire Agreement between you and us regarding your use of the Funds Transfer Service. If any inconsistency exists between the account disclosure statements and agreement(s) and this Agreement, then the terms of this Agreement shall control. No representation or statement not expressly contained in this Agreement or in any amendment hereto shall be binding upon you or us.

23. **Governing law**: All actions arising out of or concerning the Funds Transfer Service or these terms and conditions shall be heard by a judge sitting without a jury. In any such action, Capital One Bank shall be entitled to its reasonable attorneys' fees. The Funds Transfer Service and these terms and conditions shall be governed by the internal laws of the State of Virginia without regard to its conflicts of rules and the laws of the United States.

24. **Severability**: In the event that any court or tribunal of competent jurisdiction determines that any provision of the Agreement is illegal, invalid or unenforceable, the remainder of this Agreement shall not be effected thereby.

## Products

Credit Cards

Checking & Savings

Auto

Business

## Get to Know Us

About

Corporate Information

Newsroom

Technology

## On the Go

Locations & ATMs

Capital One Travel

Mobile App

Meet Eno

Commercial

Investors

Digital Tools

Capital One Shopping

Careers & Jobs

CreditWise

Diversity & Inclusion

Canada

UK

## Legal

## Support

Privacy

COVID-19

Patriot Act Certification

Help Center

Wolfsberg Questionnaire

Learn & Grow

Subpoena Policy

Resources for Military

Additional Disclosures

Accessibility Assistance

Tweet @AskCapitalOne

Security

Contact Us

## Footnotes

47/47

Learn more about FDIC insurance coverage.

Privacy          AdChoices          Terms & Conditions          ©2025 Capital One

