**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

THE DONALD J. TRUMP REVOCABLE          Case No. 1:25-cv-21596-RKA
TRUST, *et. al.*,

       Plaintiffs,

vs.

CAPITAL ONE, N.A., a Virginia
Corporation,

       Defendant.

_____/

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs THE DONALD J. TRUMP REVOCABLE TRUST, ERIC TRUMP, DJT HOLDINGS MANAGING MEMBER, LLC, DJT HOLDINGS, LLC, ERIC TRUMP WINE MANUFACTURING, LLC, LAMINGTON FAMILY HOLDINGS, LLC, MOBILE PAYROLL CONSTRUCTION, LLC, PINE HILL DEVELOPMENT, LLC, T INTERNATIONAL REALTY, LLC, TNGC CHARLOTTE, LLC, TRUMP ICE, LLC, and DTTM OPERATIONS, LLC (collectively, "Plaintiffs") by and through undersigned counsel, sue Defendant CAPITAL ONE, N.A. In support, Plaintiffs allege as follows:

### NATURE OF THE ACTION

"To be known as one of the most successful and trusted financial services companies in the world, we must continue to conduct ourselves – both as an organization and as individuals – according to the highest standards of **honesty and fairness**. Our core Values and Excellence and Do the Right Thing embody our commitment to ethical business practices and inspire our culture and the decisions we make each day. Our commitment to living our Values and living up to exacting standards for integrity and professionalism is essential to building an enduring great

company. All of our stakeholders – our customers, communities, regulators and shareholders – expect nothing less." These principles were proclaimed by Capital One's founder, Chairman, and Chief Executive Officer Richard D. Fairbank in 2020. And yet, Capital One's unlawful, deceptive, and reckless conduct that gives rise to this action is the antithesis of what it claims to be the foundation of its business practices.

For decades, Plaintiffs have been customers of Capital One. During that timeframe, Plaintiffs and their affiliated entities have transacted tens of millions of dollars through Capital One. Over those years, President Donald J. Trump has maintained a highly public persona while Capital One and Plaintiffs—all of which contain President Trump's name or are otherwise affiliated with him—have maintained a mutually beneficial relationship. However, on March 8, 2021, Capital One forever altered the dynamic of the parties' relationship.

That day, without warning or provocation, Capital One notified Plaintiffs that hundreds of bank accounts that they controlled, were beneficiaries of, and actively used to transact ("Plaintiffs' Accounts") would be closed on June 7, 2021. Capital One did not provide Plaintiffs any recourse, remedy, or alternative—its decision was final. Collectively, Plaintiffs' Accounts held millions of dollars belonging to them and their affiliated entities. Because Capital One did not provide Plaintiffs and their affiliated entities with any advance notice and unilaterally terminated Plaintiffs' Accounts, Plaintiffs suffered considerable financial harm and losses caused not only by the interruption to their access to Capital One's banking services, but also by the devastating impact on Plaintiffs' ability to transact and access their monies.

Plaintiffs have reason to believe that Capital One's unilateral decision came about as a result of political and social motivations and Capital One's unsubstantiated, "woke" beliefs that it needed to distance itself from President Trump and his conservative political views. In essence,

Capital One "debanked" Plaintiffs' Accounts because Capital One believed that the political tide at the moment favored doing so. In addition to the considerable financial and reputational harm that Plaintiffs and their affiliated entities suffered, Capital One's reckless decision is part of a growing trend by financial institutions in the United States of America to cut off a consumer's access to banking services if their political views contradict with those of the financial institution. Capital One's conduct is but one example of a systemic, subversive industry practice that aims to coerce the public to shift and re-align their political views. Plaintiffs file this action to redress the harm they and their affiliated entities have suffered and shed light on a matter of great public interest and importance.

## PARTIES

1.      Plaintiff THE DONALD J. TRUMP REVOCABLE TRUST is a revocable trust created in Palm Beach County, Florida.

2.      Plaintiff ERIC TRUMP is *sui juris* and is a resident of Palm Beach County, Florida.

3.      Plaintiff DJT HOLDINGS MANAGING MEMBER, LLC is a Delaware limited liability company with its principal place of business in Palm Beach County, Florida. Its sole member is The Donald J. Trump Revocable Trust.

4.      Plaintiff DJT HOLDINGS, LLC is a Delaware limited liability company with its principal place of business in Palm Beach County, Florida. DJT Holdings, LLC's members are Trust and DJT Holdings Managing Member, LLC.

5.      Plaintiff ERIC TRUMP WINE MANUFACTURING, LLC is a Delaware limited liability company with its principal place of business in Charlottesville, Virginia. Eric Trump Wine Manufacturing, LLC's members are Eric Trump and Eric Trump Wine Manufacturing Member Corp., whose sole shareholder is Eric Trump.

6.      Plaintiff LAMINGTON FAMILY HOLDINGS, LLC is a Delaware limited liability company with its principal place of business in Bedminster, New Jersey. Its sole member is DJT Holdings, LLC.

