**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

THE DONALD J. TRUMP REVOCABLE TRUST, *et al.*,

Case No. 1:25-cv-21596-RKA

Plaintiffs,

vs.

CAPITAL ONE, N.A., a Virginia Corporation,

Defendant.
_______________________________________/

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Plaintiffs The Donald J. Trump Revocable Trust ("Trust"), Eric Trump, DJT Holdings Managing Member, LLC, DJT Holdings, LLC, Eric Trump Wine Manufacturing, LLC, Lamington Family Holdings, LLC, Mobile Payroll Construction, LLC, Pine Hill Development, LLC, T International Realty, LLC, TNGC Charlotte, LLC, Trump Ice, LLC, and DTTM Operations, LLC (collectively, "Plaintiffs"), by and through undersigned counsel, hereby file this Memorandum of Law in Opposition ("Response") to the Motion to Dismiss the Second Amended Complaint ("Motion" or "Motion to Dismiss") [D.E. 91] filed by Defendant, Capital One, N.A. ("Capital One" or "Defendant"). In support thereof, Plaintiffs state as follows:

## PRELIMINARY STATEMENT

Buckling to political pressure and groupthink mentality, Capital One unlawfully and wrongfully debanked Plaintiffs in early 2021. For four years before that, Capital One watched and surveilled Plaintiffs, for no reason other than politics. Beginning in early 2017, the bank stood up a program that it called Project Safeguard, an apparatus unlike anything it had ever created for any other customer in its history. The program included a dedicated anti-money laundering team, weekly internal meetings, monthly briefings to the [redacted], and quarterly reviews with the internal audit team and regulators. Capital One's own corporate representative testified that this machinery was built for one reason: the bank was "dealing with the President of the United States." SAC ¶¶ 36, 41. This unprecedented action was not prompted by a suspicious transaction, a regulatory referral, or a law enforcement request, because none actually existed. It was prompted solely by the identity and position of the customer.

During the entire four years of continuous surveillance, Project Safeguard produced only confirmation that all transactions and dealings by Plaintiffs and the other Trump-related accounts were completely proper and appropriate. Capital One never closed a single Trump-related account. SAC ¶ 41. Twice it broadly considered taking remedial action, and rejected it because, in its own words, "the regulatory risk did not rise [to] the level to cause risk or concern." SAC ¶ 42. The transactions that Capital One would later invoke as a false pretext to try and justify a mass debanking - wire payments tied to a 2016 condominium project, a development project abandoned in 2016, and consulting payments back in 2008, had been reviewed and cleared. Capital One never once asked a single account holder about a single transaction. SAC ¶¶ 40, 43.

Then, the political winds shifted, and everything Capital One had previously cleared as normal suddenly became purported "evidence." In the fall of 2020, as the campaign for President


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

of the United States of America entered its final weeks, the New York Times and other outlets unsurprisingly published biased articles about President Trump's finances, which drew in large part from tax information illegally stolen, and then shared with the left-leaning outlets by Charles Littlejohn, a now-convicted felon and then-IRS contractor/employee. Those, and a series of other false, malicious, and defamatory articles and statements by the New York Times form the basis of an ongoing defamation case brought by the President in the United States District Court for the Middle District of Florida, under case number 8:25-cv-02487. The February 24, 2021, closure memorandum, drafted by Capital One, recites, as its supposed "new context" justifying closure, updated research from October 2020 and information that "[b]y February 2021 ... illuminated additional concerns." SAC ¶¶ 44-46. Under oath, Capital One's corporate representative conceded who that source was: "media sources," specifically the *New York Times*, which he, without sarcasm, described as "objective" in its coverage of President Trump. SAC ¶¶ 45-47. Asked what Capital One learned that it did not already know from four years of its own investigation, he testified: "I don't recall exactly what we knew in 2017 versus 2020." SAC ¶ 47. Asked how Capital One gained "more clarity" if he could not recall what it knew before, he answered: "I don't recall." *Id*. Nothing about these ***lawful*** transactions had changed. What had changed was the political climate – and the media narrative surrounding President Trump.

Then came January 6, 2021, and Capital One shifted from monitoring to mobilizing – taking the politically self-serving path. On January 7, 2021, [redacted] directed his team to determine whether accounts tied to President Trump were receiving "stop the steal" funds. SAC ¶ 50. Within a week, multiple divisions across Capital One were independently hunting for anything connected to the President. A [redacted] wrote that "our leadership is interested in capturing data on accounts loosely related to President Trump and anything 'agenda related.'" SAC ¶¶ 67-68. A [redacted] wrote of "internal energy building up to understand what accounts could loosely be related to President Trump [and] his agenda." SAC ¶ 70. Vitally, the [redacted], who operationally led Project Safeguard, supplied the clearest description of what was happening inside the bank: "it just seems like every corner of the bank is looking into this, which is logical, but also potentially concerning." SAC ¶ 69.

On January 14, 2021, the AML team discussed making a recommendation. By then, the bank had already fully vetted, and deemed nonactionable, three of the four transaction categories that would later appear in its closure memorandum; only one additional set of transactions, which



**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

surfaced around January 21, 2021, remained. SAC ¶¶ 51-52. That remaining set was, by the bank's own account, a simple transfer between two Trump entities, preceded by multiple wires that Capital One had itself sent the other way and about which no one ever asked Plaintiffs. SAC ¶¶ 72-74. What Capital One's own investigators said that day is at the heart of this case:

> Investigator [redacted] wrote: "I am not sure I am ready to give my recommendation." Investigator [redacted] answered: "same." [redacted] then said plainly what the evidence showed: **"I don't think I would close solely on AML reasons."** [redacted] agreed that **"it's hard to say we are ready to close for AML reasons,"** and proposed designating certain transactions as "the straw." SAC ¶¶ 53-54. Later in the same conversation, team leader [redacted], who reported directly to [redacted], described the exercise for what it was: **"I think [redacted] has the final chapter of the book written and we all agree with it but we still need to write the chapters leading up to that."** [redacted] replied: **"yeah exactly. We all agree where this is headed but that doesn't mean we are there."** SAC ¶ 56.