7.      Plaintiff MOBILE PAYROLL CONSTRUCTION, LLC is a Delaware limited liability company with its principal place of business in Bedminster, New Jersey. Mobile Payroll Construction, LLC's members are DJT Holdings, LLC and Mobile Payroll Construction Manager Corp., whose sole shareholder is DJT Holdings Managing Member, LLC.

8.      Plaintiff PINE HILL DEVELOPMENT, LLC is a Delaware limited liability company with its principal place of business in Pine Hill, New Jersey. Pine Hill Development, LLC's members include DJT Holdings, LLC and Pine Hill Development Managing Member Corp., whose sole shareholder is DJT Holdings Managing Member, LLC.

9.      Plaintiff T INTERNATIONAL REALTY, LLC is a Delaware limited liability company with its principal place of business in Jupiter, Florida. T International Realty, LLC's members are The Donald J. Trump Revocable Trust, The Ivanka Trump Revocable Trust, The Donald J. Trump, Jr. Revocable Trust, and The Eric F. Trump Revocable Trust—all of which were created in Palm Beach County, Florida.

10.     Plaintiff TNGC CHARLOTTE, LLC is a Delaware limited liability company with its principal place of business in Mooresville, North Carolina. TNGC Charlotte, LLC's members are DJT Holdings, LLC and TNGC Charlotte Manager Corp., whose sole shareholder is DJT Holdings Managing Member, LLC.

11.     Plaintiff TRUMP ICE, LLC is a New York limited liability company with its principal place of business in New York, New York. Trump Ice, LLC's sole member is DJT Holdings, LLC.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

12.     Plaintiff DTTM OPERATIONS, LLC is a Delaware limited liability company with its principal place of business in Palm Beach County, Florida. DTTM Operations, LLC's members are DJT Holdings, LLC and DTTM Operations Managing Member Corp., whose sole shareholder is DJT Holdings Managing Member, LLC.

13.     Defendant CAPITAL ONE, N.A. is Virginia corporation with its principal place of business in Virginia and authorized to do business in the State of Florida.

## JURISDICTION AND VENUE

14.     This Court possesses subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest, costs, and attorneys' fees.

15.     The Court possesses personal jurisdiction over Capital One pursuant to Florida Statute §§ 48.193(1)(a)(1), (1)(a)(2), and (1)(a)(6).

16.     Florida Statute § 48.193(1)(a)(1) confers personal jurisdiction over Capital One because, during the operative period alleged in the Complaint, Capital One operated, conducted, engaged in, or carried on a business or business venture, and maintained offices in, Florida.

17.     Florida Statute § 48.193(1)(a)(2) confers personal jurisdiction over Capital One because, during the operative period alleged in the Complaint, Capital One committed tortious conduct against Plaintiffs that caused them and their affiliated entities to suffer significant financial harm.

18.     Florida Statute § 48.193(1)(a)(6) confers personal jurisdiction over Capital One because, during the operative period alleged in the Complaint, Capital One injured Plaintiffs and their affiliated entities while it was engaged in the sale of banking services in Florida.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(3) because Defendant maintains an office for transaction and its customary business in this District, Defendant has several agents and representatives acting on its behalf in this District, and Defendant is subject to this Court's personal jurisdiction.

20.     Plaintiffs have retained Brito, PLLC to prosecute this action and have agreed to pay it a reasonable attorney's fee.

21.     All conditions precedent to this action have been performed, excused, or waived.

## FACTUAL BACKGROUND

**A. Plaintiffs' longstanding, mutually beneficial relationship with Capital One**.

22.     For the past several decades, Plaintiffs and their affiliated entities have held hundreds of bank accounts with Capital One.

23.     Plaintiffs' businesses, and the title on Plaintiffs' Accounts maintained with Capital One, either used President Donald J. Trump's name or were affiliated with him.

24.     Plaintiffs have operated many businesses across various industries including, but not limited to, real estate, hospitality, entertainment, tourism, media, and sports.

25.     Throughout their mutually beneficial banking relationship, Plaintiffs have deposited, transacted, and leveraged hundreds of millions of dollars with Capital One to grow and scale these businesses.

26.     In exchange, Capital One has profited from Plaintiffs' substantial deposits, impeccable creditworthiness, and the prestige associated with having a business relationship with President Trump.

**B. The beginning of debanking in America**.

27.     In 2009, President Barack Obama launched the Financial Fraud Enforcement Task Force ("Task Force").[1]

28.     Initially, the Task Force's mission was to assist the Department of Justice with the "investigation and prosecution of cases of bank, mortgage, loan, and lending fraud; securities and commodities fraud; retirement plan fraud; mail and wire fraud; tax crimes; money laundering; False Claims Act violations; unfair competition; discrimination; and other financial crimes and violations[.]"[2]

29.     Four years later, the Task Force's scope was expanded to "protect the American public from the often-devastating effects of financial fraud, whether it be mortgage fraud or investment fraud, grant or procurement fraud, consumer fraud or fraud in lending."[3]

30.     A central principle guided the Task Force:

 If we can eliminate the mass-marketing fraudsters' access to the U.S. financial system -- that is, if we can stop the scammers from accessing consumers' bank accounts -- then we can protect the consumers and starve the scammers. This will significantly reduce the frequency of and harm caused by this type of fraud. We hope to close the access to the banking system that mass marketing fraudsters enjoy -- effectively putting a chokehold on it -- and put a stop to this billion dollar problem that has harmed so many American consumers, including many of our senior citizens.[4]

---

[1]     Executive Order 13519 - Establishment of the Financial Fraud Enforcement Task Force, OBAMA WHITE HOUSE ARCHIVES (November 17, 2009) (https://obamawhitehouse.archives.gov/the-press-office/executive-order-financial-fraud-enforcement-task-force).