The "final chapter," the unlawful conclusion of debanking the Plaintiffs, was written first. The purported "evidence" was assembled afterward. That is not an anti-money laundering investigation. That is the construction of a pretext, described in real time, in writing, by the people constructing it.

While the AML team wrote the chapters leading to a factually unsupported, unlawful conclusion that it had already reached, another part of the bank was explaining why that conclusion was somehow necessary for Capital One. On January 25, 2021, External Affairs, which focuses on media and government relations, not legal fronts, AML issues, or anything related to rules and regulations, circulated a presentation titled "Capitol Hill Violence: Business Response, Actions and Critique" (the "External Affairs Presentation"). SAC ¶¶ 61-64. It was not an AML document. It tracked how companies across every industry were severing ties with President Trump, reporting that "[b]anks with direct ties to Trump and his family have taken aggressive action in separating themselves," and that consumers were "praising companies for cutting ties and questioning why they didn't do it sooner," while "threatening to boycott." The External Affairs Presentation identified Capital One by name and logo as one of only three companies still under media scrutiny for its remaining Trump relationship, beneath a large magnifying-glass graphic, observing that "reporters are scouring disclosures to uncover remaining business links of Trump ... There aren't many ..." *Id.*



**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

The External Affairs Presentation went to Capital One leadership at the same time as the AML team was drafting its predetermined closure memorandum. The [redacted] was copied on the closure recommendation one month later. SAC ¶¶ 61, 65, 77. Remarkably, Capital One's corporate representative testified that the External Affairs Presentation had "nothing to do with" the closure decision. SAC ¶ 65. Capital One asks this Court to accept that assertion, which stretches credulity, at the pleading stage, where every reasonable inference runs against it. The day after the External Affairs Presentation was circulated, [redacted] wrote: "I think [redacted] is really feeling the pressure on this one," and reported that [redacted] found the team's slides contained "[t]oo much info for the business," directing that detail be stripped before the material went to "Los Jefes." SAC ¶¶ 59-60. The pressure was on to unlawfully debank Plaintiffs and related entities.

The memorandum issued on February 24, 2021, recommended exit from the entire relationship based entirely on pretext. Two weeks later, Capital One sent Plaintiffs identical form letters that said nothing of substance: no concern, no transaction, no basis, and no opportunity to respond. SAC ¶¶ 75, 84, 86. It then closed 366 accounts. The bank's corporate representative testified that only 20 to 25 had *any* connection to the four transaction categories that were used as pretext. SAC ¶¶ 85, 91. The rest, including every account belonging to these Plaintiffs, were closed, because they shared a signer or beneficial owner with a Trump entity. SAC ¶ 91. A bottled water company. A winery in Virginia. A golf course in North Carolina. A construction payroll company. A real estate brokerage. None was ever flagged for suspicious activity. [redacted] could not identify which Plaintiff was connected to which transaction, because for most there is no connection. SAC ¶¶ 93-94.

Nor did Capital One close every Trump account. It kept nineteen open, including accounts for certain family members. SAC ¶¶ 88-90. Some accounts could remain open, the cover memorandum explained, but only after "modification to the individuals with account signer authority," meaning removal of President Donald J. Trump as signer. *Id*. The balances did not change. The activity did not change. The beneficial ownership did not change. What changed was the presence of the President's name on the account.

This is the unlawful conduct that Capital One asks the Court to hold unreviewable. Its Motion to Dismiss rests on a single, weak basis: arguing that because the Rules supposedly permit closure "for any or no reason," the reason it actually chose – and the conduct by which it reached


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

that decision – can never give rise to liability. That is wrong. A contractual right to terminate without cause is not a license to terminate for an unlawful reason, nor does it immunize independently actionable conduct undertaken in reaching that result. This is not a case in which Capital One acted for "no reason." Its corporate representative identified the wrongful reason under oath. He testified that the February 24 memorandum was the basis for the bank exiting; that the four transaction categories were "the basis with which the recommendation [was] made"; that no other transactions supported it; and that he knew of no non-AML reason, and none was discussed in the meetings he attended. SAC ¶¶ 80, 82-83.

Capital One, therefore, ran two tracks, which resulted in the unlawful debanking. *Internally*, it concocted and invoked a specific, documented, risk-based rationale, used it to obtain sign-off from [redacted], and executed a 366-account closure on its authority. *Externally*, it concealed that rationale from the customers whose accounts it closed, and hid behind a clause that contains no substance. Capital One now wrongly seeks the benefit of both positions: the empty, pretextual AML justification when it attempts to explain itself to its own executives, regulators, and to this Court, and the no-reason clause in seeking to defeat this lawsuit. It cannot have both. That contradiction between Capital One's two untenable positions is another of myriad reasons why the Motion to Dismiss should be denied.

Plaintiffs do not contend that Capital One was obligated to bank them forever. They contend that once Capital One elected to justify and execute these closures through a purported risk-based process, it was required to perform that process lawfully and honestly. It did not. Capital One reached its conclusion before it wrote its justification, resurrected as pretext lawful transactions (dressed in newspaper clippings), that its own investigators had already cleared, overrode its own investigators' judgment that the AML case was not there, swept in hundreds of accounts connected to nothing it had purportedly identified, and concealed all of it. Those, and other, allegations presented by Plaintiffs rest on Capital One's own *limited* documents and sworn testimony to date, and they state claims that a jury, not a motion to dismiss, should resolve. Defendant's Motion to Dismiss should be denied and this case should proceed.

## LEGAL STANDARD

A complaint survives dismissal where it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must accept all well-

pleaded allegations as true, and draw all reasonable inferences in Plaintiffs' favor. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010). Plausibility "is not akin to a probability requirement," and a defendant's competing innocent explanation cannot be adopted on a motion to dismiss. *Iqbal*, 556 U.S. at 678; *see Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007). Additionally, Rule 8(d) permits pleading in the alternative. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273-74 (11th Cir. 2009).