[2]     *Id.*

[3]     Financial Fraud Enforcement Task Force Executive Director Michael J. Bresnick at the Exchequer Club of Washington, D.C., UNITED STATES DEPARTMENT OF JUSTICE ARCHIVES, (March 20, 2013) (https://www.justice.gov/archives/opa/speech/financial-fraud-enforcement-task-force-executive-director-michael-j-bresnick-exchequer).

[4]     *Id.*

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

31.     Thus, the Task Force's efforts became unofficially known and publicly referred to as "Operation Choke Point."

32.     Although the Task Force's mission was to curb and eliminate sweeping examples of financial fraud, the Task Force had an ulterior motive.

33.     "Officials at both the Comptroller of the Currency (OCC) and the Federal Deposit Insurance Corporation (FDIC) threatened banks with regulatory pressure if they did not bend to their will. Gun and ammunition dealers, payday lenders and other businesses operating legally suddenly found banks terminating their accounts with little explanation aside from 'regulatory pressure.' "[5]

34.     "In this unprecedented initiative, unelected bureaucrats at the Department of Justice, the FDIC and other agencies set out to kill legal businesses by starving them of access to financial institutions."[6]

35.     Indeed, many lawful businesses, most of which did not present any significant legal, financial, or reputation risk, had their banking relationships terminated without warning or recourse.

36.     Operation Choke Point was not a siloed operation led by rogue employees. Instead, many high-ranking FDIC officials led the government's efforts.

---

[5]     Operation Choke Point reveals true injustices of Obama's Justice Department, THE HILL (November 7, 2018)  (https://thehill.com/blogs/congress-blog/politics/415478-operation-choke-point-reveals-true-injustices-of-obamas-justice/).

[6]     Evidence is now clear: Operation Choke Point hurt lawful businesses, AMERICAN BANKER (November 25, 2018) (https://www.americanbanker.com/opinion/evidence-is-now-clear-operation-choke-point-hurt-lawful-businesses)

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

37.     For example, former FDIC Regional Director Anthony Lowe instructed his staff to use all "available means, including verbal recommendations, to strongly encourage [supervised banks] to refrain from any activities that provide assistance to the business activities of [payday] lenders[.]"

38.     Operation Choke Point persisted for years under the Obama administration, and it led to countless legal businesses losing access to banking services.

39.     "Former Federal Deposit Insurance Corp. Chairman William Isaac went as far as to call it 'one of the most dangerous programs I have experienced in my 45 years of service as a bank regulator, bank attorney and consultant, and bank board member.' "[7]

40.     As a result, in 2017, President Trump's first administration ended Operation Choke Point because "law abiding businesses should not be targeted simply for operating in an industry that a particular administration might disfavor."[8]

41.     Days before President Trump's first term ended, the Office of the Comptroller of the Currency promulgated a final rule to ensure that consumers and businesses, independent of their political viewpoints, would have "fair access to banking services provided by large national banks, federal savings associations, and federal branches and agencies of foreign bank organizations."[9]

---

[7]     *Id.*

[8]     Correspondence from Office of Assistant Attorney General to Hon. Bob Goodlatte, UNITED STATES DEPARTMENT OF JUSTICE, (August 16, 2017) (https://www.consumerfinancemonitor.com/wp-content/uploads/sites/14/2017/08/2017-8-16-Operation-Chokepoint-Goodlatte.pdf)

[9]     OCC Finalizes Rule Requiring Large Banks to Provide Fair Access to Bank Services, Capital, and Credit, OFFICE OF THE COMPTROLLER OF THE CURRENCY, (January 14, 2021) (https://www.occ.gov/news-issuances/news-releases/2021/nr-occ-2021-8.html).

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

42.     Then, in 2021, President Joe Biden took office.

43.     Not long after, the unlawful practices similar to Operation Choke Point began to resurface.

44.     This time, however, it was not the government that took the lead in foreclosing banking services to legal businesses.

45.     Instead, there were several national financial institutions themselves, including Capital One, that were debanking countless private businesses.

**C.  Capital One debanks Plaintiffs**.

46.     On March 8, 2021, Plaintiffs received correspondence from Capital One communicating that hundreds of their bank accounts were being closed and their account relationships with Capital One would be terminated by June 7, 2021 ("Termination Letter").

47.     Although Capital One extended the closure of several of Plaintiffs Accounts, Plaintiffs were left to scramble to advise their business partners, customers, vendors, and creditors that Capital One had terminated their banking relationships and hindered Plaintiffs' ability to use its funds therein to transact.