## ARGUMENT

### I. Count I States a Claim for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing.

Plaintiffs allege that Capital One built a pretextual closure process, ran it dishonestly, and then hid it. Capital One's response to those allegations reduces to a syllogism: it claims the Rules permit closure for any reason; Capital One closed the accounts; therefore, nothing else matters. That syllogism fails, because Florida law does not treat every grant of discretion alike, and the authorities that Capital One relies upon do not support the arguments set forth in the Motion.

#### A. The SAC Identifies the Express Provision That Capital One Failed to Perform in Good Faith.

The Court previously dismissed Plaintiffs' breach of contract claim, as the Court found that Plaintiffs disclaimed a breach of contract, and did not identify the express term that Capital One failed to perform. Tr. 21. The Court expressly reserved the question now presented, however, explaining that "[t]his is not to say . . . that the discontinuation of a contract under a termination clause can never constitute a breach, it may," and disagreeing with Plaintiffs only for having "not identified any cases" so holding under Florida law. Tr. 22:25-23:8. The authorities set forth below supply that information. *Silver v. Countrywide Home Loans, Inc.*, 483 F. App'x 568, 570 (11th Cir. 2012), does not require more; a plaintiff does not need to identify a provision *other than* the one conferring the discretion. The SAC addresses both grounds, and not by mere relabeling as Defendant claims. The SAC identifies the termination provision as the express term breached, and how Capital One failed to perform under that provision. SAC ¶¶ 98-138. Capital One did not perform its obligations under that provision as a simple election. It performed those obligations through a process of its own design, and its corporate representative testified that the memorandum which the process produced was "the basis" by which the bank exited, that the four transaction categories were "the basis with which the recommendation is made," that no other transactions



**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

supported it, and that he knew of no non-AML reason, and none was discussed in the meetings he attended. SAC ¶¶ 80, 82-83. The question that Count I presents is, therefore, not whether Capital One could close Plaintiffs' accounts. It is whether the process that Capital One built, invoked, and acted upon had to be conducted honestly and in good faith. It did have to be conducted in that proper way, and Capital One failed to comply with that requirement.

***The implied covenant of good faith and fair dealing is itself a term of the Rules.*** Florida law provides the answer on this issue, and it begins with a principle that the Motion never engages. "[E]very contract includes not only its written provisions, but also the terms and matters which, though not actually expressed, are implied by law, and these are as binding as the terms which are actually written or spoken." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999) (quoting *First Nationwide Bank v. Fla. Software Servs., Inc.*, 770 F. Supp. 1537, 1542 (M.D. Fla. 1991)). One of the terms that Florida law implies is "the implied covenant of good faith, fair dealing, and commercial reasonableness." *Id.* (citing Restatement (Second) of Contracts § 205 (1979)); *Fernandez v. Vazquez*, 397 So. 2d 1171, 1173-74 (Fla. 3d DCA 1981). It arises because "[a] contract is an agreement whereby each party promises to perform their part of the bargain in good faith, and expects the other party to do the same," and it exists "to protect the contracting parties' reasonable expectations." *Cox*, 732 So. 2d at 1097 (quoting *First Nationwide Bank*, 770 F. Supp. at 1543; citing *Scheck v. Burger King Corp.*, 798 F. Supp. 692, 693 n.5 (S.D. Fla. 1992)). The implied covenant of good faith and fair dealing (the "Covenant") is, therefore, not something imposed upon the Rules from outside. It is part of them, and just as binding on Capital One as the rest of the Rules.

***Where a contract commits performance to one party's discretion, good faith requires that the discretion be exercised within reasonable limits.*** Having stated that premise, *Cox* adopted, as persuasive, the formulation that governs this case, drawn from the reasoning of Justice Souter, then a member of the Supreme Court of New Hampshire:

> [U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

*Cox*, 732 So. 2d at 1097 (quoting *Centronics Corp. v. Genicom Corp.*, 562 A.2d 187, 193 (N.H. 1989)). Two features of that formulation decide this Motion in Plaintiffs' favor. *First*, the obligation attaches to discretion conferred "by word or silence," so the presence of express permissive language does not end the inquiry—it is what triggers it. *Second*, it attaches where the discretion is sufficient "to deprive another party of a substantial proportion of the agreement's value" — here, of all of it: a banking relationship dating back to at least 2006, hundreds of accounts, and, at one point, a mere twenty-four hours given by Capital One for the Trust to move approximately $170 million from Capital One. SAC ¶¶ 28, 85, 96. From that premise, *Cox* held that "where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Cox*, 732 So. 2d at 1097-98. Additionally, as the decision that *Cox* cited in support put it, "[e]ven when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." *Travellers Int'l v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) (quoted in *Cox*, 732 So. 2d at 1098). Broad discretion to close the accounts did not eliminate the Covenant. The opposite is true. Under *Cox,* that discretion still had to be exercised in good faith.

***The Covenant cannot vary express terms, and Plaintiffs do not ask it to.*** "Of course, the implied obligation of good faith cannot be used to vary the express terms of a contract." *Cox*, 732 So. 2d at 1098 (citing *City of Riviera Beach v. John's Towing*, 691 So. 2d 519, 521 (Fla. 4th DCA 1997)). Plaintiffs do not ask the Court to vary anything. They do not ask the Court to write a for-cause requirement into the Rules, to impose a notice obligation that the Rules do not contain, or to hold that Capital One was required to bank them indefinitely. Capital One has the contractual right to close accounts under certain circumstances, but not in the way they were closed in this case. *Burger King Corp. v. Weaver*, 169 F.3d 1310 (11th Cir. 1999), illustrates the distinction. There, the plaintiff identified no breached express provision, and instead asked the court to imply an exclusive-territory right that the agreement did not confer. *Id.* at 1317. Plaintiffs seek no new right here. They identify the express provision—the termination provision—and invoke the Covenant only to require that Capital One exercise the discretion in good faith.