48.     Capital One's unilateral, unprovoked, and sudden decision caused the businesses operated by Plaintiffs and their affiliated entities to suffer considerable financial harm.

49.     In addition to that financial harm, Plaintiffs and their affiliated entities and members suffered considerable reputational harm due to the severance of their relationship with Capital One.

50.     Notably, before receiving the Termination Letter, Plaintiffs' Accounts were in good standing.

51.     During the entirety of Plaintiffs' banking relationship with Capital One, Plaintiffs never received any document, warning, or other notice indicating that Plaintiffs' Accounts were delinquent, flagged for suspicious activity, engaged in fraud, or other activity that would warrant sudden and abrupt termination.

52.     Indeed, when Plaintiffs' Accounts were terminated, Plaintiffs were actively engaged in business in several states, including North Carolina and New Jersey.

53.     However, upon conclusion of Plaintiffs' due diligence, they learned that Capital One terminated Plaintiffs' Accounts as a result of political discrimination against President Trump, the Trump Organization, and the Trump family.

**D.  Plaintiffs' activity in North Carolina.**

      **i.     TNGC Charlotte, LLC.**

54.     Plaintiff TNGC Charlotte, LLC owns and operates Trump National Golf Club, Charlotte ("Trump Charlotte"), which is in Charlotte, North Carolina.

55.     TNGC Charlotte, LLC's operations are exclusive to North Carolina.

56.     Trump Charlotte is an esteemed country club that offers its members access to an eighteen-hole golf course, world-class cuisine, fitness and tennis facilities, and other sought-after amenities.

57.     Among Plaintiffs' Accounts was the bank account used to operate Trump Charlotte's business and finances.

58.     When it received the Termination Letter,  TNGC Charlotte, LLC was forced to scramble to advise its business partners, clients, vendors, and creditors that Capital One had terminated its banking relationship and hindered its ability to use its funds therein to transact.

59.     When Plaintiffs' Accounts were terminated, TNGC Charlotte, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, TNGC Charlotte, LLC suffered considerable financial harm and reputational harm.

60.     Capital One's decision to debank TNGC Charlotte, LLC and terminate its bank account had a direct effect on North Carolina commerce because it had a direct impact on Trump Charlotte's business operations and therefore, caused TNGC Charlotte, LLC to suffer an injury in North Carolina.

      **ii.     T International Realty, LLC**.

61.     Plaintiff T International Realty, LLC owns and operates Trump International Realty.

62.     Trump International Realty is a luxury real estate firm that has listed and sold multiple seven and eight-figure parcels of real estate in North Carolina.

63.     Although Trump International Realty operates its business in New York and Las Vegas as well, it has a substantial presence and track record in North Carolina.

64.     Indeed, when the Termination Letter was received, Trump International Realty had under contract multiple properties in Saluda, North Carolina, Mooresville, North Carolina, and Huntersville, North Carolina.

65.     Collectively, these properties were listed for at least $22,608,000.00.

66.     Any commission earned by Trump International Realty for the sale of these properties would have been deposited in its bank account, which was among Plaintiffs' Accounts.

67.     When it received the Termination Letter,  T International Realty, LLC was forced to scramble to advise its business partners, clients, vendors, and creditors that Capital One had terminated its banking relationship and hindered its ability to use its funds therein to transact.

68.     When Plaintiffs' Accounts were terminated, T International Realty, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, T International Realty, LLC suffered considerable financial harm and reputational harm.

69.     Capital One's decision to debank T International Realty, LLC and terminate its bank account had a direct effect on North Carolina commerce because it had a direct impact on Trump Charlotte's business operations and therefore, caused T International Realty, LLC to suffer an injury in North Carolina.

### iii.     DTTM Operations, LLC.

70.     Plaintiff DTTM Operations, LLC is the holder of certain trademarks used on countless products associated with President Trump and the Trump Organization.

71.     Those registered marks appear on several products that DTTM Operations, LLC sells at Trump Charlotte's golf club.

72.     In 2021, several products bearing the registered marks owned by DTTM Operations, LLC were actively being sold in North Carolina at Trump Charlotte.

73.     Since then and to date, several products bearing the registered marks owned by DTTM Operations, LLC continue to be sold in North Carolina at Trump Charlotte.

74.     When it received the Termination Letter, DTTM Operations, LLC's ability to use its funds in and transact with its Accounts with Capital One was hindered.

75.     When Plaintiffs' Accounts were terminated, DTTM Operations, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, DTTM Operations, LLC suffered considerable financial harm and reputational harm.

76.     Capital One's decision to debank DTTM Operations, LLC and terminate its bank account had a direct effect on North Carolina commerce because it had a direct impact on the sale

of several products bearing the registered marks owned by DTTM Operations, LLC, caused DTTM Operations, LLC to suffer an injury in North Carolina.

**E. Plaintiffs' activity in New Jersey**.

      **i.   Mobile Payroll Construction, LLC**.

77.    Plaintiff Mobile Payroll Construction, LLC is a payroll and construction management company.

78.    For various real estate projects affiliated with the Trump Organization in New York and New Jersey, Mobile Payroll Construction, LLC processes and funds payroll for various construction management crew and covers operating expenses for those real estate development projects as well.