Tellingly, absent from the Rules is how Capital One would make any such decision. The Rules say nothing about how an account would be reviewed, what would be treated as risk, what



**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

would be done with a transaction that the bank did not understand, or whether the customer would be asked to explain before the bank acted. *Cox* turned on precisely that silence: "the written contracts between CSXI and appellants are silent with regard to the methodology or standards to be used by CSXI in exercising its discretion to assign loads for transport." *Cox*, 732 So. 2d at 1098. So too here. The Rules define Capital One's authority to close an account, but they do not define the methodology or standards by which that authority would be exercised. Plaintiffs do not challenge the former. They challenge the latter. Capital One supplied its own methodology, used that process to generate the stated, pretextual basis for the closures, presented that basis to its own leadership, and now attempts to rely on it before this Court. SAC ¶¶ 79-80, 82.

Capital One's own authority draws the line in the same place. *Amica Mut. Ins. Co. v. Morowitz*, 613 F. Supp. 2d 1358 (S.D. Fla. 2009), held the Covenant inapplicable where an insurance policy contained language that "expressly granted absolute and unlimited discretion" over the very conduct in dispute, which was the decision whether to settle. *Id.* at 1361. The court contrasted *Cox*, where the contracts were silent as to "the methodology or standards" governing the exercise of discretion. *Id.* The Covenant, *Amica* explained, "may fill gaps when one party has the authority to make discretionary decisions without defined standards (because the contract is silent as to any standards)." *Id.* (internal citation omitted). Capital One claims to read that decision as though the Rules' termination sentence conferred absolute discretion over everything that the bank did. That is incorrect. While the Rules conferred discretion over whether to close an account, the standards by which Capital One would decide to close an account are the gap that the Covenant fills.

***Capital One did not exercise a binary choice.*** The decision that Capital One leads with confirms that framework, and identifies when the Covenant applies. *Sunshine Gasoline Distributors, Inc. v. Biscayne Enterprises, Inc.*, 139 So. 3d 978 (Fla. 3d DCA 2014), confined its holding in footnote 1, finding that even when a party has "sole discretion" within a contract, unless it is faced with a binary choice, it must exercise that discretion to protect the parties' reasonable expectations under that contract. *Id.* at 980 n.1 (citing *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1185 (Fla. 2d DCA 2000); *Hyman v. Ocean Optique Distribs., Inc.*, 734 So. 2d 546, 547-48 (Fla. 3d DCA 1999); and *Cox*, 732 So. 2d at 1097-98) (emphasis added). A landlord deciding whether to renew a lease makes a binary choice: renew or do not renew. Capital One did no such thing, and exercised discretion at every step. Capital One had put in place a surveillance operation,

Project Safeguard, that operated for over four years, built an investigative process spanning over seven weeks, selected four transaction categories from a record reaching back to at least 2008, memorialized the result in a memorandum, routed that recommendation through the [redacted] to the [redacted] for approval, with copies to [redacted], *and then made decisions on an account-by-account basis*: 366 accounts closed and 19 kept open, one of them only on the condition that President Trump be removed as a signer. SAC ¶¶ 39-40, 50, 75, 77, 85, 88, 90. A party making a binary choice has no occasion to draw nineteen exceptions to it. Capital One exercised precisely the "broad range of authority" that *Sunshine Gasoline* distinguishes from a simple yes-or-no decision, and identifies as the circumstance in which the duty of good faith protects the parties' reasonable expectations. The Covenant undoubtedly applies here.

***The manner in which Capital One exercised its discretion presents questions of fact.*** *Cox*'s application of the rule disposes of the Motion. The record there showed that an owner/operator contracting exclusively with CSXI could not meet its costs of operation if assigned only low-paying, short-distance shipments, and that CSXI repeatedly failed to assign the longer and more lucrative hauls. On that showing, the court held that "while the appellants have no right under the contracts to any particular method of assignment, issues of fact exist as to whether the manner by which CSXI exercised its discretion in assigning freight to appellants violated the implied duty of good faith, fair dealing and commercial reasonableness." *Cox*, 732 So. 2d at 1098. The court then added the sentence that answers Capital One here: "Certainly, good faith business reasons might support the assignment of loads by CSXI to the appellants." *Id.* The availability of an innocent explanation did not resolve the case. It was the reason the case could not be resolved as a matter of law.

The same follows here, on allegations considerably stronger than those that *Cox* found sufficient. Plaintiffs do not claim a contractual right to any particular method of account review. They allege instead that Capital One reached the closure decision before it assembled the justification, as Capital One's own executives stated; that its own investigators wrote that they would not close "solely on AML reasons"; that a member of the team proposed designating a stale transaction category as "the straw"; that three of the four predicates were transactions Capital One had already examined across four years of dedicated monitoring, and found insufficient to warrant even a question, let alone closure; and that hundreds of accounts with no connection to any cited

transaction were closed regardless. SAC ¶¶ 40-42, 53-56, 91, 93-94. Whether good-faith business reasons might nonetheless support what Capital One did is the question that *Cox* reserved to the trier of fact, and it is not one this Court can resolve on a motion to dismiss.

***Courts in this District enforce the Covenant against a bank's exercise of deposit-agreement discretion.*** A closely analogous case is *In re Checking Account Overdraft Litigation*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010), where depositors alleged that banks used discretion under deposit agreements to sequence transactions so as to maximize overdraft fees. The banks argued, as Capital One does, that the conduct was expressly permitted, and that the Covenant cannot vary express terms, citing *Weaver* among others. *Id.* at 1314-15. The court rejected the banks' argument in terms that apply directly here, finding that the bank's decision "must be carried out as contemplated by the covenant of good faith and fair dealing." *Id*. at 1315.

Plaintiffs make the identical claim here. They do not ask the Court to tell Capital One when it may close an account, but only that the process it invoked be carried out honestly and in good faith, in line with the Covenant. The court also declined to treat permissive language as express authorization, noting that *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1364 (N.D. Ga. 2008), had refused to read a deposit agreement's statement that the bank "may" post items "in any order" as conferring a right to manipulate transactions. *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1316-17. Moreover, the court held that whether the banks acted in good faith was "a question of fact which should be deferred until discovery is taken," cautioning that "[f]actual issues must not be resolved on Motion to Dismiss by the simple expedient of selecting facts asserted by one side over the other as true." *Id.* at 1317. That answers Capital One's request that the Court accept the bank's own characterization of its internal communications as "cherry-picked." Mot. 2. The Motion must be denied.