79.    Among Plaintiffs' Accounts was the bank account used to operate Mobile Payroll Construction, LLC's business and finances.

80.    When it received the Termination Letter, Mobile Payroll Construction, LLC was forced to scramble to advise its business partners, clients, vendors, and creditors that Capital One had terminated its banking relationship and hindered its ability to use its funds therein to transact.

81.    When Plaintiffs' Accounts were terminated, Mobile Payroll Construction, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, Mobile Payroll Construction, LLC suffered considerable financial harm and reputational harm.

82.    Capital One's decision to debank Mobile Payroll Construction, LLC and terminate its bank account had a direct effect on New Jersey commerce because it had a direct impact on its ability to fund payroll to multiple people servicing multiple real estate projects in New Jersey and therefore, caused Mobile Payroll Construction, LLC to suffer an injury in New Jersey.

**ii.    Eric Trump Wine Manufacturing, LLC**.

83.    Plaintiff Eric Trump Wine Manufacturing, LLC owns and operates a winery in Charlottesville, Virginia ("Trump Winery").

84.    Trump Winery produces different vintages and blends of red wine, white wine, and rosé for sale and distribution throughout the United States, including New Jersey.

85.    In 2021, Trump Winery sold and distributed its wine throughout New Jersey.

86.    Since then, and to date, Trump Winery sells and distributes its wine throughout New Jersey.

87.    When it received the Termination Letter, Eric Trump Wine Manufacturing, LLC was forced to scramble to advise its business partners, clients, vendors, and creditors that Capital One had terminated its banking relationship and hindered its ability to use its funds therein to transact.

88.    When Plaintiffs' Accounts were terminated, Eric Trump Wine Manufacturing, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, Eric Trump Wine Manufacturing, LLC suffered considerable financial harm and reputational harm.

89.    Capital One's decision to debank Eric Trump Wine Manufacturing, LLC and terminate its bank account had a direct effect on New Jersey commerce because it had a direct impact on Trump Winery's business operations and therefore, caused Eric Trump Wine Manufacturing, LLC to suffer an injury in New Jersey.

**iii.    DTTM Operations, LLC**.

90.    Plaintiff DTTM Operations, LLC is the holder of certain trademarks used on countless products associated with President Trump and the Trump Organization.

91.     Those registered marks appear on several products that DTTM Operations, LLC sells at Trump Bedminster's golf club.

92.     In 2021, several products bearing the registered marks owned by DTTM Operations, LLC were actively being sold in New Jersey at Trump Bedminster.

93.     Since then and to date, several products bearing the registered marks owned by DTTM Operations, LLC continue to be sold in New Jersey at Trump Bedminster.

94.     When it received the Termination Letter, DTTM Operations, LLC's ability to use its funds in and transact with its Accounts with Capital One was hindered.

95.     When Plaintiffs' Accounts were terminated, DTTM Operations, LLC's bank account was shuttered, it lost the ability to transact, and, consequently, DTTM Operations, LLC suffered considerable financial harm and reputational harm.

96.     Capital One's decision to debank DTTM Operations, LLC and terminate its bank account had a direct effect on New Jersey commerce because it had a direct impact on the sale of several products bearing the registered marks owned by DTTM Operations, LLC, caused DTTM Operations, LLC to suffer an injury in New Jersey.

**F.  Other Plaintiffs were also debanked**.

97.     Plaintiffs Eric Trump, The Donald J. Trump Revocable Trust, Pine Hill Development, LLC, Lamington Family Holdings, LLC, DJT Holdings, LLC, DJT Holdings Managing Member, LLC, and Trump Ice, LLC were also debanked via the termination of their Accounts.

98.     Capital One's Rules Governing Deposit Accounts purport to allow Capital One to terminate or decline an account relationship with any consumer for any purpose. However, they

do not allow termination for an illegal purpose. A true and correct copy of the Rules Governing Deposit Accounts is **Exhibit A**.

99.     Capital One terminated Plaintiffs' Accounts as a result of political discrimination against President Trump, the Trump Organization, and his family.

100.    Neither the letter nor the spirit of Capital One's Rules Governing Deposit Accounts stipulate that Capital One may terminate an existing client relationship based on political discrimination.

101.    Consequently, Capital One's debanking of Plaintiffs' Accounts was unlawful.

**D.  The growing trend of debanking in America today**.

102.    Capital One's decision is wrongful, and it is representative of a systemic and widespread practice that is employed by many financial institutions in the United States of America today.

103.    The banking industry's practices are so rampant that at least sixteen Attorneys General have pleaded that Bank of America take note of its history of debanking consumers and legal businesses for their political views and reform its banking practices.[10]

---

[10]     15 AGs put BofA on notice for 'de-banking' conservatives, BANKING DIVE (April 18, 2024)     (https://www.bankingdive.com/news/15-attorneys-general-put-bofa-notice-debanking-conservatives-christians/713618/); *see also* Correspondence from Attorney General Kris W. Kobach to Brian T. Moynihan, STATE OF KANSAS OFFICE OF THE ATTORNEY GENERAL (April 15, 2024)     (https://adfmedialegalfiles.blob.core.windows.net/files/2024-04-16BankOfAmericaLetter.pdf); *see also* Attorney General Miyares Demands Bank of America Cease Practice of Debanking Conservatives, OFFICE OF THE ATTORNEY GENERAL COMMONWEALTH OF VIRGINIA (April 16, 2024) (https://www.oag.state.va.us/media-center/news-releases/2718-april-16-2024-attorney-general-miyares-demands-bank-of-america-cease-practice-of-debanking-conservatives).