**B. The Identified Provisions of the Rules Do Not Displace Florida Law.**

Read as a whole, the Rules do not license everything that Capital One chose to do. The Liability section itself limits its protection to the extent "otherwise provided by applicable law," and the Rules must be read so that every provision has meaning. *Fla. Polk Cnty. v. Prison Health Servs., Inc.*, 170 F.3d 1081, 1084 (11th Cir. 1999) (cited at Mot. 8). That reservation preserves obligations imposed by law, independent of the parties' drafting. The Covenant is such an obligation. The exculpatory clause does not do any more work: Florida construes such clauses narrowly and against the drafter, and Capital One's reading would permit a bank to fabricate a

compliance record, and answer *any* resulting claim by pointing to boilerplate language in its own form. That outcome would be untenable and unlawful. Plaintiffs do not contend that any of these provisions independently creates an affirmative duty. SAC ¶ 35. They instead demonstrate that the instrument that Capital One invokes as a shield does not purport to displace the law. Capital One's "circular" label attempts to invert the point: the clause does not create the Covenant; it confirms that the Rules do not displace it.

**C. Federal Law Does Not Displace Plaintiffs' State-Law Claims.**

Plaintiffs assert no claim under the Bank Secrecy Act ("BSA"), and seek to enforce no duty that statute creates. They assert Florida contract and tort claims, and the federal anti-money laundering regime does not displace them. Capital One's authority confirms as much. *FW Distributing, LLC v. J.P. Morgan Chase Bank, N.A.*, 2024 WL 4665255 (S.D. Fla. Nov. 1, 2024), was brought by a non-customer defrauded by the banks' customers, on the theory that the BSA imposed a duty running to it; the court rejected that theory, because the BSA affords no private right of action. *Id.* at *8 n.2; Mot. 9. That holding says nothing about – and certainly does not immunize – conduct independently actionable under state contract or tort law.

Nor does Capital One's argument engage the claim that Plaintiffs actually plead. Plaintiffs do not allege that Capital One was required to produce a suspicious activity report or protected examination material. They allege that the AML predicate itself was manufactured, and nothing in the BSA authorizes a bank to invent a compliance rationale. Judge King rejected a materially identical argument in *In re Checking Account Overdraft Litigation*, holding that a federal regulation authorizing banks to charge overdraft fees "does not authorize banks to ignore general contract or tort law," and noting that the Comptroller's own regulations reserve contracts and torts to the states. 694 F. Supp. 2d at 1313 (citing 12 C.F.R. § 7.4007). The same is true of the federal anti-money laundering regime.

**D. The SAC Pleads the Bad Faith that the Covenant Requires.**

***Plaintiffs plead conscious and deliberate conduct, not negligence or bad judgment.*** The governing standard is settled. A claim lies where the defendant's conduct was "prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012) (quoting *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1318 (M.D. Fla. 2000) (internal citation omitted)). *Shibata* further


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

identifies when such breaches occur, including "when the conduct is undertaken pursuant to a grant of discretion and the scope of that discretion has not been designated." 133 F. Supp. 2d at 1318. In *Resnick*, the claim failed, because the plaintiffs alleged only that the defendant "failed to safeguard" data, and "failed to promptly notify" them, allegations that the Eleventh Circuit read as sounding in negligence; the court noted it did not understand the plaintiffs to allege conscious acts frustrating the agreement's purpose. 693 F.3d at 1329. The SAC alleges extensive conscious acts, SAC ¶¶ 115-116, and it does so with documents: the "final chapter" written before the chapters leading to it; investigators stating on the record that the AML case was not there; a colleague proposing to designate a stale, abandoned project as "the straw"; a team leader reporting that the decisionmaker was "really feeling the pressure"; and a direction to strip detail from the slides before they reached leadership. SAC ¶¶ 53-54, 56, 59-60.

***Plaintiffs plead direct evidence of ulterior motive, and pretext in the alternative.*** Plaintiffs plead bad faith by the most direct route that Florida law recognizes: documentary evidence of Capital One's ulterior motive. The decision that Capital One cites for the pretext standard, *Nat'l Franchisee Ass'n v. Burger King Corp.*, 2010 WL 4811912 (S.D. Fla. Nov. 19, 2010), identifies two routes: (1) allege facts identifying defendant's improper ulterior motives, or (2) in place of direct evidence, allege facts indicating that defendant's stated purpose is merely pretext. *Id.* at *4 (internal citation omitted).

Plaintiffs take the first route. The External Affairs Presentation pressuring executives and identifying Capital One by logo among the last companies still tied to President Trump, the "agenda related" directive, the observation that "every corner of the bank is looking into this," and the report that the decisionmaker was "really feeling the pressure" are direct evidence of the bad faith plan to debank. SAC ¶¶ 59, 63, 68-69. Those are not merely facts from which pretext may be inferred. They are contemporaneous evidence of a motive distinct from the AML rationale Capital One ultimately invoked. That is precisely the kind of bad faith *National Franchisee* describes: "a subterfuge or evasion of contractual duties" in which a party "claims to be exercising a power for the purposes defined in the contract" while "in fact using that power to achieve some other purpose." *Id.* at *3. That is the two-track allegation, exactly.

Plaintiffs also satisfy the second route. Capital One says the pretext standard cannot be met, because it never gave Plaintiffs a stated purpose. Mot. 10. But it had one, memorialized in writing, and confirmed under oath. SAC ¶¶ 75, 80, 82. Capital One's position would reward the


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

defendant who conceals its rationale over the one who discloses it. And *National Franchisee's* remaining requirement — injury severe enough to deprive the plaintiff of "whatever benefits the plaintiff could have reasonably expected under the contract," *id.* at *4 — is met here in a more significant way than it was in *National Franchisee*. The franchisees alleged lost margin on only two menu items. Plaintiffs allege the total destruction of a decade-long banking relationship across 366 accounts, disruption of ongoing business operations, inability to access deposited funds, costs associated with establishing replacement banking relationships, loss of favorable banking terms and conditions, and reputational harm, including a demand that the Trust move approximately $170 million within twenty-four hours. SAC ¶¶ 28, 85, 95-96.