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

104.     Congress has also been advised that debanking is a glaring issue that must be addressed.[11]

105.     Given the timeliness of this kitchen-table issue, other politicians, including United States Senator Elizabeth Warren (D-MA), have taken notice that debanking is a problem impacting consumers and businesses in the United States of America.[12]

106.     In addition, United States Senator Kevin Cramer (R-ND) has reintroduced the Fair Access to Banking Act, which seeks to protect "fair access to financial services and ensures banks operate in a safe and sound manner" and eliminate debanking.[13]

107.     In response, Bank of America and JP Morgan Chase CEOs have not only denied that their companies engage in debanking,[14] but they are lobbying to shape the narrative and favorably regulate debanking practices going forward.[15]

---

[11]     De-Banking/De-Risking: Issues for the 119th Congress, CONGRESSIONAL RESEARCH SERVICE (January 29, 2025) (https://crsreports.congress.gov/product/pdf/IF/IF12886).

[12]     Warren says Trump was 'on to a real problem' when he blasted BofA for debanking customers, YAHOO FINANCE (February 5, 2025) (https://finance.yahoo.com/news/warren-says-trump-was-on-to-a-real-problem-when-he-blasted-bofa-for-debanking-customers-162323188.html).

[13]     Cramer Reintroduces Fair Access to Banking Act to Protect Legal Industries from Debanking, KEVIN CRAMER U.S. SENATOR FOR NORTH DAKOTA (February 5, 2025) (https://www.cramer.senate.gov/news/press-releases/cramer-reintroduces-fair-access-to-banking-act-to-protect-legal-industries-from-debanking#:~:text=The%20Fair%20Access%20to%20Banking,against%20legal%20industries%20and%20individuals.%E2%80%9D).

[14] *Id.*

[15]     BofA, JPMorgan to lobby White House, Congress after conservative criticism, REUTERS (January 24, 2025) (https://www.reuters.com/business/finance/bofa-plans-engage-with-white-house-congress-debanking-spokesperson-2025-01-24/).

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

108.     Plainly, debanking is a matter of public interest and significant importance to all consumers and businesses in the United States of America.

109.     It bears noting that Florida has prohibited financial institutions from terminating their banking relationship with an individual or a business based on their political opinions, speech, or affiliations. *Compare* Fla. Stat. § 655.0323(2)(a) ("It is an unsafe and unsound practice for a financial institution to deny or cancel its services to a person, or to otherwise discriminate against a person in making available such services or in the terms or conditions of such services, on the basis of: (a) The person's political opinions, speech, or affiliations[.]"); *with* Fla. Stat. § 655.0323(5) ("Notwithstanding ss. 501.211 and 501.212, a failure to comply with subsection (1) or engaging in a practice described in subsection (2) constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act under part II of chapter 501. Violations must be enforced only by the enforcing authority, as defined in s. 501.203(2)[.]").

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

**CAUSES OF ACTION**

**COUNT I – DECLARATORY RELIEF**
**(Plaintiffs v. Capital One)**

110.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 109 as if set forth herein.

111.     This is an action under Florida Statute § 86.011, *et. seq.*

112.     There is an actual and present controversy between Plaintiffs and Capital One over the basis and propriety of Capital One's unilateral termination of Plaintiffs' Accounts as a result of political discrimination against President Trump, the Trump Organization, and his family.

113.     Due to the irreconcilable differences between Plaintiffs and Capital One, Plaintiffs are in doubt as to their legal rights, status, powers, privileges, and/or immunities with respect to Plaintiffs' Accounts and whether Capital One's Rules Governing Deposit Accounts allow termination of an existing banking relationship based on political discrimination.

114.      There is a bona fide, actual, present need for a declaration of the legal rights, powers, privileges, status, and immunities of the parties with respect to Plaintiffs' Accounts, Capital One's Rules Governing Deposit Accounts.

115.     Plaintiffs are not seeking an advisory opinion from this Court because there is a live controversy between the parties as to whether Plaintiffs' Accounts were improperly terminated and/or whether Plaintiffs' Accounts should be reinstated by Capital One.

116.     Plaintiffs are not seeking an advisory opinion from this Court because the relief sought is not based on a hypothetical set of facts.

117.     Plaintiffs and their affiliated entities, in good faith, and at all times material to this action, believe that they are entitled to possess all rights and obligations as holders of Plaintiffs' Accounts.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

118.     Thus, Plaintiffs are entitled to have the doubt surrounding their rights and obligations as holders of Plaintiffs' Accounts resolved by way of declaratory relief from this Court.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter a judgment declaring that: (a) Capital One improperly terminated Plaintiffs' Accounts, (b) Plaintiffs are entitled to an award of costs, and (c) Plaintiffs are entitled to any other relief as this Court deems just and proper.