***Florida public policy bears directly on the good-faith inquiry.*** Capital One's own authority makes public policy relevant to whether a contractual termination power may be exercised in bad faith. *Coira v. Florida Medical Ass'n*, 429 So. 2d 23, 24 (Fla. 3d DCA 1983), holds that a terminating party's bad-faith motive is immaterial only where that motive is not alleged to conflict with state public policy. The Motion deceptively quotes the holding with the condition removed: "[a]ny bad faith motives . . . are immaterial . . . where the contract . . . provides that either party may cancel it upon furnishing proper notice." Mot. 9-10 (quoting *Coira*, 429 So. 2d at 24). The passage reads, in full:

> [W]ith respect to Dr. Davidson, any bad faith motives for cancelling his policy are immaterial where it is not alleged that these motives conflict with the public policy of the state, *compare L'Orange v. Medical Protective Co.*, 394 F.2d 57 (6th Cir. 1968), and where the contract of insurance provides that either party may cancel it upon furnishing proper notice.

*Coira*, 429 So. 2d at 24. The condition is conjunctive, and the Eleventh Circuit has reproduced the passage in full, including it. *Weaver*, 169 F.3d at 1317. The "compare" signal points to *L'Orange*, where an insurer cancelled a physician's malpractice policy, because he had testified against another physician, a motive that did offend public policy. *Coira*, thus, actually supplies the framework that Plaintiffs invoke: a discretionary termination is insulated from scrutiny only when the alleged motive is one the State has not condemned. That is not the case here.

Florida has now spoken directly to the practice alleged here. The Legislature has declared it "an unsafe and unsound practice for a financial institution to deny, cancel, suspend, or terminate its services to a person ... on the basis of ... [t]he person's political opinions, speech, or affiliations," and equally an unsafe and unsound practice to do so on the basis of "[a]ny factor if it is not a

quantitative, impartial, and risk-based standard." Fla. Stat. § 655.0323(2)(a), (c). Determinations to deny services must rest on "an analysis of risk factors unique to each current or prospective customer." *Id.* § 655.0323(1). The statute expressly contemplates the maneuver alleged here: where an institution reports that it acted "due to suspicious activity," the regulator must determine whether the action "was taken without any basis" and, if so, "continue to investigate" whether the institution discriminated on political grounds. *Id.* § 655.0323(5)(c).

Plaintiffs acknowledge that the statute postdates the 2021 closures, and creates no private right of action, and they assert no such claim under it. The statute is cited for a different and narrower purpose: it is an authoritative declaration of this State's public policy condemning the precise motive and actions by Capital One presented here. The statute reflects the policy judgment against which Capital One's exercise of its contractual discretion can properly be evaluated. That is the only purpose that *Coira* requires. Capital One cannot invoke *Coira*, while omitting the condition that makes it inapplicable. The condition is satisfied here as a matter of record, not argument: this Court has already held that Plaintiffs "have done just barely enough to state a claim of political discrimination." Tr. 11:15-16.

## II. Count II States a Claim for Fraudulent Concealment.

Count II alleges that Capital One created an internal rationale for closing Plaintiffs' accounts, acted on that rationale, and then concealed it from the very customers whose accounts it closed, depriving them of any ability to answer false and contrived charges that they never knew had been leveled. Capital One's characterization of the claim as one for a mere explanation, Mot. 11-17, does not engage with what is pleaded.

### A. The SAC Pleads Every Element of Fraudulent Concealment.

***Capital One's own undertaking gave rise to a duty to disclose.*** Capital One did not simply remain silent. It prepared a lengthy memorandum, identifying four transaction categories, SAC ¶¶ 39, 75; circulated that memorandum to [redacted], SAC ¶ 77; obtained approval to close 366 accounts based upon it; directed that detail be stripped from the supporting materials before they reached leadership, SAC ¶ 60; issued form letters that disclosed nothing; and maintained a policy of never divulging "the cause for closure to customers," SAC ¶¶ 86-87. Concealment of a rationale that a party has created and relied upon is conduct, not silence.

Florida recognizes the distinction, declining to find fraud where "there was no active concealment and a party with the exercise of due diligence could have discovered the facts." *W.*


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

*Brook Isles Partner's 1, LLC v. Com. Land Title Ins. Co.*, 163 So. 3d 635, 639 (Fla. 2d DCA 2015) (quoted in *Garrett-Alfred v. Facebook, Inc.*, 540 F. Supp. 3d 1129, 1139 (M.D. Fla. 2021)). Both predicates are absent here: the concealment was active, and no diligence would have revealed a memorandum that lived only on Capital One's internal systems.

The duty to disclose here arises not from the status of the banking relationship, but from Capital One's own undertaking. Florida law is that "when a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed." *Cont'l Gen. Ins. Co. v. Gardina*, 773 F. Supp. 3d 1294, 1303 (M.D. Fla. 2025) (cited at Mot. 12 n.5). *Accord Ramel v. Chasebrook Constr. Co.*, 135 So. 2d 876, 882 (Fla. 2d DCA 1961) (a party owing no duty to speak must nonetheless "disclose the whole truth" if "he undertakes to do so"); *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003) (same).

Capital One did speak. It sent letters terminating the relationship, and those letters conveyed, by their form and by their silence, that the closures were an unremarkable exercise of contractual discretion. That was untrue, and Capital One knew it was so, having spent two months falsely building the record that purportedly said otherwise. Capital One's contrary authorities address the status of relationships, rather than the consequences of conduct. *Garrett-Alfred* held that content moderators pleaded "no duty ... or any special relationship," and identified nothing that their employer had done to assume one. 540 F. Supp. 3d at 1139. Here, Plaintiffs plainly identify the actions of Capital One.