### COUNT II - VIOLATION OF
### NORTH CAROLINA'S CONSUMER PROTECTION ACT
### (TNGC Charlotte, LLC, T International Realty, LLC, & DTTM Operations, LLC v. Capital One)

119.     Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC repeat and reallege the allegations contained in paragraphs 1 through 109 as if set forth herein.

120.     This is an action arising from Capital One's violations of North Carolina's Unfair and Deceptive Trade Practices Act. *See* N.C. Gen. Stat. § 75-1.1.

121.     N.C. Gen. Stat. § 75-1.1(a) defines unfair and deceptive trade practices as any "unfair or deceptive acts or practices in or affecting commerce, [which] are declared unlawful."

122.     N.C. Gen. Stat. § 75-1.1(b) defines "commerce" as "all business activities, however denominated[.]"

123.     Capital One maintains a continuous and systematic presence in North Carolina because it operates several branches therein and provides banking services, credit services, investment services, and other financial products and services to consumers throughout the State.

124.     Over the course of decades, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC have opened and maintained several bank accounts with Capital One.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

125.    During this timeframe, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC have deposited, transacted, and leveraged millions of dollars with Capital One.

126.    In exchange, Capital One has profited from Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC's deposits, transactions, and the prestige of being associated with President Trump.

127.    By engaging in banking activity, Capital One has engaged in trade or commerce.

128.    Because Capital One and Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC maintained mutual banking relationships, the parties have been and remain market participants under N.C. Gen. Stat. § 75-1.1.

129.    On March 8, 2021, Capital One notified Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC that it was closing all of their Accounts and terminating their account relationships with Capital One by June 7, 2021.

130.    On June 7, 2021, Capital One terminated the Accounts of Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC.

131.    Capital One did not provide any lawful justification for why the Accounts of Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC were being closed.

132.    Instead, upon information and belief, Capital One leveraged unlawful and deceptive tactics and means to close the Accounts of Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC based on President Trump's political views to politically discriminate against him, the Trump Organization, and his family.

133.    Simply stated, Capital One debanked Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC.

134.    Capital One's unlawful and deceptive debanking practices were employed in the trade or commerce of providing banking services to the Accounts of Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC, which falls under the definitions of N.C. Gen. Stat. § 75-1.1(a)-(b).

135.    Capital One's unlawful and deceptive debanking practices, which terminate banking relationships based on a consumer or business' political views that are contradictory to those held by Capital One, are a matter of significant public interest to the residents of North Carolina.

136.    Capital One's unlawful and deceptive practices to debank other consumers and businesses based on their political views directly affect North Carolina residents when their banking relationships are terminated.

137.    Capital One's unlawful and deceptive practices to debank other consumers and businesses based on their political views directly and indirectly affect North Carolina residents because it chills their exercise of political speech by the threat of having their banking relationships terminated.

138.    At the time that Plaintiffs' Accounts were terminated, as explained in paragraphs 55 through 77, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC were actively engaged in business in North Carolina.

139.    Capital One's unlawful and deceptive debanking practices injured Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC because it prevented them from using their bank accounts or accessing the funds therein.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

140.    As a direct and proximate result of Capital One's conduct, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC have suffered significant damages.

141.    Under N.C. Gen. Stat. §§ 75-16 and 75-16.1, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC seek recovery of treble damages and attorneys' fees and costs for prosecuting this action.

142.    Because Capital One's conduct against Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC was willful, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC intend to seek recovery of punitive damages against Capital One.

**WHEREFORE**, Plaintiffs TNGC Charlotte, LLC, T International Realty, LLC, and DTTM Operations, LLC respectfully request that the Court enter Final Judgment in their favor and against Defendant Capital One, N.A. for all available damages under North Carolina law, an award of punitive damages, an award of attorneys' fees and costs, and any other relief this Court deems proper.

### COUNT III - VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT
### (Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC & DTTM Operations, LLC v. Capital One)

143.    Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC repeat and reallege the allegations contained in paragraphs 1 through 109 as if set forth herein.

144.    This is an action arising from Capital One's violations of New Jersey's Consumer Fraud Act. N.J.S.A. § 56:8-2.

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

145.    N.J.S.A. § 56:8-2 prohibits "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate."

146.    N.J.S.A. § 56:8-1(c) defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale[.]"

147.    Capital One maintains a continuous and systematic presence in New Jersey because it operates several branches therein and provides banking services, credit services, investment services, and other financial products and services to consumers throughout the State.

148.    Over the course of decades, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC have opened and maintained several bank accounts with Capital One.

149.    During this timeframe, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC have deposited, transacted, and leveraged millions of dollars with Capital One.

150.    In exchange, Capital One has profited from Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC's deposits, transactions, and the prestige of being associated with President Trump.

151.    By engaging in banking activity and providing banking services to Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC, Capital One has directly offered merchandise to Plaintiffs under N.J.S.A. § 56:8-1(c).