Plaintiffs do not ask the Court to hold that banks must explain every business decision, only that a bank which closes 366 accounts on the supposed strength of four specific transactions cannot conceal those transactions from the account holders who could have explained them.

***Material facts were concealed, and the concealment is pleaded with particularity.*** The SAC pleads the who, what, when, where, and how. It identifies the concealed material precisely: the February 24, 2021, memorandum; the four transaction categories; that those categories were supposedly the sole basis for closure; the absence of any non-AML reason; that the conclusion preceded the justification; that the bank's own investigators rejected the AML basis; and that most Plaintiffs had no connection to any cited transaction. SAC ¶ 142. It identifies the who ([redacted]), the when (February 24 and 25, and March 8, 2021), and the how (form letters disclosing nothing, coupled with a policy of nondisclosure). SAC ¶¶ 75, 77, 86-87, 145. In addition, it identifies what Capital One obtained:

the ability to execute a politically driven mass closure without ever defending its stated rationale to anyone whose accounts it closed.

The contrast with the authority that Capital One invokes is complete. In *Garrett-Alfred*, the plaintiffs identified no specific concealed material, no report and no document, and failed to identify "who should have warned them, when they should have been warned, and where." 540 F. Supp. 3d at 1138-39. The danger that they alleged was also publicly known and discoverable through ordinary diligence. *Id*. at 1139. Here, the concealed material is a specific internal memorandum that existed only on Capital One's systems, and no measure of diligence would have revealed it to Plaintiffs.

***Capital One knew disclosure would induce forbearance, as its own authority states the element.*** Quoting *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1196 (S.D. Fla. 2017), the Motion recites that a defendant must have "[known] that its concealment or non-disclosure would induce the plaintiff to act *or refrain from acting*." Mot. 11. Capital One, thus, states the governing element disjunctively, and Plaintiffs plead the second branch of it.

***Plaintiffs plead reliance.*** Plaintiffs plead reliance by identifying what they would have done differently had Capital One disclosed the purported AML basis on which it was acting. SAC ¶ 152. That is what Florida law requires. Reliance in a concealment case is measured by causal connection, not by whether the plaintiff was induced to enter a transaction. Applying Restatement (Second) of Torts sections 546 and 547, the Third District has framed the question as whether the plaintiff's reliance was "a substantial factor in determining the course of conduct that results in his loss." *Stev-Mar, Inc. v. Matvejs*, 678 So. 2d 834, 838 (Fla. 3d DCA 1996) (quoting Restatement (Second) of Torts section 546). The comment explains that a defendant's misrepresentation may have caused the plaintiff's pecuniary losses if that misrepresentation was a substantial factor in plaintiff's decision. *Id*. (quoting Restatement (Second) of Torts section 546 cmt. b). Florida courts have repeatedly adopted the Restatement's framework in this area. *See Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 339 (Fla. 1997); *Besett v. Basnett*, 389 So. 2d 995, 997 (Fla. 1980).

The Fourth District has applied that same framework to forbearance. In *Hollywood Lakes Country Club, Inc. v. Community Ass'n Services, Inc.*, 770 So. 2d 716 (Fla. 4th DCA 2000), a management company represented to a developer that it was collecting and enforcing community assessments, "causing the developer to refrain from independently acting to collect assessments," leaving the developer liable for the resulting shortfall. *Id*. at 718. The trial court dismissed the


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

fraud count. The Fourth District reversed, holding the complaint "include[d] all of the necessary allegations to state a cause of action for fraud." *Id*. The reliance there did not consist of entering a transaction. The parties were already in a relationship, and the forbearance occurred during its performance. That is the posture here, and it is the posture in which the Fourth District found a claim adequately pleaded.

Neither of Capital One's reliance authorities supplies a contrary rule. *Humana, Inc. v. Castillo*, 728 So. 2d 261 (Fla. 2d DCA 1999), is a class certification decision holding that certification was improper under Florida Rule of Civil Procedure 1.220 and *Lance v. Wade*, 457 So. 2d 1008 (Fla. 1984), because reliance is individualized, and common questions, therefore, could not predominate. *Id.* at 265-66. Its reference to a plaintiff who "would not have entered the transaction" reflects that case's posture, *i.e.,* fraudulent inducement into an HMO enrollment, and, read as Capital One reads it, the formulation would wrongly contradict *Stev-Mar*, which holds it is "not even necessary" that the plaintiff would have acted or refrained from acting differently absent the misrepresentation. 678 So. 2d at 838. The principle common to both decisions is causal connection, which *Humana* itself states. *Id.* at 265. *Vital Pharmaceuticals, Inc. v. Balboa Capital Corp.*, 2016 WL 4479370 (S.D. Fla. Aug. 26, 2016), is even further afield: it was decided on summary judgment, applied California law to the Covenant, and rejected the fraud claims, because the plaintiffs claimed reliance on a purchase option that the lease expressly contradicted. *Id.* at *5-7. Plaintiffs do not claim reliance on any representation that the Rules contradict.

Measured against that standard, the SAC pleads reliance with specificity. The operative inquiry is what Plaintiffs would have done differently had the false AML basis been disclosed. *Cf. Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n*, 232 So. 3d 502, 506-07 (Fla. 1st DCA 2017) (reversing judgment because plaintiff offered no evidence that its damages "resulted from its action or inaction attributed to any reliance," and no evidence of "what the Association would have done differently"). The SAC answers that inquiry with concrete, verifiable propositions, rather than unrecorded intentions. Plaintiffs allege they would have explained the transactions at issue with facts ascertainable from the accounts themselves; explained the transactions that Capital One had already reviewed and cleared across four years of monitoring; challenged the recommendation before execution by identifying the staleness of those predicates, as well as the absence of any connection between most of Plaintiffs' accounts and the four cited categories; sought emergency injunctive relief; and taken steps to mitigate the operational and


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

reputational consequences of a 366-account closure. SAC ¶ 152. Whether any of those responses would have succeeded is a merits question. That the concealment foreclosed them is pleaded—as conduct rather than as a state of mind.