152.    On March 8, 2021, Capital One committed the affirmative act of notifying Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC that it was closing all of their Accounts and terminating their account relationships with Capital One by June 7, 2021.

153.    Capital One did not provide any justification for why the Accounts of Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC were being closed.

154.    Instead, upon information and belief, Capital One leveraged unlawful and deceptive tactics and means to close the Accounts of Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC based on President Trump and his political views.

155.    Essentially, Capital One debanked Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC.

156.    Capital One's unlawful and deceptive debanking practices were employed in the trade or commerce of providing banking services to Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC, which falls under the definition of N.J.S.A. § 56:8-2.

157.    Capital One's unlawful and deceptive debanking practices, which terminate banking relationships based on a consumer or business' political views that are contradictory to those held by Capital One, are a matter of significant public interest to the residents of New Jersey.

158.    Capital One's unlawful and deceptive practices to debank other consumers and businesses based on their political views directly affect New Jersey residents when their banking relationships are terminated.

159.     Capital One's unlawful and deceptive practices to debank other consumers and businesses based on their political views directly and indirectly affect New Jersey residents because it chills their exercise of political speech by the threat of having their banking relationships terminated.

160.     Because Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC were actively engaged in business in New Jersey when the Termination Letter was received and took effect, as explained in further detail in paragraphs 78 through 106, the closing of their Accounts on June 7, 2021, was an ascertainable loss under N.J.S.A. § 56:8-2.

161.     Capital One's unlawful and deceptive debanking practices injured Plaintiffs, Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC because it prevented them from using their bank accounts or accessing the funds therein.

162.     As a direct and proximate result of Capital One's conduct, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC have suffered significant damages.

163.     Under N.J.S.A. § 56:8-19, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC seek recovery of treble damages and attorneys' fees and costs for prosecuting this action.

164.     Because Capital One's conduct against Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC was willful, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC intend to seek recovery of punitive damages against Capital One.

**WHEREFORE**, Plaintiffs Mobile Payroll Construction, LLC, Eric Trump Wine Manufacturing, LLC, and DTTM Operations, LLC respectfully request that the Court enter Final Judgment in their favor and against Defendant Capital One, N.A. for all available damages under New Jersey law, an award of punitive damages, an award of attorneys' fees and costs, and any other relief this Court deems proper.

### COUNT IV – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Plaintiffs v. Capital One; Pled Alternatively)

165.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 109 as if set forth herein.

166.    Plaintiffs and Capital One agreed that the Rules Governing Deposit Accounts would govern the parties' relationship.

167.    The Rules Governing Deposit Accounts state:

**Closing an account**. We may close any account in our sole discretion at any time, for any or no reason and without notice to you. For example, we may close your account with no notice of action if the account has a zero balance. If we close your account with a balance, we will notify you of our action and either transfer the funds to another internal account owned by you or an external account through an approved link or send you a check for the collected balance in your account, less any amounts due to us for pending transactions. Capital One Bank is not liable for any damages or liabilities resulting from the termination of an account relationship. Subject to any rights we may have with respect to advance notice of withdrawal from your account, you may close your account at any time and for any reason. If we receive a debit or credit to your closed account, the account may be reopened to accept the debit or credit for you, even if doing so overdraws your account, and funds deposited therein will be subject to any and all rights we may have with respect to offset. If your account is overdrawn when we close it, you agree to promptly pay all amounts owed to us.

Exhibit B.

168.    In the Rules Governing Deposit Accounts, Capital One reserved the right to terminate any existing banking relationship at any time and for any reason.

169.    However, neither the letter nor the spirit of the Rules Governing Deposit Accounts authorized Capital One to terminate an existing banking relationship with a client for an unlawful purpose.

170.    Here, the Termination Letter closed Plaintiffs' Accounts and severed any banking relationship that Plaintiffs had with Capital One because of Capital One's political discrimination against President Trump, the Trump Organization, and his family.

171.    When Capital One issued the Termination Letter it committed a conscious and deliberate act against Plaintiffs that were inconsistent with Plaintiffs' reasonable expectations under the Rules Governing Deposit Accounts.

172.    When Capital One executed the mandate in the Termination Letter and closed Plaintiffs' Accounts, Capital One failed to discharge its obligations under the Rules Governing Deposit Accounts to Plaintiffs regarding how their Accounts should have been managed.

173.    Consequently, Plaintiffs have suffered considerable financial and reputational harm.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter Final Judgment in their favor and against Defendant Capital One, N.A. for all available damages under Florida law, an award of attorneys' fees and costs pursuant to the Rules Governing Deposit Accounts, and any other relief this Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial as to all issues so triable.

Dated: June 12, 2025                    Respectfully submitted,

                                            **BRITO, PLLC**
*Counsel for Plaintiffs*
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office: 305-614-4071
Fax: 305-440-4385

By: /s/ *Alejandro Brito*
        **ALEJANDRO BRITO**
        Florida Bar No. 098442
        Primary: abrito@britopllc.com
        Secondary: apiriou@britopllc.com
        **IAN MICHAEL CORP**
        Florida Bar No. 1010943
        Primary: icorp@britopllc.com

**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071