***Plaintiffs plead causation.*** Count II does not seek the damages flowing from the closures themselves. It seeks the harm attributable to Plaintiffs' inability to respond, challenge, or mitigate at the time the closures occurred. SAC ¶¶ 151, 155. Capital One's contention, that the harms flow from the closures rather than the silence, Mot. 16, therefore answers a claim for damages that Plaintiffs do not assert in this Count.

### B. Count II Rests on Conduct and Damages Independent of the Contract Claim.

The wrongs alleged in Counts I and II are distinct. The contractual wrong is the dishonest performance of the closure process. The tortious wrong is the affirmative concealment of that process from Plaintiffs. Capital One could have committed the first without the second: it could have wrongfully terminated the accounts and identified the four transactions that concerned it. It chose not to. The damages diverge, as well. Count I seeks losses flowing from a bad-faith closure; Count II seeks losses flowing from Plaintiffs' inability to contest or mitigate that closure at the time. SAC ¶¶ 138, 155. Capital One's lead authority does not reach these allegations: *Ginsberg v. Lennar Florida Holdings, Inc.*, 645 So. 2d 490 (Fla. 3d DCA 1994), rests on the economic loss rule as it stood before *Tiara Condominium Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399, 400, 407 (Fla. 2013), which limited that rule "to products liability cases," and receded from contrary authority. In any event, Rule 8(d) permits pleading in the alternative. *Mazer*, 556 F.3d at 1273-74.

## III. Count III States a Claim for Declaratory Relief.

### A. The Declarations Sought Address a Prohibition That Operates Today.

Capital One's February 25, 2021, cover memorandum states that Plaintiffs "will be subject to controls intended to prohibit them from opening **and maintaining any Capital One accounts going forward.**" SAC ¶ 159 (emphasis added). Capital One has never withdrawn that prohibition, and does not disclaim it in its Motion. A permanent bar operating today is not past conduct. It is the present state of the parties' relationship, imposed unilaterally, and grounded, by its own terms, on the false AML characterization that Plaintiffs allege was fabricated. That is what the Court directed Plaintiffs to plead. Tr. 14:24-15:5. A bar operating today establishes "a substantial likelihood" of future injury, *Bowen v. First Fam. Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir.


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

2000) (cited at Tr. 13:11-16), and so is unlike the conduct in *Malowney*, where nothing suggested recurrence. 193 F.3d 1342, 1347 (11th Cir. 1999).

Capital One's rejoinder is that Plaintiffs have not asked to be reinstated. Mot. 18-19. However, a demand is not required where it would be futile, and Capital One's own document supplies the futility: the bar is prospective and categorical, and no opportunity to cure was offered. SAC ¶¶ 166-168. Cynically, Capital One does not represent that it would entertain such a request; it argues only that none was made.

### B. The SAC Alleges a Live and Immediate Controversy.

The injury is the characterization itself, not its publication. Capital One continues to falsely assert, in this Court and under oath, that Plaintiffs' accounts were closed for anti-money laundering reasons. SAC ¶¶ 170-172. That assertion is live and contested, and an AML-based closure by a national bank is a recognized risk marker in onboarding at other institutions, which routinely inquire about prior closures. SAC ¶¶ 174-176. Capital One's contention that reputational injury is unavailable because it never publicized the rationale, Mot. 19-20, mistakes the nature of the harm.

## IV. In the Alternative, Any Deficiency Should Be Cured by Amendment.

If the Court concludes that any count requires further development, dismissal with prejudice would be inappropriate. Discovery was limited to a 90-day period, and merits discovery has not occurred. Plaintiffs request leave to amend in the event of any dismissal.

## CONCLUSION

Capital One wrongly asks this Court to hold that the words "any or no reason" in a form deposit agreement place beyond judicial review a two-month campaign in which a national bank overrode its own investigators, resurrected transactions it had already cleared, drafted its conclusion before its evidence, coordinated with and was led by its media-relations function, closed hundreds of accounts belonging to businesses it never accused of anything, and concealed all of it behind letters that said nothing. No case that Capital One cites comes close to compelling that result. The Motion should be denied.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Plaintiffs respectfully request oral argument to adjudicate Defendant's Motion to Dismiss the Second Amended Complaint. Oral argument will assist the Court in addressing the application of the implied covenant of good faith and fair dealing to


**Brito, PLLC**
2121 Ponce de Leon Boulevard, Suite 650 │ Coral Gables, Florida 33134
Telephone: (305) 614-4071

Capital One's documented internal closure process, the alleged concealment, and the ongoing and present dispute requiring declaratory relief. Plaintiffs request one hour for oral argument.

Dated: August 21, 2026

Respectfully submitted,

**BRITO, PLLC**
*Counsel for Plaintiffs*
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office: 305-614-4071
Fax: 305-440-4385

By: /s/ *Michael O. Mena*
**ALEJANDRO BRITO**
Florida Bar No. 098442
Primary: abrito@britopllc.com
Secondary: apiriou@britopllc.com
**MICHAEL O. MENA**
Florida Bar No. 010664
Primary: mmena@britopllc.com
**IAN MICHAEL CORP**
Florida Bar No. 1010943
Primary: icorp@britopllc.com
Secondary: chernandez@britopllc.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed on August 21, 2026, through the Court's CM/ECF Filing Portal upon:

**Debevoise & Plimpton, LLP**
Helen Cantwell, Esq.
Susan Reagan Gittes, Esq.
Erich O. Grosz, Esq.
66 Hudson Boulevard
New York, New York 10001
hcantwell@debevoise.com
srgittes@debevoise.com
eogrosz@debevoise.com

*Counsel for Defendant*

**Gelber Schachter & Greenberg, P.A.**
Adam Schachter, Esq.
Gerald Greenberg, Esq.
Shane Grannum, Esq.
1 SE 3rd Avenue, Suite 2600
Miami, Florida 33131
aschachter@gsgpa.com
ggreenberg@gsgpa.com
sgrannum@gsgpa.com

*Co-counsel for Defendant*

By: /s/ *Michael O. Mena*